The Honorable David G. Estudillo

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| ELIAS PEÑA, ISAIAH HUTSON, and RAY ALANIS, | Case No.: 3:21-CV-05411-DGE |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANT CLARK COUNTY'S MOTION FOR SUMMARY JUDGMENT DISMISSAL** |
| vs. | |
| CLARK COUNTY, WASHINGTON, | Noted for Hearing: March 10, 2023 |
| Defendant. | **Oral Argument Requested** |

# TABLE OF CONTENTS

I.      INTRODUCTION……………………………………………………………7

II.     STATEMENT OF FACTS…………………………………………………...7

   A. The Discrimination and Harassment Started Shortly After Hire………………..8

   B. The Harassment Continued After Plaintiffs Transferred to Other Units…………9

   C. The Continuing Harassment Included Derogatory, Discriminatory Language……9

   D. The Harassment Included Heightened Scrutiny from Supervisors………………10

   E. Plaintiffs Had to File Formal Complaints to Receive the Same Treatment as White
      Employees………………………………………………………………………...12

   F. Clark County's Human Resources Department Refused to Acknowledge the
      Pattern of Harassment and Hostile Work Environment, and Dismissed, Slow-
      Walked or Ineffectively Handled Complaints……………………………….........13

   G. Supervisors Dissuaded Complaints About Harassment and Retaliated against
      Plaintiffs for Complaining…………………………………………………………..15

   H. The Harassment and Discrimination Has Not Diminished after Plaintiffs Filed this
      Lawsuit……………………………………………………………………………17

III.    LEGAL STANDARD………………………………………………………18

IV.     ARGUMENT………………………………………………………………...19

   **A. Plaintiffs' Claims Are Timely………………………………………………19**

   **B. Plaintiffs Have Established a *Prima Facie* Case of Hostile Work
      Environment………………………………………………………………...19**

      **1. Plaintiffs are Subjected to Slurs, Insults, and Jokes Because of Their Race
         or National Origin………………………………………………………...20**

      **2. There is Sufficient Evidence for a Jury to Find that Clark County's
         Discriminatory Conduct is Severe or Pervasive…………………………20**

      **3. Plaintiffs' Work Environment is Subjectively and Objectively
         Hostile……………………………………………………………………...21**

      **4. Clark County is Liable for the Hostile Work Environment Created by its
         Supervisors……………………………………………………………......22**

         **a. *Clark County is Liable for Supervisor Harassment*…………………22**

            **i. *Clark County Superintendents and Crew Chiefs Are
               Supervisors*……………………………………………………22**

ii.  *Clark County Superintendents and Crew Chiefs Engaged in Tangible Employment Actions Against Plaintiffs*……………..24

iii.  *Clark County Cannot Avail Itself of an Affirmative Defense*…24

iv.  *Plaintiffs Can Establish a Prima Facie Retaliation Case*.........25

b.  ***Clark County is Liable for Co-Worker Harassment***………………..25

C.  **Clark County is Liable for a Hostile Work Environment under the Washington Law Against Discrimination, RCW § 49.60.030 *et seq***……..........26

D.  **The Evidence Construed in Favor of Plaintiffs Supports a Case of Disparate Treatment and Equal Protection** ………………………………………........27

E.  **Plaintiffs Are Entitled to Punitive Damages Against Clark County**…………29

V.  **CONCLUSION**………………………………………………………………29

**PLAINTIFFS' OPPOSITION TO DEFENDANT CLARK COUNTY'S MOTION FOR SUMMARY JUDGMENT DISMISSAL**, CASE NO. 3:21-CV-05411-DGE

3

# TABLE OF AUTHORITIES

Page(s)

Cases

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970) ......................................................................................................... 19

*Anderson v.  Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...........................................................................................7, 18, 19

*Broth. of Teamsters v. U.S.*,
   431 U.S. 324 (1977) ......................................................................................................... 28

*Burlington Ind. v. Ellerth*,
   524 U.S. 742 (1998) .................................................................................................. 22, 24

*Burrell v. Start Nursery*, Inc.,
   170 F.3d 951 (9th Cir. 1999) ......................................................................................... 25

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ......................................................................................................... 19

*Chuang v. Univ. of Cal. Davis*,
   225 F.3d 1115 (9th Cir. 2000) ....................................................................................... 18

*City of Newport v. Fact Concerts, Inc.*,
   453 U.S. 247 (1981) ......................................................................................................... 29

*Durham Life Ins. Co. v. Evans*,
   166 F.3d 139 (3rd 1999) ................................................................................................. 24

*EEOC v. Management Hosp. of Racine*,
   666 F.3d 422 (7th Cir. 2012) ......................................................................................... 24

*El-Hakem v. BJY, Inc.*,
   415 F.3d 1068 1074 n. 2 (9th Cir. 2005) .................................................................... 22

*Faragher v. City of Boca Raton*,
   524 U.S. 775 (1998) .................................................................................................. 22, 24

*Fried v. Wynn Las Vegas*,
   18 F.4th 643 (9th Cir. 2021) .......................................................................................... 19

*Fuller v. City of Oakland, Cal.*,
   47 F.3d 1522 (9th Cir. 1995) ......................................................................................... 20

*Glasgow v. Georgia-Pacific Corp.*,

103 Wash.2d 401 (1985) ........................................................................... 26, 27

*Godwin v. Hunt Wesson, Inc.*,
150 F.3d 1217 (9th Cir. 1998) ...................................................................... 28

*Hailey v. City of Camden*,
631 F. Supp. 2d 528 (D. N.J. 2009) ............................................................. 29

*Hargett v. NYC Transit Authority*,
640 F. Supp. 2d 450 (S.D.N.Y. 2009) .......................................................... 30

*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993) ................................................................................. 20, 21

*Hawn v. Executive Jet Management, Inc.*,
615 F.3d 1151 (9th Cir. 2010) ..................................................................... 28

*Hunt v. Cromartie*,
526 U.S. 541 (1999) ...................................................................................... 18

*Jones v. R.R. Donnelley & Sons Co.*,
541 U.S. 369 (2004) ...................................................................................... 19

*Jones v. Rabanco, Ltd.*,
439 F. Supp. 2d 1149 (W.D. Wash. 2006) .................................................... 20

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ........................................................................ 29

*Loeffelholz v. University of Washington*,
175 Wash.2d 264 (2012) ............................................................................... 26

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*,
263 F.3d 208 (2nd Cir. 2001) ....................................................................... 24

*Manatt v. Bank of America NA*,
339 F.3d 792 (9th Cir. 2003) ........................................................................ 28

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ...................................................................................... 28

*McGinest v. GTE Serv. Corp.*,
360 F.3d 1103 (9th Cir. 2004) ...................................................................... 18

*Meritor Sav. Bank, FSB v. Vinson*,
477 U.S 57 (1986) ......................................................................................... 24

*National R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) ...................................................................................... 19

*Nichols v. Azteca Rest. Enters., Inc.*,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

256 F.3d 864 (9th Cir. 2001) ........................................................................ 20, 22

*Nnachi v. City and County of San Francisco,*
2014 WL 4088149 (N.D. Cal. Aug. 19, 2014) ................................................ 29

*Reynaga v. Roseburg Forest Prods.,*
847 F.3d 678 (9th Cir. 2010) ........................................................................ 27

*Rhodes v. Ill. Dep't of Transp.,*
359 F.3d 498 (7th Cir. 2004) ........................................................................ 23

*Robles v. Agreserves, Inc.,*
158 F. Supp. 3d 952 (E.D. Cal. 2016) .......................................................... 21

*Rosenbaum v. City & City of San Francisco,*
484 F.3d 1142 (9th Cir. 2007) ...................................................................... 29

*Schnidrig v. Columbia Mach., Inc.,*
80 F.3d 1406 (9th Cir. 1996) ........................................................................ 27

*Steiner v. Showboat Operating Co.,*
25 F.3d 1459 (9th Cir. 1994) ........................................................................ 21

*Storey v. Burns Intern. Sec. Servs.,*
390 F.3d 760 (3rd Cir. 2004) ........................................................................ 24

*Vance v. Ball State Univ.,*
570 U.S. 421 (2013) ............................................................................. 22, 23, 24

*Vasquez v. County of Los Angeles,*
349 F.3d 634 (9th Cir. 2003) .................................................................. 20, 24

*Washington v. Boeing Co.,*
105 Wash. App. 1 (2001) .............................................................................. 28

Statutes

RCW § 49.60.030 ................................................................................................ 26

Rules

Fed. R. Civ. P. 56(a) ......................................................................................... 18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### INTRODUCTION

This is a hostile work environment and disparate treatment case. Plaintiffs Elias Pena, Isaiah Hutson, and Ray Alanis ("Plaintiffs") are Latinos whose hard work on the roads maintenance crews for Clark County has been recognized with performance awards and praise by supervisors. Lozada Declaration; **Exhibit R**, Young 50:14-25; **Exhibit H**, Smith 50:13-52:4; **Exhibit N**, Griswold 12:2-9; **Exhibit G**, Waggoner 109:3-9.[1] Despite Plaintiffs' best efforts to do their jobs well, Clark County's managers, supervisors, and personnel harassed them with anti-Latino and racially discriminatory remarks and conduct over the course of many years. When Plaintiffs sought assistance from Clark County management to remedy and prevent further harassment, Clark County managers and supervisors ignored Plaintiffs' claims, and increasingly scrutinized their work performance, continued to harass and discriminate against them, and denied them equivalent compensation and opportunities for additional work and promotion. Plaintiffs continue to work for Clark County and suffer the injury of working in a racially hostile and abusive environment.

Clark County's motion for summary judgment fails because: (1) The evidence establishes a *prima facie* case for hostile work environment; (2) The evidence establishes a *prima facie* case for disparate treatment; and (3) Clark County misrepresents the facts and testimony in a desperate attempt to support its claims that there are no genuine issues of material fact that require resolution by a fact finder at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Simply put, Clark County has failed to meet its burden to show that no reasonable jury could return a verdict for Plaintiffs. Clark County's motion for summary judgment must be denied.

### STATEMENT OF FACTS

Accepting as true all well-pleaded facts, and construing all evidence in favor of Plaintiffs' claims, multiple questions of fact must be resolved by the jury as to whether Plaintiffs experienced a hostile work environment as a group and individually throughout their employment. Clark County attempts to isolate several incidents as discrete moments of discrimination, but the record establishes an ongoing hostile work environment. The following facts from the record amount to only a small fraction of the evidence supporting Plaintiffs' claims of ongoing discriminatory

---

[1] Cites refer to exhibits described in Lozada Declaration.

treatment.

A.  The Discrimination and Harassment Started Shortly After Hire

Clark County hired Ray Alanis in 2014, Isaiah Hutson in June 2016, and Elias Pena in mid-2017. **Exhibit A**, Alanis 9:23-24, 10:6-8; **Exhibit B**, Hutson 10:14-19; **Exhibit C**, Pena 41:5-13.

Isaiah Hutson experienced discrimination as early as June 2016 when he started at the Finn Hill Shed location. Hutson 54:6-24. In 2016, co-worker Richard Harris told Hutson that he admired Hitler. Hutson 78:18-79:13. Harris threatened violence directly and indirectly to Hutson. For example, he boasted that in his previous employment he sabotaged the equipment of Mexican co-workers, and threw things off roofs to injure them because he did not believe they belonged on his jobsite. Hutson 54:3-13, 79:14-80:11, 83:17-84:14. Harris tried to harm Hutson by cutting a tree branch that nearly hit him. Hutson 81:14-82:5, 85:5-8. Harris regularly yelled at Hutson when he temporarily served as crew chief of the Finn Hill crew, but he did not yell at White employees. Hutson 82:12-15.

In May 2017, co-worker Gage Bryant overheard Harris say that, "the county is going to shit because it's hiring all these beaners and spics." Hutson 86:11-19. Throughout this whole period that Hutson worked with Harris, Harris made hateful remarks about Mexicans and mistreated Hutson. Hutson 86:2-87:12, 96:3-97:21. Hutson did not complain at the time because he understood the culture in the Roads Division was that employees should avoid trouble by not complaining. That culture exists to this day. *See* **Exhibit D**, Martinez 22:24-25 ("[I]f somebody complains, I just try to ignore it and go the other direction"); **Exhibit E**, Perez 19:10-11 ("I usually try to stay away from any kind of drama" and stuff like that"); **Exhibit F**, Morales 8:21-24 ("I probably shouldn't say stuff. Because if it gets back to them that said I stuff like this, you know, they – they like to put targets on people"); **Exhibit T**, Flores 19:19-21 (I'm afraid that I'm going to say something that is not correct and I'm going to get in trouble.").

In August 2017, Hutson heard Crew Chief Nick Eiesland, say "they're building a wall around Finn Hill, kicking the Mexicans out." Hutson 92:23-93:11. The comment referred to Hutson and Elias Pena transferring out of the Finn Hill Shed. Hutson 92:23-93:18; 134:20-135:14. Pena, who worked alongside Hutson and Eiesland at the time, also heard the comment. Pena 84:20-85:13.

B.  The Harassment Continued After Plaintiffs Transferred to Other Units

Shortly thereafter, Hutson transferred to drainage crew. His direct supervisor was his former co-worker Richard Harris, who had been promoted to crew chief. Hutson 56:6-16. Harris did not stop harassing Hutson after he became a crew chief.  Hutson 92:9-22. Hutson, fearing for his safety, reported Harris' comments and discriminatory conduct to Superintendent Timothy Waggoner in October 2017.  Hutson 90:5-10, 92:9-22, 94:7-96:25. Instead of investigating his complaint, Waggoner told Hutson, "I think you're the problem." Alanis 105:9-13.  Hutson told Waggoner about Harris's racist remarks, including "beaners and spics" and "the county is going to shit, ever since they started hiring them." Alanis 106:14-19. Waggoner responded that Harris would not say those things and attacked Hutson. Hutson 103:4-19; Alanis 105:9-13.  Waggoner failed to report Hutson's complaints. Waggoner 100:1-5. Waggoner testified he did not believe that Hutson's claims about Harris constituted discrimination or harassment because he did not hear the remarks. Waggoner 124:5-14. In summer 2018, Hutson confided in co-worker Clayton Tikka about Harris' racial discrimination and Waggoner's failure to investigate. **Exhibit X**, Tikka Decl. ¶ 8.

After Hutson complained to him, Waggoner targeted Hutson. He unreasonably demanded that Hutson improve his performance and target goals on the vactor truck, and he scrutinized Hutson's work. He did not reprimand vactor operators Darrell Young and Norm Malboro, who had similar performance numbers. Hutson 104:12-105:25; **Exhibit T**, Weiker 16:17-17:13. Waggoner and Harris refused to confirm whether Hutson was scheduled to work one weekend, putting him at risk of termination. Hutson 107:5-11, 109:6-18. When Hutson showed up to the job site to make sure he was not scheduled, Waggoner accused him of taking advantage of overtime pay.  Hutson 111:2-22; Smith, 52:11-53:24.

C.  The Continuing Harassment Included Derogatory, Discriminatory Language

Plaintiffs have heard the following comments on the work site: "beaners and spics;" "the landscaping crew;" "manuel [sic] labor;" Latinos referred to as "cancers;" "the county needs to cut out the cancers here at Clark County and we're working on it;" "keep the brown down." Alanis 98:15-99:3; Morales 7:11-13; Perez 22:14-19. Alanis understands "keep the brown down" to mean Latinos are barred from certain positions. Alanis 13:2-6. Union Vice-President Clayton Tikka

confirmed that, since 2018, Plaintiffs have complained of discriminatory language and harassment against them, including but not limited to: Crew Chief John May referring to Latinos as "cancers" that have to be "cut out;" Crew Chief Richard Harris' mistreatment of Isaiah Hutson; Superintendent Timothy Waggoner failing to investigate and correct Harris' behavior; and Crew Chief Nick Eiesland (later promoted to superintendent) making  discriminatory comments aimed at Isidoro Flores about whether Latino landscaping crews were his family members. *See* Tikka Decl. at ¶ 5, 7–8.

In 2018, Pena worked together with Hutson and Alanis at the Mabry Shed. Pena 81:7-82:17. Pena heard co-workers say "there goes manuel labor" and other anti-Latino comments. Pena 160:18-161:3; Morales 41:9-18. Crew Chief John May and other employees said that a "white master" oversaw Plaintiffs when they worked together. Pena 163:6-15; 164:2-7. May also said, when looking at Pena, "I'm working on getting rid of these cancers." Pena 164:19-165:10; Tikka Decl. ¶ 5.

Plaintiffs continued to hear remarks during their employment. For example, during summer 2019 or 2020, Hutson heard co-worker Jeff Kajava, in front of Brandon Pilot, John May and Richard Harris, say "It's a good day in the County boys, cops are killing n***ers and Trump is kicking out the Mexicans." Hutson 114:7-115:5; Alanis 213:9-21. Hutson spoke to Isidoro Flores, who confirmed that he heard the same remark. Hutson 115:17-116:2. Kajava was known to also make vulgar and sexual jokes. **Exhibit U**, Nichols 19:20-20:21.

D. The Harassment Included Heightened Scrutiny from Supervisors

Pena, Hutson and Alanis regularly sought to volunteer to serve as acting crew chief, a position akin to a first line supervisor, when they worked at the Mabry Shed together. Crew Chief Marc Smith confirmed that Waggoner did not like Plaintiffs serving as crew chief and would ask, "why do these people fill in as crew chief?" Smith 76:16-81:15; 87:18-90:13. Waggoner did not have a problem with White employee Kenny Hugo serving, despite Hugo's substance abuse issues and erratic behavior. Smith 82:15-85:7.

Like Hutson, Alanis experienced constant harassment by Superintendent Timothy Waggoner. In 2018, Alanis transferred to the Sign Shop reporting directly to Matt Griswold. Alanis

49:16-20, 55:13-57:11. Matt Griswold approved his personal time off (PTO). Alanis 49:16-23. Around 2018, Alanis took PTO, only to have Waggoner call him and yell at him for taking time off. Waggoner reprimanded Alanis for not seeking permission for PTO from him. Alanis 50:21-24. Waggoner said, "I sign your time sheet." Alanis answered "I don't know what's going on. I got it approved by my current superintendent [Griswold]." Alanis 51:2-7. Waggoner had not denied PTO for any White employee. Alanis 51:17-20, 229:17-20.

Since 2019, Alanis has worked at the Salmon Creek Shed, where he has filled in as crew chief. 5:11-6:9, 36:5-7. Waggoner regularly yelled at Alanis when he served as crew chief. Alanis 90:11-17. Waggoner also scrutinized Alanis' work. For example, in 2019, Alanis worked with Micah Passmore operating the vactor truck. Waggoner yelled at and reprimanded Alanis for not wearing a headset. Alanis 64:5-24. Alanis recalled that he "could hear [Waggoner] screaming at me with my earplugs on." Alanis 69:3-5. Harris saw Waggoner yell at Alanis during the incident. Harris 101:21-104:11. Waggoner did not yell at Passmore for not wearing the headset. Alanis 230:4-14. Micah Passmore confirmed that the previous operator failed to notify him and Alanis about wearing a headset, and when Passmore walked away from Waggoner to retrieve the headset, Waggoner did not reprimand him. **Exhibit I**, Passmore 17:17-19:25. Union President Young also confirmed that the headset policy was newly implemented and Alanis was not informed. Young 251:15-252:1. Alanis used the headset after Waggoner humiliated him.  Alanis 68:21-23.

Waggoner's conduct included sabotage accusations against Alanis. Waggoner told Alanis and Brian Smith to follow him into the crew chief room; Crew Chiefs Harris and May were waiting for them. Alanis 71:16-72:22. Waggoner asked Alanis, "[t]here's a rumor that I'm hearing that you've trying to break the vactor. Is that true?" Alanis 73:12-15. Waggoner accused Alanis of destroying the vactor by leaving water inside on a cold day. Alanis 73:21-74:3. In fact, no such thing occurred. The vactor was not out of commission the next morning. Alanis 77:1-9. According to May, the vactor "froze a little bit" that amounted to "[n]othing of any kind of significance." **Exhibit Q**, May 87:17-20.  May did not believe the rumors that Alanis had sabotaged the vactor. May 88:24-89:7.

Alanis was fearful for his job after Waggoner accused him of workplace sabotage because

**PLAINTIFFS' OPPOSITION TO DEFENDANT CLARK COUNTY'S MOTION FOR SUMMARY JUDGMENT DISMISSAL**, CASE NO. 3:21-CV-05411-DGE

11

the vactor was notorious for breaking down. Alanis 78:1-4. Alanis walked out of the crew chief room after the meeting distraught. Alanis 81:1-4. His co-workers noticed. Jeremiah Hertz told him, "Ray, we see what's going on here with you" regarding "the way they're treating you." Alanis 81:5-9. Crew Chief Smith said "[t]hat ain't right." Alanis 82:16-21; *see also* Young 329:17-330:9; Tikka Decl. ¶ 5–11.

Waggoner did not yell at Brian Smith. Alanis 230:16-21. Waggoner did not accuse anyone else of sabotaging equipment. Alanis 230:24-231:1. Alanis informed Marc Smith and Waggoner that he did not feel comfortable operating the vactor because if it broke down, his job would be jeopardized due to unfounded accusations of sabotage. Alanis 84:17-20, 86:4-17. Waggoner confirmed that Alanis no longer operates the vactor because he had yelled at him. Waggoner 106:23-107:3.

Waggoner's conduct extended to unequal treatment. For example, in 2018 or 2019, Hutson and Pena asked Waggoner about their stagnant pay. Pena 92:23-25. Waggoner ignored their concerns, while at the same time approving pay increases for two white employees, Micah Passmore and Norm MacDonald. Pena 302:3-21; Young 237:22-238:25.

E. <u>Plaintiffs Had to File Formal Complaints to Receive the Same Treatment as White Employees</u>

Plaintiffs filed several formal complaints and grievances seeking the same treatment as their White counterparts. For example, in May 2019, Pena applied for the distributor operator position, a higher paying job, that required an unrestricted commercial driver's license (CDL). Pena 113:12-18; 188:21-24; Waggoner 139:1-6.  Waggoner warned Pena that, unless he received his CDL in a short period of time he would be "gone." Pena 65:24-66:6; 188:3-9; 303:8-20. Pena raised concerns to Waggoner about his training schedule because he was not afforded the same amount of time to get a CDL as co-worker Aaren Morring. Waggoner 141:2-7. Unlike Pena, supervisors allowed Morring to train on Clark County's equipment before he received his license. Pena 111:13-17, 115:22-116:5, 120:4-8, 124:15-23; **Exhibit V**, Morring 23:6-24:4, 43:1-24; Young 59:4-21. Pena filed a complaint with human resources (HR). Pena 118:12-15, 121:11-22, 254:3-19. When union

representatives complained about Pena's unequal treatment, it took a prolonged negotiation with the union for the County to allow Pena go to trucking school for the requisite training. *See* Young 54:24-55:5; Pena 221:23-222:2.

Similarly, in or around June 2019, Hutson complained to HR Analyst Kara Hill that Waggoner routinely denied him training pay, and re-directed training pay to White employees not authorized to receive it. Hutson 147:24-154:4. During their meeting, Hutson again told her about his continuing grievances, incidents, and discriminatory conduct of supervisors Harris and Waggoner. Hutson 155:15-157:16. Hutson requested a discrimination investigation and gave specific examples regarding Harris' and Waggoner's discriminatory conduct and harassment. Hutson 155:6-16. Hutson then filed union grievances in July 2019, and in December 2019, after Waggoner again denied pay increases to him and Pena. Hutson 189:7-193:9; Young 32:5-12. White employees were given the pay increase without incident. Hutson 148:2-15; 151:1-7. The County failed to address the discrimination complaints.

F. Clark County's Human Resources Department Refused to Acknowledge the Pattern of Harassment and Hostile Work Environment, and Dismissed, Slow-Walked or Ineffectively Handled Complaints

Several instances demonstrate how Clark County reacted inadequately and ineffectively to Plaintiffs' harassment and discrimination complaints.

For example, in May 2019, after Crew Chief John May referred to the "cancer" while pointing at Alanis and Hutson, Hutson notified HR Director Mande Lawrence. Hutson 158:3-16; 161:2-13; Young 60:18-25. Lawrence said "I don't believe John May would say something like that," and when he tried to provide details about Eiesland, Harris and Waggoner, she said "when people feel threatened sometimes they threaten back." Hutson 157:14-166:7. Union President Young felt that management "brushed away" the incident concerning John May. Young 61:1-6.

Similarly, Roads Operations Manager Carolyn Heniges understood Hutson's grievance to mean simply that he was not paid; she did not follow up with Hutson about his discrimination complaints. **Exhibit J**, Heniges 43:4-7; 106:8-13. On July 11, 2019, Hutson emailed union representatives Darrell Young and Larry Clark the dates and hours that he trained employees.

Heniges 104:8-22. Heniges denied Hutson's grievance, and only after appeal did Director of Public Works Ahmad Qayoumi award Hutson training pay. Heniges 15:16-21. The training pay was awarded because "there was some confusion on how that was being applied." Heniges 16:19-17:2. HR Director Mande Lawrence notes that Clark County "had not applied it consistently across the board." **Exhibit K**, Lawrence 59:24-25; 65:23-66:1. Clark County considered this grievance resolved without dealing with Hutson's discrimination concerns.

On July 29, 2019, Pena met with management to discuss his CDL training schedule. Pena 220:18-221:11. Pena was excluded from the list of employees approved to go to the trucking school. Pena 221:23-222:2; Heniges 66:9-21. Union President Young had to fight with Hill to place Pena on the training list. Again, Clark County ignored the discrimination aspects of Pena's complaint, and considered the matter resolved.

From January 2020 through September 2021, Hutson was on workers' compensation leave. Hutson 19:4-7. Just before he went on workers' compensation in January 2020, Hutson spoke with HR Analyst Hill concerning his perception, after all the incidents involving him, that Waggoner did not like him because of his race. **Exhibit L**, Hill 38:6-17. Hill told him she would start an investigation. Hill 39:20-40:1. Hill did not start her investigation until March 2020; Alanis' and Pena' complaints were added later. Hill 105:15-106:16; 132:17-18.

On March 6, 2020, and again in April 2020, Alanis followed up with Hill, sharing additional information about Waggoner. Alanis 148:1-24, 173:13-15; Young 254:24-258:25. Alanis later met with Clark County Manager Kathleen Otto. Alanis characterized the meeting as "rough" and "unprofessional." Alanis 181:17-25. Because of Otto's confrontational tone, Alanis felt unable to provide names or information to her. Alanis 185:25-186:10.

In the same month, Hutson reported Kajava's and May's comments to Hill and Otto. Hutson 117:5-118:6; 167:5-169:6. Hill then scheduled a meeting that Hutson thought was part of the HR investigation she promised in January 2020. Hutson 170:13-174:18. Instead, Hill informed Hutson that he should refrain from bringing up past incidents, and warned him that talking to others about their conversation could lead to discipline against him. Hill 123:22-124:12; Hutson 205:10-23.

In April 2020, Pena and Union President Young met with Hill regarding about the CDL

complaint Pena had filed six months earlier. Pena 69:20-70:18. During the meeting, Hill informed him that employees said negative things about him, and then asked him if we wanted to proceed with his complaint. Pena 249:21-251:12. She did not give Pena any details. Pena wanted to make additional complaints, but was dissuaded when Hill confronted him. Pena 252:5-14.

Hutson did not have any more luck with HR than his colleagues. Following Hill's report in June 2020, denying their collective complaints, Hutson filed an appeal to Otto. Hutson 74:19-76:5. In their August 2020 meeting, Hutson tried to list specific incidents; in response, Otto interrupted and attacked him. Hutson 125:7-132:1.

Pena also met with Manager Otto in August 2020 about his appeal of HR's finding of no discrimination with respect to Plaintiffs' complaints. Otto told him that he could not provide new information other than the information in the appeal. Pena 272:15-22. Otto warned him that if he spoke to anyone about their meeting there will be "consequences" and alluded to termination. Pena 66:10-16. During the meeting, Pena was not given an opportunity to provide more information because she attacked and discouraged him. Pena 153:14-154:12, 272:23-274:2.

In July 2020, Alanis contracted COVID. Alanis 134:9-12; Hill 78:19-23. On July 7, 2020, Pena spoke to Hill and Waggoner about his exposure to COVID after spending time with Alanis. Pena 192:1-193:12; Hill 78:9-13. Hill sent three White employees home because of possible exposure to Alanis. Morring 15:22-16:17; Passmore 30:22-32:23. By contrast, Hill told Pena that he had to take personal time if he believed that he was exposed. Pena 201:3-7. The three White employees informed Pena that Hill sent them home, and that the health department was not involved in the individual decisions. Pena 81:18-82:3, 87:10-18, 204:16-209:8, 280:6-281:3.

G. <u>Supervisors Dissuaded Complaints About Harassment and Retaliated against Plaintiffs for Complaining</u>

In 2019 or 2020, after Alanis filed a complaint against Waggoner for workplace harassment and pay denial, Waggoner asked him whether "it's fair to waste taxpayers' money." Alanis 30:1-5, 90:21-91:13, 108:16-22. Co-employees accused Plaintiffs of being "crybabies" and "complaining just to complain." Pena 268:12-24, 269:3-11.

In 2020, Waggoner subjected Pena to three urine analyses after he had filed a complaint for pay denial. Pena 287:5-288:17. According to company policy, an employee is selected for a urine analysis by an algorithm, which sends a notice to the superintendent for approval. Pena 288:2-7. Prior to 2020, Pena was never randomly selected for a urine analysis. Pena 289:4-8.

In June 2021, Superintendent Nick Eiesland authorized overtime pay to his friend, Brandon Pilot, who was not a regular employee at the Mabry Shed. Pena 125:1-23. On June 8, 2021, Pena filed a grievance based on nepotism, breach of union contract, and retaliation based on discrimination, alleging that Pilot received an overtime opportunity that should have been offered to Pena under union rules. Pena 211:21-212:21; Tikka Decl. ¶ 10–11.  Pena received the overtime pay due him only after six months of fighting with management. Pena 219:9-11. Union Vice-President Tikka heard Eiesland angrily yell at Pena when he informed Eiesland that he planned to file a grievance. Eiesland did not deny overtime pay to White employees, and he targeted Pena for his earlier discrimination complaints. *See* Tikka Decl. ¶ 10–11.

In Spring 2022, Alanis applied for the Mabry crew chief position. Alanis 20:1-9. He withdrew his application after Roads Operations Manager Josh Lipscomb berated him publicly, and not others, for his phone use during a meeting when Alanis was filling in as a crew chief. Alanis 21:3-9, 21:20-22:7; Lipscomb 87:20-25. Alanis told Lipscomb that he was on his phone because he was communicating with his crew. He offered to show Lipscomb his meeting notes to demonstrate his engagement in the meeting. Lipscomb ignored his explanations. Alanis 22:9-25. Alanis reported the incident to HR. Alanis 125:18-23, 127:1-3.  HR determined that Lipscomb violated county policies. Alanis 127:4-23, 129:9-19. Previously, Alanis was denied the position of crew chief, in part because Superintendent Kenny Price gave the answers to the standardized test to a White employee. Alanis 13:9-24.

Other employees warned Plaintiffs about supervisors' retaliatory conduct. Employees have told Alanis that Waggoner, May, Harris, and Eiesland are part of the "Good Ol' Boys Club" who hold grudges and "have it out for you, and they will get revenge on you." Alanis 234:3-19. According to Hill, the Roads Division has cliques based on work history, family, and childhood friends. Hill 114:20-115:2. Union President Young told Alanis that Waggoner, May, and Harris

that "they're out for you." Alanis 239:4-20.

H.   <u>The Harassment and Discrimination Has Not Diminished after Plaintiffs Filed this Lawsuit</u>

The harassment has continued to this day. For example, in late 2022, supervisors Lipscomb and Eiesland disciplined Pena for asking a question during a group meeting that Eiesland later acknowledged was appropriate. Pena 49:13-23, 53:23-55:8, 57:2-13. They called him into a coaching session a week after the meeting. Pena 59:15-60:10. They documented the coaching session and placed it in his personnel file. Pena 50:3-11, 61:12-18, 62:5-16. It was only after the union complained to HR Director William Winfield that HR removed the coaching documentation from his file. Pena 62:19-63:19; Lipscomb 70:15-25.

Also in late 2022, Lipsomb singled out Hutson for reprimand after Hutson asked a question in a public meeting. Lipscomb yelled at Hutson and accused him of being aggressive. Lipscomb did not, by contrast yell at White employees, who were yelling at him about the subject matter of the meeting. *See* **Exhibit Y**, Larry Jones Decl. ¶ 3–10.

In December 2022, Crew Chief Chad Weiker was deposed for this lawsuit. After the deposition he yelled at Pena and Hutson in front of their crew for putting him through a deposition. Lipscomb 114:12-117:25.

Lipscomb admitted that after Plaintiffs complained to HR, he was recently asked to remove materials that had been posted in the workplace and publicly visible for many years. Lipscomb 122:3–125:25. One posting stated:

///

///

///

///

///

///

///



**Exhibit Z**, posting. Lipscomb stated that he did not find the posting personally offensive, nor disparaging any group of people. Lipscomb 124:15-23.

## LEGAL STANDARD

Summary adjudication is only appropriate where, viewing the evidence in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.' *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (internal citation omitted).  In employment discrimination cases, it is important to "zealously guarding an employee's right to a full trial[.]"*McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).  The judge must leave to the jury any "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts." *Anderson*, 477 U.S. at 255. A plaintiff alleging employment discrimination "need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123–24 (9th Cir. 2000).

1

**ARGUMENT**

2      Clark County has utterly failed to satisfy the requirements of summary judgment. There are

3  numerous genuine issues of material fact that require resolution by a factfinder at trial. *Anderson*,

4  477 U.S at 256. Construing all such genuine issues of fact in favor of Plaintiffs, there is sufficient

5  evidence to allow a jury to find in Plaintiffs' favor on each element of their claims. *See Adickes v.*

6  *S.H. Kress & Co.*, 398 U.S. 144, 158–160 (1970); *Celotex*, 477 U.S. at 325. Clark County's motion

7  for summary judgment must be denied and the jury must be allowed to resolve Plaintiffs' claims.

8      **A.      Plaintiffs' Claims Are Timely**

9      The Plaintiffs' claims are timely, including allegations of conduct that occurred at the

10  beginning of their employment. A hostile work environment is the product of a series of acts that

11  collectively constitute an unlawful employment practice. *National R.R. Passenger Corp. v.*

12  *Morgan*, 536 U.S. 101, 117 (2002). If at least one act occurred within the limitations period, the

13  entire period that they experienced a hostile work environment may be considered in determining

14  liability and damages, including punitive damages. *Id.*

15      Plaintiffs filed their EEOC charges in February 2021, articulating the claims described

16  above. The derogatory and demeaning conduct occurred as early as 2017, intensified in 2018, and

17  continued throughout the limitations period. Pena 221:23-222:2. That conduct continued on an

18  almost weekly basis, even as the harassing co-workers became crew chiefs and supervisors for the

19  County overseeing their work. Clark County's policies and practices allowed such behavior as early

20  as 2017, when Hutson complained to superintendent Waggoner, and Waggoner failed to stop the

21  harassment. *See Fried v. Wynn Las Vegas*, 18 F.4th 643, 648 (9th Cir. 2021) ("An employer can

22  create a hostile work environment by failing to take immediate and corrective action in response to

23  a coworker's [harassment or discrimination] the employer knew or should have known about.").

24  Moreover, Plaintiffs' Section 1981 claims have a longer statute of limitations (four years), and so

25  their discrimination claims are timely. *Jones v. R.R. Donnelley & Sons Co*., 541 U.S. 369 (2004).

26      **B.      Plaintiffs Have Established a *Prima Facie* Case of Hostile Work Environment**

27      Plaintiffs have established a *prima facie* case of a hostile work environment based on race

28

and national origin discrimination, which requires an employee to demonstrate that: (1) he or she was subjected to slurs, insults, jokes or other harassing conduct because of his or her race or national origin; (2) the conduct was sufficiently severe or pervasive to alter the conditions of his or her employment; and (3) the work environment was both subjectively and objectively abusive or hostile. *See Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1527 (9th Cir. 1995); *see also Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).

Abundant evidence demonstrates that Clark County managers and supervisors subjected Plaintiffs to ethnic slurs and other harassment because of their race and/or national origin; the conduct was severe or pervasive because it was ubiquitous and engaged in by co-workers and supervisors; and it interfered with Plaintiffs' work performance and negatively affected their job opportunities. A jury could find that the work environment was intimidating, hostile, and offensive in ways that are both pervasive and severe.

### 1. Plaintiffs are Subjected to Slurs, Insults, and Jokes Because of Their Race or National Origin

Clark County employees subjected Plaintiffs to anti-Latino slurs, insults, jokes, and additional harassing conduct over a period of several years. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22–23 (1993). Plaintiffs were subjected to constant harassment, which intensified when their co-worker harassers were promoted to supervisory positions. *See Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872–73 (9th Cir. 2001); *Jones v. Rabanco, Ltd.*, 439 F. Supp. 2d 1149, 1164 (W.D. Wash. 2006) (finding unwelcomed racial harassment where supervisors used n***ger and other racial slurs, and treated Black and Latino employees worse than white employees). Recall from the facts that Jeff Kajava said "it's a good day in the County boys, cops are killing n***ers and Trump is kicking out the Mexicans" in front of and within earshot of Crew Chiefs John May, Brandon Pilot, and Richard Harris, and was not reprimanded or disciplined in any way.

### 2. There is Sufficient Evidence for a Jury to Find that Clark County's Discriminatory Conduct is Severe or Pervasive

The harassing remarks and conduct were certainly pervasive, if not severe. *Fuller*, 47 F.3d at 1527. The anti-Latino remarks by Crew Chiefs Eiesland, May, and Harris were the most severe

because these were first line supervisors on roads crews who interacted daily with one or all of the Plaintiffs. Because Clark County employees work on a small team with their crew chief, Plaintiffs were unable to avoid the discriminatory remarks, and they were subjected to frequent harassment. *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1462–63 (9th Cir. 1994) (It is enough "if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay in her position."). Justice O'Connor put the point well:

> A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

*Harris*, 510 U.S. at 22.

When Plaintiffs reported the anti-Latino remarks and conduct to their crew chiefs' supervisor, Waggoner failed to remedy the situation. *See Robles v. Agreserves, Inc.*, 158 F. Supp. 3d 952, 984 (E.D. Cal. 2016) ("[C]onduct is more impactful because of his [harasser's] status as [the employee's] foreman."). Instead, Waggoner perpetuated the harassment and engaged in behavior to humiliate, target, and belittle Plaintiffs' concerns and work performance.

**3. Plaintiffs' Work Environment is Subjectively and Objectively Hostile**

Clark County maintained an objectively and subjectively hostile work environment. Plaintiffs' discrimination complaints reflect their subjective belief that Defendant's work environment is hostile. Plaintiffs have foregone opportunities for additional work or pay because they have to directly report to supervisors who belittle them in front of their co-workers, or have to work with co-workers who have made racial remarks. Alanis testified that Jeremiah Hertz and Crew Chief Smith noticed the mistreatment perpetuated by Waggoner. Union President Young and Union Vice-President Tikka also testified about the mistreatment. Smith testified that Waggoner would ask him why Plaintiffs were serving as acting crew chief and expressed hostility towards them when they did. Comments such as these establish that Clark County maintains an objectively hostile work

environment.

Further, Clark County failed to take adequate remedial action to eliminate the hostile work environment harassing supervisors and employees created.  An employer must take remedial action once it knows or should know, of harassing conduct, and it breaches this duty by failing to undertake, or ineffectually undertaking, remedial action. *See Nichols,* 256 F.3d at 875–76 ("When the employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, liability attaches for both the past harassment and any future harassment.").

### 4.  Clark County is Liable for the Hostile Work Environment Created by its Supervisors

Under Title VII, an employer is liable for the hostile environment created by a supervisor. *El-Hakem v. BJY, Inc.*, 415 F.3d 1068, 1074 n. 2 (9th Cir. 2005). The employer is strictly liable if the harassment culminates in a tangible employment action. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (citing *Burlington Ind. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)).

#### a.  Clark County is Liable for Supervisor Harassment

##### i.     Clark County Superintendents and Crew Chiefs Are Supervisors

Supervisor status is determined as a matter of fact, and not based solely on a formal designation. An employer is a supervisor if empowered to "make tangible employment actions" or "take tangible employment actions against the victim." *Vance*, 570 U.S. 432, 450. Here, it is undisputed that superintendents are supervisors.  Crew chief are also supervisors, given that they are delegated authority that is reserved for and relied on by higher management. *See* **Exhibit O**, Oman 16:11-13 (crew chiefs assist in hiring), 28:22-25 ("I validate everything through the crew chief, who's supposed to be supervising that shed."); Young 69:20-70:16 (crew chiefs are supposed to follow the chain of command and report any complaints); **Exhibit W**, Harris 36:4-38:25 (crew chiefs make the final decision when superintendents are unavailable); Waggoner 82:11-19 (superintendents and crew chiefs "collaborate" when assigning out-of-class pay).

The Supreme Court has noted that a person can qualify as a supervisor if their

recommendations amount to "tangible employment actions […] subject to approval by higher management." *See Vance*, 570 U.S. at 436–438, 437 n. 8. An employer cannot limit its supervisory designations to avoid supervisor liability. Where an employer "attempt[s] to confine decision making power to a small number of individuals, those individuals will have a limited authority to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee." *Id.* at 447. Even where a harassing employee does not have the power to take formal actions vis-a-vis the victim, the harasser may have substantial input into those decisions, if he is more familiar with the victim's work than the off-site manager with actual direct authority over the victim. *See id.* (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 509 (7th Cir. 2004) (Rovner, J. concurring in part and concurring in the judgment). "Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Vance*, 570 U.S. at 447.

Clark County Roads Division is headed by the Roads Operations Manager, who oversees three superintendents. Defendant's Motion at 2. By Defendant's own admission, crew chiefs report directly to superintendents and serve as liaisons between the superintendents and the crew. *Id.* It appears that Clark County "attempt[ed] to insulate [itself] from liability for workplace harassment by formally empowering only a handful of individuals to take tangible employment actions," *Vance*, 570 U.S. at 446, but the three superintendents do not work directly with Plaintiffs and therefore are unable to evaluate their work performance without delegating that responsibility to crew chiefs. According to former Roads Operations Manager Sue Stepan, the superintendents rely heavily on the crew chiefs for managing the day-to-to operations of each crew. **Exhibit P**, Stepan 20:9-15 ("[C]rew chiefs have the best eyes on what's happening in the field. The superintendents are often in their office, but the crew chiefs are the ones who are really much on the ground with the crews day in, day out and crew chiefs have the best opportunity to observe what's happening on their crew."). Crew chiefs have substantial input into decisions with respect to Plaintiffs because they are the persons most familiar with their performance, they assign work duties and overtime pay, as well as provide disciplinary recommendations to superintendents. Under those

circumstances, Clark County "effectively delegated the power to take tangible employment actions" to crew chiefs. *Id.* at 447.

       ii.     *Clark County Superintendents and Crew Chiefs Engaged in Tangible Employment Actions Against Plaintiffs*

Tangible employment actions include any economic benefit, such as "hiring" and "promotion," or but also actions with no immediate economic effect such as "undesirable assignment" and "reassignment with significantly different responsibilities." *Ellerth*, 524 U.S. at 761; *Faragher*, 524, U.S. at 790, 808; *see Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) ("[T]he language of Title VII is not limited to 'economic' or 'tangible' discrimination."). An act that causes significant disruption in an employee's earning potential and working conditions is a tangible employment action. *See Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3rd 1999). Waggoner repeatedly denied increased pay owed to Plaintiffs, and Plaintiffs eventually received pay only after filing multiple grievances with the union and waiting months for a response. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223–224 (2nd Cir. 2001) (holding that the lost use of wages for a period, even if reimbursed, constitutes an economic injury that can qualify as a tangible employment action). In addition to having to work under hostile conditions, Plaintiffs have each suffered tangible employment actions. For example, the County kept Hutson from receiving increased pay several times. Pena used personal time to quarantine when HR denied his request for COVID leave, and he was also denied overtime opportunities. Alanis no longer operates the vactor truck after Waggoner accused him of sabotage, and he withdrew his application for a promotion when Lipscomb berated him for using his phone to communicate with his crew. Evidence clearly supports Plaintiffs' claims that they suffered tangible employment actions that have affected the terms of their employment. *See Storey v. Burns Intern. Sec. Servs.*, 390 F.3d 760, 764 (3rd Cir. 2004).

       iii.     *Clark County Cannot Avail Itself of an Affirmative Defense*

Clark Country must demonstrate a valid and effective anti-harassment policy to raise an affirmative defense. *Ellerth*, 534 U.S. at 765; *Faragher*, 524 U.S. at 807. A policy that is contravened by actual practice or one that does not result in a prompt investigation is invalid. *See EEOC v. Management Hosp. of Racine*, 666 F.3d 422, 436 (7th Cir. 2012) (finding that an

investigation commenced two months after complaints were received was not sufficiently prompt). Plaintiff tried several times to complain to supervisors about discriminatory conduct, and supervisors refused to accept their complaints. The practice of supervisors refusing or failing to investigate complaints negates any written anti-discrimination policy Clark County might have in place to protect itself from liability. When Plaintiffs complained to HR or filed grievances with the union, there was no viable way for Plaintiffs to establish their complaints about ongoing harassment and discrimination. It took months for investigations to commence, and if a complaint or grievance was investigated, it was handled as a discrete, separate incident, isolated from all the other instances of discrimination. Finally, HR discouraged Plaintiffs from complaining about repeated instances of harassment, and when Plaintiffs pressed their complaints, HR delayed its investigations.

iv.   *Plaintiffs Can Establish a Prima Facie Retaliation Case*

Plaintiffs must show that (1) they undertook a protected activity under Title VII; (2) Clark County subjected Plaintiffs to an adverse employment action; and (3) there is a casual link between those two events. *Vasquez*, 349 F.3d at 646. Evidence in this case shows that Plaintiffs engaged in protected activity when they complained about anti-Latino and anti-immigrant remarks and conducts, and in retaliation Clark County supervisors denied them pay increases, overtime opportunities, and prevented them from applying for promotions.

### b.   *Clark County is Liable for Co-Worker Harassment*

Clark County is liable for co-worker harassment if its supervisors knew or should have known about harassment and took no action to remedy it. *Burrell v. Start Nursery*, Inc., 170 F.3d 951, 955 (9th Cir. 1999). As early as 2017, Hutson notified Superintendent Timothy Waggoner about Richard Harris' comments and harassing conduct. Waggoner refused to do anything about it. Moreover, Roads Operations Manager Josh Lipscomb testified that a public posting denigrating Latino immigrants was displayed in full view of Roads Division employees for years before he finally removed it in 2022.

For years, supervisors heard comments like "manuel labor" and did nothing about them. Crew Chief Chad Weiker testified that an employee on his crew had used the term "as a joke" recently, and was fired. Weiker 72:13-73:25. Weiker's characterization of the use of this derogatory

term "as a joke" demonstrates that supervisors knew the language was being used and did not find it offensive despite it being clearly discriminatory.

Clark County knew about earlier serious incidents of race-based comments, taunts, and threats that existed in the Roads Division. In or around 2007, an employee threatened to kill Isidoro Flores and his family; between 2010 to 2015, Nick Eiesland repeatedly asked Flores whether Latino landscaping crews were his family members; from 2019 to 2022, superintendents refused to approve increased pay for Latino employees, not just Plaintiffs. *See* Morales 12:12-16; Tikka Decl. ¶ 4–11. As recently in 2022, union Vice-President Tikka was warned not to be "associated with those guys," referring to Plaintiffs, because he would "suffer the consequences." Tikka Decl. ¶ 12.

C.    **Clark County is Liable for a Hostile Work Environment under the Washington Law Against Discrimination, RCW § 49.60.030 *et seq*.**

Under Washington law, Plaintiffs can establish a hostile work environment by showing the harassment: (1) was unwelcome; (2) was because of Plaintiffs' protected status; (3) affected the terms or conditions of employment, and (4) is imputable to the employer. RCW § 49.60.030; *Loeffelholz v. University of Washington*, 175 Wash.2d 264, 275 (2012); *Glasgow v. Georgia-Pacific Corp.*, 103 Wash.2d 401, 406–07 (1985).

Harassment by co-workers or supervisors is imputed to the employer if the employer knew or should have known of the harassment and failed to take reasonably prompt and adequate corrective action. *Glasgow*, 103 Wash.2d at 407–08. Plaintiffs can demonstrate that the employer knew or should have known of the harassment by demonstrating that complaints were made to supervisors, or by demonstrating that the harassment was so pervasive that it creates an inference of the employer's knowledge or constructive knowledge. Plaintiffs made several complaints to supervisors starting 2017 through the present. Moreover, the evidence shows that supervisors themselves regularly used derogatory language aimed at Latinos, as well as treated them differently based on their race; that postings were left on public walls for years; that supervisors considered the use of terms such as "manuel labor" as harmless jokes; and that the harassing behavior was aimed at Latinos other than just the Plaintiffs.   This evidence demonstrates that the

supervisors were on notice of the pervasiveness of the harassing conduct.

Under Washington law, the Defendant can avoid liability by taking prompt and corrective action upon discovering harassment. *Glasgow*, 103 Wash.2d at 407–08. Here, not only did the County *not* take prompt action, County supervisors failed to accept complaints, and threatened other employees to keep them from intervening on behalf of Plaintiffs. Clark County argues that at least one HR investigation was completed, but it was not started until months after complaints were first made in January 2020. Moreover, the report of that investigation demonstrates the fatal flaw in the County's approach: it lists the people who were interviewed, the majority of whom were White, and many of whom are the perpetrators of discrimination in the Roads Division. The report counted and then *credited* the opinions of those people who were interviewed, in essence asking them whether they think harassment occurred in the Roads Division, and then concluding there was no violation of County policy. This majority-vote method of co-harassers determining whether harassment occurred is not a "prompt and corrective action" for resolving harassment. **Exhibit AA**, Kara Hill Report.

> **D.    The Evidence Construed in Favor of Plaintiffs Supports a Case of Disparate Treatment and Equal Protection**

Clark County's COVID quarantine polices were unevenly applied and Plaintiff Pena was the victim of disparate treatment. Clark County management and supervisors allowed three white employees to quarantine and receive paid leave, but not Pena, even though all were exposed to the same co-worker who tested positive for Covid-19. Pena can establish a disparate treatment claim in two ways: (1) under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework, or alternatively, (2) by producing direct or circumstantial evidence demonstrating that a discriminatory reason "more likely than not" motivated the employer. *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 691 (9th Cir. 2010) (citation omitted); *see also Hawn v. Executive Jet Management, Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010).

Pena can establish a *prima facie* case of disparate treatment under the *McDonnell-Douglas* framework. Courts require "very little evidence" of the employee even at "summary judgment in a

discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotation marks and citation omitted). Pena must establish that he: (1) belongs to a protected class, (2) performed his work according to the employer's legitimate expectations, (3) suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (citing *McDonnell Douglas*, 411 U.S. at 802); *see also Manatt v. Bank of America NA*, 339 F.3d 792, 799 (9th Cir. 2003) (federal courts apply the same standards in Section 1981 and Section 1983 actions as they do in Title VII). *See Washington v. Boeing Co.*, 105 Wash. App. 1, 13 (2001) (establishing similar requirements under WLAD).

Under the remaining elements for Title VII and the WLAD, Pena suffered an adverse employment action when Clark County allowed three White employees to quarantine following their exposure to Alanis, who had tested positive for COVID-19, but denied the same opportunity for Pena even though he also had contact with Alanis.  The County automatically gave the White paid time off as COVID leave. In contrast, Hill told Pena that he must use his personal time for anything related to COVID-19. All of this occurred for the same exposure at the same time to a COVID-infected individual.

In addition, Pena can establish that he was denied a pay increase for his training activity, and for overtime pay on several occasions, when similarly situated White employees were paid without question.

Alanis also experienced disparate treatment when he was discouraged from applying for a crew chief position while non-Latinos were not similarly discouraged. *See Inter. Broth. of Teamsters v. U.S.*, 431 U.S. 324, 365 (1977). In Spring 2022, Alanis applied for a crew chief position but withdrew his application after Roads Operations Manager Josh Lipscomb wrongly called him out for spending time on his phone dealing with county business during a meeting. Alanis got the message that his supervisors would make his life difficult if he were to become a

crew chief. Clark County's discriminatory policies deterred Alanis from applying for a crew chief position in the near future. *Teamsters*, 431 U.S at 365 (Applicants "suffer from discriminatory employment practices" when "[a] consistently enforced discriminatory policy" deters them from applying because they are "aware of it and unwilling to subject themselves to the humiliation of explicit and certain rejection.").

Plaintiffs were subjected to unequal treatment when they were singled out repeatedly with disparaging and belittling remarks that were based on their race or national origin. They were also treated unequally when supervisors refused to compensate them the increased pay to which they were entitled, while Whites routinely received such pay without incident.

All of these examples also demonstrate that Clark County deprived Plaintiffs of equal protection under the law. "To state a claim . . . for a violation of the Equal Protection Clause . . . a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class*." Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001); *see also Rosenbaum v. City & City of San Francisco*, 484 F.3d 1142, 1153 (9th Cir. 2007).

Clark County was aware of Plaintiffs' complaints about workplace discrimination, and its management and supervisors prevented Plaintiffs from providing additional information about the many discriminatory incidents to substantiate their claims. Documents, including emails exchanged regarding Plaintiffs' many grievances, confirm that Clark County was aware about Plaintiffs' complaints about race discrimination.

### E.      Plaintiffs Are Entitled to Punitive Damages Against Clark County

Punitive damages are available to Plaintiffs under Section 1981. Clark Country inaccurately asserts that punitive damages are not available against a municipality, but it cites a case involving a violation of Section 1983*. City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Local governments are liable under Section 1981. "To establish municipal liability on a § 1981 claim, plaintiff must allege that his injury was caused by an official policy or custom[.]" *Nnachi v. City and County of San Francisco*, 2014 WL 4088149, at *6 (N.D. Cal. Aug. 19, 2014); *see also Hailey v. City of Camden*, 631 F. Supp. 2d 528, 540 (D. N.J. 2009) ("[A] municipality is

liable under Section 1981 and 1983 only when 'execution of a government's policy or custom, whether made by its lawmakers or by whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'"); *Hargett v. NYC Transit Authority*, 640 F. Supp. 2d 450, 472 (S.D.N.Y. 2009) ("A municipal entity and its employees acting in their official capacity may be liable under § 1981."). Here, the County's official policy allowed supervisors the discretion to refer complaints they received to HR, creating an environment that contravened its written open door policy. The County's practice was reinforced when HR failed to investigate supervisors' failure to refer complaints and did nothing to reprimand supervisors. The County endorsed this policy, despite the existence of a written anti-discrimination statement.

## CONCLUSION

For the foregoing reasons, Clark County failed to meet its burden to show that no reasonable jury could return a verdict for Plaintiffs. The Court should deny its motion for summary judgment.

Dated: March 6, 2023

*I certify that this memorandum contains 8,398 words, in compliance with the Local Civil Rules.*

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**

*/s/ Luis Lozada*
Luis Lozada, pro hac vice
634 South Spring Street, 11th floor
Los Angeles, CA 90014
Facsimile: (213) 629-0266
Email: llozada@maldef.org

*/s Leticia Saucedo*
Leticia Saucedo, pro hac vice
634 South Spring Street, 11th floor
Los Angeles, CA 90014
Facsimile: (213) 629-0266
Email: lsaucedo@maldef.org

**BRESKIN, JOHNSON, TOWNSEND PLLC**

*/s Roger M. Townsend*
Roger M. Townsend, WSBA No. 25525

**PLAINTIFFS' OPPOSITION TO DEFENDANT CLARK COUNTY'S MOTION FOR SUMMARY JUDGMENT DISMISSAL**, CASE NO. 3:21-CV-05411-DGE

30

1000 Second Avenue, Suite 3670
Seattle, WA  98104
Telephone: (206) 652-8660
Facsimile: (206) 652-8290
Email: rtownsend@bjtlegal.com

*Attorneys for Plaintiffs*

1

**CERTIFICATE OF SERVICE**

2
        I hereby certify that on March 6, 2023, I electronically transmitted the attached documents

3
to the Clark's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic

4
Filing to all ECF registrants in this matter.

5
Dated: March 6, 2023

6
                                        */s Ann M. Iarossi*_____
                                        Ann M. Iarossi, Legal Assistant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28