The Honorable David G. Estudillo

1

2

3

4

5

6

7          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
8                  AT TACOMA

9   ELIAS PEÑA, ISAIAH HUTSON, and        Case No.: 3:21-CV-05411-DGE
    RAY ALANIS,
10                                          **PLAINTIFFS' TRIAL BRIEF**
                    Plaintiffs,
11
            vs.
12
    CLARK COUNTY, WASHINGTON,
13
                    Defendant.
14

15

16

17

18

19

20

21

22

23

24

CERTIFICATE OF SERVICE  - 1

# I. INTRODUCTION

Plaintiffs Elias Pena, Isaiah Hutson, and Ray Alanis ("Plaintiffs") are roads maintenance workers of Mexican or Latino national origin, ethnicity and race.  Defendant Clark County, Washington ("Clark County") discriminated against Plaintiffs and subjected them to a hostile work environment, disparate treatment, and denial of equal protection because of their race and/or national origin.  Plaintiffs bring claims under Title VII of the Civil Rights Act of 1964, RCW 49.060 ("Washington Law Against Discrimination"), Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. §§1981 and 1983.

Plaintiffs' hard work on the roads maintenance crews for Clark County has been recognized with performance awards and praise by supervisors.  Despite Plaintiffs' best efforts to do their jobs well, Clark County's managers, supervisors, and personnel harassed them with anti-Latino and racially discriminatory remarks and conduct over the course of many years.  When Plaintiffs sought assistance from Clark County management to remedy and prevent further harassment, Clark County managers and supervisors ignored Plaintiffs' claims, and increasingly scrutinized their work performance, continued to harass and discriminate against them, and denied them equivalent compensation and opportunities for additional work and promotion.  Plaintiffs continue to work for Clark County and suffer the injury of working in a racially hostile and abusive environment.

Plaintiffs seek damages against Defendant Clark County to compensate them for their economic losses in the form of pay for lost past and future wages and fringe benefits; and compensatory damages, including emotional distress and humiliation damages.  Plaintiffs also seek punitive damages against Clark County.

## II. FACTUAL BACKGROUND

### A.  The Discrimination and Harassment Started Shortly After Hire

Clark County hired Ray Alanis in 2014, Isaiah Hutson in June 2016, and Elias Pena in mid-2017.  Isaiah Hutson experienced discrimination as early as June 2016 when he started at the Finn Hill Shed location.  In 2016, co-worker Richard Harris threatened violence directly and indirectly to Hutson because of his national origin.  For example, he boasted that in his previous

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

employment he sabotaged the equipment of Mexican co-workers, and threw things off roofs to injure them because he did not believe they belonged on his jobsite. Harris intimidated Hutson by cutting a tree branch that nearly hit him. Harris regularly yelled at Hutson when he served as crew chief of the Finn Hill crew, but he did not yell at White employees. Harris also told a gathering of employees, including Hutson, that he admired Hitler.

In May 2017, co-worker Gage Bryant overheard Harris say, "the county is going to shit because it's hiring all these beaners and spics." Throughout this whole period that Hutson worked with Harris, Harris made hateful remarks about Mexicans and mistreated Hutson. Hutson did not complain at the time because he understood the culture in the Roads Division was that employees should avoid trouble by not complaining. That culture exists to this day.

In August 2017, Hutson heard Finn Hill Crew Chief Nick Eiesland, say "they're building a wall around Finn Hill, kicking the Mexicans out." The comment referred to Hutson and Elias Pena transferring out of the Finn Hill Shed. Pena, who worked alongside Hutson and Eiesland at the time, also heard the comment.

**B. The Harassment Continued After Plaintiffs Transferred to Other Units**

Shortly thereafter, Hutson transferred to drainage crew. His direct supervisor was his former co-worker Richard Harris, who had been promoted to crew chief. Harris did not stop harassing Hutson after he became a crew chief. Hutson, fearing for his safety, reported Harris' comments and discriminatory conduct to Superintendent Timothy Waggoner in October 2017. Instead of investigating his complaint, Waggoner told Hutson, "I think you're the problem." Hutson told Waggoner about Harris's racist remarks, including "beaners and spics" and "the county is going to shit, ever since they started hiring them." Waggoner replied that Harris would not say those things and attacked Hutson. Waggoner failed to report Hutson's complaints.

After Hutson complained to him, Waggoner targeted Hutson. He unreasonably demanded that Hutson improve his performance and target goals on the vactor[1] truck, and he scrutinized Hutson's work. He did not reprimand vactor operators Darrell Young and Norm Malboro, who had similar performance numbers. Waggoner and Harris refused to confirm whether Hutson was

---

[1] The vactor truck is used for cleaning out sewers and stormwater lines.

CERTIFICATE OF SERVICE  - 3

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

scheduled to work one weekend, putting him at risk of termination.  When Hutson showed up to the job site to make sure he was not scheduled, Waggoner accused him of taking advantage of overtime pay. In summer 2018, Hutson confided in co-worker Clayton Tikka about Harris' racial discrimination and Waggoner's failure to investigate.

### C.  The Continuing Harassment Included Derogatory, Discriminatory Language

Plaintiffs have heard the following comments on the work site: "beaners and spics;" "the landscaping crew;" "manuel [sic] labor;" Latinos referred to as "cancers;" "the county needs to cut out the cancers here at Clark County and we're working on it;" "keep the brown down." Alanis understands "keep the brown down" to mean Latinos are barred from certain positions. Union Vice-President Clayton Tikka confirmed that, since 2018, Plaintiffs have complained of discriminatory language and harassment against them, including but not limited to: Crew Chief John May referring to Latinos as "cancers" that have to be "cut out;" Crew Chief Richard Harris' mistreatment of Isaiah Hutson; Superintendent Timothy Waggoner failing to investigate and correct Harris' behavior; and Crew Chief Nick Eiesland (later promoted to superintendent) making  discriminatory comments aimed at Isidoro Flores about whether Latino landscaping crews were his family members.

In 2018, Pena worked together with Hutson and Alanis at the Mabry Shed.  Pena heard co-workers say "there goes manuel labor" and other anti-Latino comments.  Crew Chief John May and other employees said that a "white master" oversaw Plaintiffs when they worked together.  May also said, when looking at Pena, "I'm working on getting rid of these cancers."

Plaintiffs continued to hear remarks during their employment. For example, during summer 2019 or 2020, Hutson heard co-worker Jeff Kajava, in front of Brandon Pilot, John May and Richard Harris, say "It's a good day in the County boys, cops are killing n***ers and Trump is kicking out the Mexicans."  Hutson spoke to Isidoro Flores, who confirmed that he heard the same remark.  Kajava was known to also make vulgar and sexual jokes.

### D.  The Harassment Included Heightened Scrutiny from Supervisors

Pena, Hutson and Alanis regularly sought to volunteer to serve as acting crew chief, a position akin to a first line supervisor, when they worked at the Mabry Shed together in or around

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

2018.  Crew Chief Marc Smith confirmed that Waggoner did not like Plaintiffs serving as crew chief and would ask, "why do these people fill in as crew chief?"  Waggoner did not have a problem with White employee Kenny Hugo serving, despite Hugo's substance abuse issues and erratic behavior.

Like Hutson, Alanis experienced constant harassment by Superintendent Timothy Waggoner.  For example, in 2018, Alanis transferred to the Sign Shop reporting directly to Matt Griswold. Alanis Matt Griswold approved his personal time off (PTO).  Around summer 2018, Alanis took PTO, only to have Waggoner call him and yell at him for taking time off. Waggoner reprimanded Alanis for not seeking permission for PTO from him.  Waggoner said, "I sign your time sheet." Alanis answered "I don't know what's going on. I got it approved by my current superintendent [Griswold]."

Since 2019, Alanis has worked at the Salmon Creek Shed, where he has filled in as crew chief.  Waggoner regularly yelled at Alanis when he served as crew chief.  Waggoner also hyper-scrutinized Alanis' work.  For example, in 2019, Alanis worked with Micah Passmore operating the vactor truck. Waggoner yelled at and reprimanded Alanis for not wearing a headset.  Alanis recalled that he "could hear [Waggoner] screaming at me with my earplugs on."  Waggoner did not yell at Passmore for not wearing the headset. Micah Passmore confirmed that the previous operator failed to notify him and Alanis about wearing a headset, and when Passmore walked away from Waggoner to retrieve the headset, Waggoner did not reprimand him.  Alanis felt humiliated by the encounter with Waggoner.

Waggoner's harassing conduct included sabotage accusations against Alanis.  Waggoner accused Alanis of destroying the vactor by leaving water inside on a cold day.  In fact, no such thing occurred. The vactor was not out of commission the next morning and there were other safeguards against water line freezing, such as to put the truck in an enclosed space.

Alanis was fearful for his job after Waggoner accused him of workplace sabotage because the vactor was notorious for breaking down.  Alanis walked out of the crew chief room after the meeting distraught.  His co-workers and crew chief noted that Waggoner's behavior toward Alanis was inappropriate.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Waggoner did not accuse anyone else of sabotaging equipment. Alanis informed Marc Smith and Waggoner that he did not feel comfortable operating the vactor because if it broke down, his job would be jeopardized due to unfounded accusations of sabotage. Waggoner confirmed that Alanis no longer operates the vactor because he had yelled at him.

Waggoner's harassing conduct extended to treating the plaintiffs unequally compared to their non-Latino counterparts. For example, in 2018 or 2019, Hutson and Pena asked Waggoner about their stagnant pay. Waggoner ignored their concerns, while at the same time approving pay increases for two white employees, Micah Passmore and Norm MacDonald.

### E. Plaintiffs Had to File Formal Complaints to Receive the Same Treatment as White Employees

Plaintiffs filed several formal complaints and grievances seeking the same treatment as their White counterparts. For example, in May 2019, Pena applied for the distributor operator position, a higher paying job that required an unrestricted commercial driver's license (CDL). Waggoner warned Pena that, unless he received his CDL in a randomly short period of time he would be "gone." Pena raised concerns to Waggoner about his training schedule because he was not afforded the same amount of time to get a CDL as co-worker Aaren Morring. Unlike Pena, supervisors allowed Morring to train on Clark County's equipment before he received his license. Pena filed a complaint with human resources (HR). When union representatives complained about Pena's unequal treatment, it took a prolonged negotiation with the union for the County to allow Pena go to trucking school for the requisite training.

Similarly, in or around June 2019, Hutson complained to HR Analyst Kara Hill that Waggoner routinely denied him training pay, and re-directed training pay to White employees not authorized to receive it. During their meeting, Hutson again told her about his continuing grievances, incidents, and discriminatory conduct of supervisors Harris and Waggoner. Hutson requested a discrimination investigation and gave specific examples regarding Harris' and Waggoner's discriminatory conduct and harassment. Hutson then filed union grievances in July 2019, and in December 2019, after Waggoner again denied pay increases to him and Pena. White employees were given the pay increase without incident. The County consistently failed to

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

address the discrimination and unequal treatment complaints embedded in each of these complaints.

**F.  Clark County's Human Resources Department Refused to Acknowledge the Pattern of Harassment and Hostile Work Environment, and Dismissed, Slow-Walked or Ineffectively Handled Complaints**

Several instances demonstrate how Clark County reacted inadequately and ineffectively to Plaintiffs' harassment and discrimination complaints.  For example, in May 2019, after Crew Chief John May referred to the "cancer" while pointing at Alanis and Hutson, Hutson notified HR Director Mande Lawrence.  Lawrence said "I don't believe John May would say something like that," and when he tried to provide details about Eiesland, Harris and Waggoner, she said "when people feel threatened sometimes they threaten back."

Roads Operations Manager Carolyn Heniges only responded to Hutson's grievance regarding nonpayment, but ignored his discrimination complaints.  On July 11, 2019, Hutson emailed union representatives Darrell Young and Larry Clark the dates and hours that he trained employees.  Heniges denied Hutson's grievance, and only after appeal did Director of Public Works Ahmad Qayoumi award Hutson training pay.  HR Director Mande Lawrence notes that Clark County "had not applied it consistently across the board."  Clark County considered this grievance resolved without dealing with Hutson's discrimination concerns.

On July 29, 2019, Pena met with management to discuss his CDL training schedule.  Pena was excluded from the list of employees approved to go to a trucking training school. Union President Young had to fight with Hill to place Pena on the training list.  Again, Clark County ignored the discrimination aspects of Pena's complaint, and considered the matter resolved once his name was placed on the training list.

In January 2020, Hutson spoke with HR Analyst Hill alleging Waggoner had created a hostile work environment against him because of his race.  Hill told him she would start an investigation.  Hill did not start her investigation until March 2020; Alanis' and Pena' complaints were added later.

On March 6, 2020, and again in April 2020, Alanis followed up with Hill, sharing

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

additional information about Waggoner.  Alanis later met with Clark County Manager Kathleen Otto. Alanis characterized the meeting as "rough" and "unprofessional."  Because of Otto's confrontational tone, Alanis felt unable to provide names or information to her.

In the same month, Hutson reported Kajava's and May's comments to Hill and Otto.  Hill then scheduled a meeting that Hutson thought was part of the HR investigation she promised in January 2020.  Instead, Hill informed Hutson that he should refrain from bringing up past incidents, and warned him that talking to others about their conversation could lead to discipline against him.

In April 2020, Pena and Union President Young met with Hill regarding about the CDL complaint Pena had filed six months earlier.  During the meeting, Hill informed Pena that employees said negative things about him, and then asked him if we wanted to proceed with his complaint.  She did not give Pena any details. Pena wanted to make additional complaints, but was dissuaded when Hill confronted him.

Hutson did not have any more luck with HR than his colleagues. Following Hill's report in June 2020, denying their collective complaints, Hutson filed an appeal to Otto.  In their August 2020 meeting, Hutson tried to list specific incidents; in response, Otto interrupted and attacked him.

Pena also met with Manager Otto in August 2020 about his appeal of HR's finding of no discrimination with respect to Plaintiffs' complaints. Otto told him that he could not provide new information other than the information in the appeal.  Otto warned him that if he spoke to anyone about their meeting there will be "consequences" and alluded to termination.  During the meeting, Pena was not given an opportunity to provide more information because she attacked and discouraged him.

In July 2020, Alanis contracted COVID.  On July 7, 2020, Pena spoke to Hill and Waggoner about his exposure to COVID after spending time with Alanis.   Hill sent three White employees home because of possible exposure to Alanis.  By contrast, Hill told Pena that he had to take personal time if he believed that he was exposed.  The three White employees informed Pena that Hill sent them home, and that the health department was not involved in the individual

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

decisions.

## G. Supervisors Dissuaded Complaints About Harassment and Retaliated against Plaintiffs for Complaining

In 2019 or 2020, after Alanis filed a complaint against Waggoner for workplace harassment and pay denial, Waggoner asked him whether "it's fair to waste taxpayers' money." Co-employees accused Plaintiffs of being "crybabies" and "complaining just to complain."

In 2020, Waggoner subjected Pena to three urine analyses after he had filed a complaint for pay denial. According to company policy, an employee is selected for a urine analysis by an algorithm, which sends a notice to the superintendent for approval. Prior to 2020, Pena was never randomly selected for a urine analysis.

In June 2021, Superintendent Nick Eiesland authorized overtime pay to his friend, Brandon Pilot, who was not a regular employee at the Mabry Shed. On June 8, 2021, Pena filed a grievance based on nepotism, breach of union contract, and retaliation based on discrimination, alleging that Pilot received an overtime opportunity that should have been offered to Pena under union rules. Pena received the overtime pay due him only after six months of fighting with management. Union Vice-President Tikka heard Eiesland angrily yell at Pena when he informed Eiesland that he planned to file a grievance. Eiesland did not deny overtime pay to White employees, and he targeted Pena for his earlier discrimination complaints.

In Spring 2022, Alanis applied for the Mabry crew chief position. He withdrew his application after Roads Operations Manager Josh Lipscomb berated him publicly, and not others, for his phone use during a meeting when Alanis was filling in as a crew chief. Alanis told Lipscomb that he was on his phone because he was communicating with his crew. He offered to show Lipscomb his meeting notes to demonstrate his engagement in the meeting. Lipscomb ignored his explanations. Alanis reported the incident to HR. HR determined that Lipscomb violated county policies.

Other employees warned Plaintiffs about supervisors' retaliatory conduct. Employees have told Alanis that Waggoner, May, Harris, and Eiesland are part of the "Good Ol' Boys Club" who hold grudges and "have it out for you, and they will get revenge on you." According to Hill,

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

the Roads Division has cliques based on work history, family, and childhood friends.  Union President Young told Alanis that Waggoner, May, and Harris that "they're out for you."

**H.  The Harassment and Discrimination Has Not Diminished after Plaintiffs Filed this Lawsuit**

The harassment has continued to this day. For example, in late 2022, supervisors Lipscomb and Eiesland disciplined Pena for asking a question during a group meeting that Eiesland later acknowledged was appropriate.  They called him into a coaching session a week after the meeting.  They documented the coaching session and placed it in his personnel file.  It was only after the union complained to HR Director William Winfield that HR removed the coaching documentation from his file.

Also in late 2022, Lipscomb singled out Hutson for reprimand after Hutson asked a question in a public meeting. Lipscomb yelled at Hutson and accused him of being aggressive. Lipscomb did not, by contrast yell at White employees, who were yelling at him about the subject matter of the meeting.

In December 2022, Crew Chief Chad Weiker was deposed for this lawsuit. After the deposition he yelled at Pena and Hutson in front of their crew for putting him through a deposition.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Lipscomb admitted that after Plaintiffs complained to HR, he was asked to remove materials his posting stating.



Lipscomb stated that he did not find the posting personally offensive, nor disparaging any group of people.

### III. ARGUMENT

**A. Applicable Discrimination Laws**

**1. Title VII of the Civil Rights Act of 1964**

Title VII prohibits an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e–2(a)(1). Title VII guarantees employees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). "To establish a prima facie case, a plaintiff must offer evidence that give[s] rise to an inference of unlawful discrimination." *Godwin v. Hunt Wesson, Inc.*, 150

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

F.3d 1217, 1220 (9th Cir. 1988).  To pursue a hostile work environment claim under Title VII, an "objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (A hostile work environment is one where "the workplace is permeated with discriminatory intimidation, ridicule, and insult […] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]").

"Title VII tolerates no racial discrimination, subtle or otherwise." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973).  Title VII prohibits "all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race […] or national origin." *Washington County v. Gunther*, 452 U.S. 161, 180 (1981) (quoting *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 763 (1976)).

Although Title VII "mentions specific employment decisions with immediate consequences, the scope of the prohibition is not limited to economic or tangible discrimination, and that it covers more than terms and conditions in the narrow contractual sense." *See Faragher*, 524 U.S. at 786 (internal quotation marks and citations omitted).  "The Supreme Court has held that [Title VII] not only covers terms and conditions in the narrow sense, but evinces a congressional intent to strike the entire spectrum of disparate treatment in employment." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1125 (9th Cir. 2000) (internal quotation marks omitted and alternations added).

**2.  Washington Law Against Discrimination, RCW Chapter 49.60**

The Washington Law Against Discrimination ("WLAD") is based on Washington's strong public policy against all forms of discrimination:

> [P]ractices of discrimination against any of its inhabitants because of f race […] national origin […] are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state.

RCW § 49.60.010.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

The WLAD prohibits discrimination in employment, including disparate treatment and hostile work environment, on the basis of race or national origin, among other protected classes:

> It is an unfair practice for any employer . . . To discharge or bar any person from employment because of . . . race . . . [or] national origin . . . To discriminate against any person in compensation or in other terms or conditions of employment because of . . . race . . . [or] national origin[.]

RCW § 49.60.180.

The provisions of the Washington Law Against Discrimination are to "construed liberally" to accomplish the purpose of the chapter.  RCW 49.60.020.  Further, although the interpretation of federal law under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-2(a)(1) is instructive, it is not binding on state courts interpreting RCW 49.60.  *Glasgow v. Georgia-Pacific*, 103 Wn.2d 401, 406 n. 2 (1985).

> Washington's Law Against Discrimination contains a sweeping policy statement strongly condemning many forms of discrimination […] It also requires "this chapter shall be construed liberally for the accomplishment of the purposes thereof." […] enforcement of this State's antidiscrimination laws depends in large measure on employees' willingness to come forth and file charges or testify in discrimination cases.  Plaintiffs bringing discrimination cases assume the "role of 'a private attorney general,' vindicating a policy 'of the highest priority'" […] We have written that in resolving a question of statutory construction, we will adopt the interpretation which "best advances the legislative purpose."

*Allison v. Housing Authority*, 118 Wn.2d 79, 85–86 (1991) (internal citations omitted).  RCW 49.60.040(3) defines "employer" to include "any person acting in the interest of an employer," including supervisors.  *See Brown v. Scott Worldwide Paper Co.*, 143 Wn.2d 349, 357–58 (2001); *Renz v. Spokane Eye Clinic, P.C.*, 114 Wn. App. 611, 617 (2002).

**3.  42 U.S.C. § 1981**

Section 1981 prohibits any discrimination in employment based on race.  *Manatt v. Bank of Am.*, 339 F.3d 792, 800 (9th Cir. 2003).  Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, given evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, license, and exactions of every kind, and to no other.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

42 U.S.C. § 1981(a).   "Make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).   "Under 42 U.S.C. § 1981, discrimination based on 'ancestry or ethnic characteristics' is prohibited.   Although national origin discrimination is not within the ambit of § 1981, race has been defined broadly to cover immigrant ethnic groups." *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004) (internal citations omitted).

### 4.  Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983

Section 1983 provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the United States Constitution or federal laws by those acting under color of state law. 42 U.S.C. § 1983.  To establish a claim under Section 1983, a plaintiff must establish: (1) violation of a federal constitutional or statutory right; and (2) the defendant acted under color of state law.  *Miguel v. Guess*, 122 Wn. App. 536, 545 (2002).  To demonstrate that the defendant acted under color of state law, the plaintiff must show that the defendant exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326 (1941).  "In order for a person acting under color of state law to be liable under Section 1983, there must be a showing of personal participation in the alleged rights deprivation[.]" *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002).

Under the Equal Protection Clause of the Fourteenth Amendment, individuals have a right to be free from discrimination on the basis of race or national origin in public employment.  The Equal Protection Clause states that "[n]o State shall […] deny to any person within its jurisdiction the equal protection of the law." U.S. Const. Amend. XIV, § 1.  The Equal Protection Clause requires similarly situated individuals to be treated the same.  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

### B.  Plaintiffs Bring Federal and State Law Claims

Plaintiffs bring claims under both federal and Washington Law Against Discrimination.  Washington's law and its remedies are more expansive than federal law and its remedies are

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

more comprehensive.  The Washington Supreme Court has made clear that the potential greater recovery under WLAD rather than federal statutes is consistent with WLAD's broad scope and the requirement that the act be liberally construed to accomplish its purposes.  *Antonius v. King County*, 153 Wn.2d 256, 267 (2004) (citing RCW 49.60.020).  A person has the right to hold employment without discrimination, and the discrimination statutes embody "public policy of 'the highest priority.'"  *Id.* (citing *Xieng v. Peoples Nat'l Bank of Wash.*, 120 Wn.2d 512, 521 (1993)).

### C.  Direct and Circumstantial Evidence

Plaintiffs may prove their case through direct or circumstantial evidence.  *See Cornwell v. Electra. Cent. Credit Union,* 439 F.3d 1018, 1028 (2006); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003); *Griffith v. Schnitzer Steel Indus.*, 128 Wn. App. 438, 447 (2005).  In employment discrimination cases, direct and circumstantial evidence are treated the same:

> The reason for treating circumstantial and evidence alike is both clear and deep-rooted: "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."

*Desert Palace*, 539 U.S. at 100; *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) ("[T]he Supreme Court held that the distinction between direct and circumstantial evidence is irrelevant[.]").  "Direct, 'smoking gun' evidence of discriminatory animus is rare, since 'there will seldom be eyewitness' testimony as to the employer's mental processes," and 'employers infrequently announce their bad motives orally or in writing."  *Hill v. BCTI Income Fund-I*, 144 Wash.2d 172, 179 (2001), *abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittias City*, 404 P.3d 464 (2017) (internal quotation marks and citation omitted).  "Consequently, it would be improper to require every plaintiff to produce 'direct evidence of discriminatory intent.'"  *Id.* (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n. 3 (1983)).

### D.  Race and National Origin Discrimination

#### 1.  Hostile Work Environment

##### a.  *Burden of Proof*

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Plaintiffs allege that they were subjected to a hostile work environment on the basis of their race and/or national origin in violation of Title VII, Section 1981, and WLAD.  Under federal law, Plaintiffs must demonstrate that: (1) he or she was subjected to slurs, insults, jokes or other harassing conduct because of his or her race or national origin; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his or her employment; and (4) the work environment was both subjectively and objectively abusive or hostile.  *See Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1527 (9th Cir. 1995); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) ("[T]he elements to prove a hostile work environment are the same for both racial harassment and sexual harassment."); Ninth Circuit Model Jury Instructions 10.5.

Under Washington law, Plaintiffs must demonstrate that: (1) the harassment occurred because of Plaintiffs' race and/or national origin; (2) the harassment was unwelcome; (3) the harassment affected the terms and conditions of their employment; and (4) the harassment is imputed to the employer.  *See* RCW § 49.60.030; *Loeffelholz v. University of Washington*, 175 Wash.2d 264, 275 (2012); *Glasgow*, 103 Wn.2d at 406–07; *Washington v. Boeing Co.*, 15 Wn. App. 1, 13 (2000); Washington Pattern Instructions 330.23.

### b.   Harassing Conduct Based on Race and/or National Origin

Clark County employees subjected Plaintiffs to anti-Latino slurs, insults, jokes, and additional harassing conduct over a period of several years.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22–23 (1993) (considering "all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance").  For example, Crew Chief John May, among other things, referred to Latinos as "cancers" and said when looking at Plaintiffs that "the county got too much cancer, there's cancer here" and "I'm working on getting rid of these cancers" as well as Plaintiffs were serving under a "white master."  Similarly, former Crew Chief Richard Harris, among other things, said that "the county is going to shit because they keep hiring all these beaners and spics."  *See Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998) ("[R]acist attacks need

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

not be directed at the complainant in order to create a hostile [] environment.").

Plaintiffs were subjected to constant harassment, which intensified when their co-worker harassers were promoted to supervisory positions.  Crew Chief, and later Superintendent, Nick Eiesland said in front of Plaintiffs Hutson and Pena that the border wall around Finn Hill was working because they got rid of two Mexicans, referring to Plaintiffs Hutson and Pena, and they only needed to get rid of one more, referring to Julio Morales, another employee on the crew. Because of a hostile work environment, Clark County employees on an almost weekly basis remarked and referred to Plaintiffs as "the landscaping crew," "Manuel Labor," and "keep the brown down" because of their race and/or national origin.  *See Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872–73 (9th Cir. 2001) (holding that the employer maintained a hostile work environment where co-workers and supervisors called a male employee derogatory slurs at least once a week); *Jones v. Rabanco, Ltd.*, 439 F. Supp. 2d 1149, 1164 (W.D. Wash. 2006) (finding that unwelcomed racial harassment where supervisors used the n-word, other racial slurs, and treated Black and Latino employees worse than white employees).  Most notably, employee Jeff Kajava said "it's a good day in the County boys, cops are killing n***ers and Trump is kicking out the Mexicans" in front of Crew Chiefs John May, Brandon Pilot, and Richard Harris.

The evidence in this case will show that Plaintiffs were subjected to a course of harassing treatment over the course of many years in the Roads Division.  Plaintiffs endured various incidents, often only days apart, that were motivated by racial animus.  Consequently, the Roads Division became a hostile work environment where multiple incidents took place that wore Plaintiffs down as to constitute illegal harassment:

> Hostile environment claims are different in kind from discrete act.  Their very nature involves repeated conduct […] The "unlawful employment practice" therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

*AMTRAK v. Morgan*, 536 U.S. 101, 115 (2002) (citation omitted); *see also Antonius*, 153 Wn.2d at 269–70 ("[T]hat the hostile work environment occurs over a series of days or perhaps years in direct contrast to discrete acts, a single act of harassment may not be actionable on its own […]

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   such claims are based on the cumulative effect of individual acts.").  Therefore, the issue is not

2   whether any single act by Clark County employees created the hostile work environment but

3   rather the "entire constellation of surrounding circumstances."  *Oncale v. Sundowner Offshore*

4   *Servs., Inc.*, 523 U.S. 75, 82 (1998).

### c.   Conduct was Unwelcome

5   Clark County employees subjected Plaintiffs to a course of conduct that was intended to

6   make their working life at the Roads Division intolerable and difficult.  It was such that a

7   reasonable person in his position would have found it "more difficult for [him] to do his job, to

8   take pride in [his] work, and to desire to stay."  *See McGinest*, 360 F.3d at 1113 (quoting *Steiner*

9   *v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994)).  The hostile work environment

10  created so much stain on Plaintiffs that they sought mental health counseling and had physical

11  manifestations of panic attacks, stress, and loss of enjoyment of life.  Defendant cannot argue

12  that the harassing conduct that Plaintiffs experienced was welcomed.

### d.   Conduct Affected the Terms and Conditions of Employment

13  The harassing Clark County employees' anti-Latino racially discriminatory remarks and

14  conduct altered the conditions of Plaintiffs' employment because the harassing remarks and

15  conduct were severe and pervasive, and non-Latinos were not subjected to such harassment.  The

16  anti-Latino remarks by Crew Chiefs Nick Eiesland, John May, and Richard Harris were the most

17  severe because these were first line supervisors on roads crews who interacted daily with one or

18  all of the Plaintiffs.  *Nichols*, 256 F.3d at 872 ("The required level of severity or seriousness

19  varies inversely with the pervasiveness or frequency of the conduct."); *Gregory v. Widnall*, 153

20  F.3d 1071, 1074 (9th Cir. 1998) ("[T]he more outrageous the conduct, the less frequent must it

21  occur to make a workplace hostile.").  Because Clark County employees work on a small team

22  with their crew chief, Plaintiffs were unable to avoid the discriminatory remarks, and they were

23  subjected to frequent harassment.  *Steiner*, 25 F.3d at 1462–63 (It is enough "if such hostile

24  conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take

pride in her work, and to desire to stay in her position.").  Justice O'Connor put the point well:

A discriminatorily abusive work environment, even one that does not seriously

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

> affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

*Harris*, 510 U.S. at 22.  Clark County employees' conduct towards Plaintiffs affected the terms and conditions of their employment through the differential application of discipline, over-scrutinized work performance, being yelled at for no reason, and filing complaints to receive pay entitled to them for work performed.  *See Burlington North. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006) (noting that "one good way" to discourage an employee from complaining about discrimination would be to give them the most arduous and least desirable job duties).

When Plaintiffs reported the anti-Latino and anti-Hispanic remarks and conduct to their supervisor, Superintendent Timothy Waggoner, he failed to remedy the situation.  *See Robles v. Agreserves, Inc.*, 158 F. Supp. 3d 952, 984 (E.D. Cal. 2016) ("[C]onduct is more impactful because of his [harasser's] status as [the employee's] foreman.").  Instead, Waggoner perpetuated the harassment and engaged in behavior to humiliate, target, and belittle Plaintiffs' concerns and work performance.  Accordingly, a few isolated incidents or even a single incident, if sufficiently severe, may be sufficient to alter the conditions of employment and create a hostile or abusive work environment.  *See Boyer-Liberto v. Fountainbleau Corp.*, 2015 WL 216849, at *1, 10, 13 (4th Cir. May 7, 2015) ("[W]e underscore the Supreme Court's pronouncement in *Faragher* […] that an isolated incident of harassment, if extremely serious, can create a hostile work environment.").

### e.  *Subjectively and Objectively Hostile Work Environment*

Clark County maintained an objectively and subjectively hostile work environment. Courts consider the totality of the circumstances for hostile work environment, including the frequency, severity and nature of the conduct "from the perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff."  *McGinest*, 360 F.3d at 1113, 1115. Plaintiffs' discrimination complaints reflect their subjective belief that Defendant's work environment is hostile.  Plaintiffs have foregone opportunities for additional work or pay because

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

they have to directly report to supervisors who belittle them in front of their co-workers, or have to work with co-workers who have made racial remarks. Alanis testified that Jeremiah Hertz and Crew Chief Smith noticed the mistreatment perpetuated by Waggoner. Union President Young and Union Vice-President Tikka also testified about the mistreatment. Smith testified that Waggoner would ask him why Plaintiffs were serving as acting crew chief and expressed hostility towards them when they did. Comments such as these establish that Clark County maintains an objectively hostile work environment.

Further, Clark County failed to take adequate remedial action to eliminate the hostile work environment harassing supervisors and employees created. An employer must take remedial action once it knows or should know, of harassing conduct, and it breaches this duty by failing to undertake, or ineffectually undertaking, remedial action. *See Nichols,* 256 F.3d at 875–76 ("When the employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, liability attaches for both the past harassment and any future harassment.").

Plaintiffs testified that Clark County management ignored Plaintiffs' discrimination complaints. Management also attempted to prevent Plaintiffs from bringing forth additional information by attacking Plaintiffs and convincing them that their problems had to do with their work performance.

### f. *Supervisor Harassment*

#### i. *Clark County Superintendents and Crew Chiefs Are Supervisors*

An employer is liable for the hostile environment created by a supervisor. *El-Hakem v. BJY, Inc.*, 415 F.3d 1068, 1074 n. 2 (9th Cir. 2005). The employer is strictly liable if the harassment culminates in a tangible employment action, with no affirmative defense. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (citing *Burlington Ind. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)). Supervisor status is determined as a matter of fact, and not based solely on a formal designation. An employer is a supervisor if empowered to "make tangible employment actions" or "take tangible employment actions against the victim." *Vance*, 570 U.S. 432, 450. Similarly, this analysis informs the interpretation

CERTIFICATE OF SERVICE  - 20

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

of WLAD.  "The real question with respect to employer liability for a hostile work environment created by a supervisor is whether the supervisor was aided in creating the hostile work environment by the agency relation.  If the supervisor was so aided, the supervisor's act becomes the act of the employer—and where there has been tangible employment action based on [harassment], it is clear that the supervisor was aided by the agency relation." *Henningsen v. WorldCom*, 102 Wn.App. 828, 843 (2000) (citing *Ellerth*, 524 U.S. at 762).

Here, it is undisputed that superintendents are supervisors.  Crew chief are also supervisors, given that they are delegated authority that is reserved for and relied on by higher management.  For example, Clark County Superintendents Timothy Waggoner and Carl Oman have testified that they rely on crew chiefs for managing their particular sheds, assigning work assignments, and validating individual employee's requests for vacation or sick leave.

The Supreme Court has noted that a person can qualify as a supervisor if their recommendations amount to "tangible employment actions [...] subject to approval by higher management." *See Vance*, 570 U.S. at 436–438, 437 n. 8.  An employer cannot limit its supervisory designations to avoid supervisor liability.  Where an employer "attempt[s] to confine decision making power to a small number of individuals, those individuals will have a limited authority to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee." *Id.* at 447.  Even where a harassing employee does not have the power to take formal actions vis-a-vis the victim, the harasser may have substantial input into those decisions, if he is more familiar with the victim's work than the off-site manager with actual direct authority over the victim. *See id.* (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 509 (7th Cir. 2004) (Rovner, J. concurring in part and concurring in the judgment).  "Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Vance*, 570 U.S. at 447.

Clark County Roads Division is headed by the Roads Operations Manager, who oversees three superintendents.  By Defendant's own admission, crew chiefs report directly to superintendents and serve as liaisons between the superintendents and the crew.  It appears that

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Clark County "attempt[ed] to insulate [itself] from liability for workplace harassment by formally empowering only a handful of individuals to take tangible employment actions," *Vance*, 570 U.S. at 446, but the three superintendents do not work directly with Plaintiffs and therefore are unable to evaluate their work performance without delegating that responsibility to crew chiefs. According to former Roads Operations Manager Sue Stepan, the superintendents rely heavily on the crew chiefs for managing the day-to-to operations of each crew.  Consequently, crew chiefs have substantial input into decisions with respect to Plaintiffs because they are the persons most familiar with their performance, they assign work duties and overtime pay, as well as provide disciplinary recommendations to superintendents. Under those circumstances, Clark County "effectively delegated the power to take tangible employment actions" to crew chiefs.

    *ii.   Clark County Superintendents and Crew Chiefs Engaged in Tangible Employment Actions*

Tangible employment actions include any economic benefit, such as "hiring" and "promotion," or but also actions with no immediate economic effect such as "undesirable assignment" and "reassignment with significantly different responsibilities." *Ellerth*, 524 U.S. at 761; *Faragher*, 524, U.S. at 790, 808; *see Meritor Sav. Bank*, 477 U.S. at 64 ("[T]he language of Title VII is not limited to 'economic' or 'tangible' discrimination.").  An act that causes significant disruption in an employee's earning potential and working conditions is a tangible employment action. *See Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3rd 1999). Waggoner repeatedly denied increased pay owed to Plaintiffs, and Plaintiffs eventually received pay only after filing multiple grievances with the union and waiting months for a response. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223–224 (2nd Cir. 2001) (holding that the lost use of wages for a period, even if reimbursed, constitutes an economic injury that can qualify as a tangible employment action).  In addition to having to work under hostile conditions, Plaintiffs have each suffered tangible employment actions.  For example, the County kept Plaintiff Hutson from receiving increased pay several times.  Plaintiff Pena used personal time to quarantine when HR denied his request for COVID leave, and he was also denied overtime opportunities.  Plaintiff Alanis no longer operates the vactor truck after Waggoner accused him of sabotage, and he

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

withdrew his application for a promotion when Roads Operations Manager Lipscomb berated him for using his phone to communicate with his crew.  Evidence clearly supports Plaintiffs' claims that they suffered tangible employment actions that have affected the terms of their employment. *See Storey v. Burns Intern. Sec. Servs.*, 390 F.3d 760, 764 (3rd Cir. 2004).

### g. *Co-Worker Harassment*

#### i. *Federal Law*

Clark County is liable for co-worker harassment if its supervisors knew or should have known about harassment and took no action to remedy it. *Burrell v. Start Nursery*, Inc., 170 F.3d 951, 955 (9th Cir. 1999).  As early as 2017, Plaintiff Hutson notified Superintendent Timothy Waggoner about Richard Harris' comments and harassing conduct. Waggoner refused to do anything about it.  Moreover, Roads Operations Manager Josh Lipscomb testified that a public posting denigrating Latino immigrants was displayed in full view of Roads Division employees for years before he finally removed it in 2022.

For years, supervisors heard comments like "manuel labor" and did nothing about them.  Crew Chief Chad Weiker testified that an employee on his crew had used the term "as a joke" recently, and was fired.  Weiker's characterization of the use of this derogatory term "as a joke" demonstrates that supervisors knew the language was being used and did not find it offensive despite it being clearly discriminatory.

Clark County knew about earlier serious incidents of race-based comments, taunts, and threats that existed in the Roads Division.  In or around 2007, an employee threatened to kill Isidoro Flores and his family; between 2010 to 2015, Nick Eiesland repeatedly asked Flores whether Latino landscaping crews were his family members; from 2019 to 2022, superintendents refused to approve increased pay for Latino employees, not just Plaintiffs.  As recently in 2022, union Vice-President Tikka was warned not to be "associated with those guys," referring to Plaintiffs, because he would "suffer the consequences."

#### ii. *Washington Law Against Discrimination*

Harassment by co-workers or supervisors is imputed to the employer if the employer knew or should have known of the harassment and failed to take reasonably prompt and adequate

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

corrective action.  *Glasgow*, 103 Wash.2d at 407–08.  Plaintiffs can demonstrate that the employer knew or should have known of the harassment by demonstrating that complaints were made to supervisors, or by demonstrating that the harassment was so pervasive that it creates an inference of the employer's knowledge or constructive knowledge.  Plaintiffs made several complaints to supervisors starting 2017 through the present.  Moreover, the evidence shows that supervisors themselves regularly used derogatory language aimed at Latinos, as well as treated them differently based on their race; that postings were left on public walls for years; that supervisors considered the use of terms such as "manuel labor" as harmless jokes; and that the harassing behavior was aimed at Latinos other than just the Plaintiffs.   This evidence demonstrates that the supervisors were on notice of the pervasiveness of the harassing conduct.

Under Washington law, the Defendant can avoid liability by taking prompt and corrective action upon discovering harassment. *Glasgow*, 103 Wash.2d at 407–08.  Here, not only did the County *not* take prompt action, Clark County supervisors failed to accept complaints, and threatened other employees to keep them from intervening on behalf of Plaintiffs. Clark County argues that at least one HR investigation was completed, but it was not started until months after complaints were first made in January 2020. Moreover, the report of that investigation demonstrates the fatal flaw in the County's approach: it lists the people who were interviewed, the majority of whom were White, and many of whom are the perpetrators of discrimination in the Roads Division. The report counted and then *credited* the opinions of those people who were interviewed, in essence asking them whether they think harassment occurred in the Roads Division, and then concluding there was no violation of County policy.  This majority-vote method of co-harassers determining whether harassment occurred is not a "prompt and corrective action" for resolving harassment.  Additionally, an employer's obligation is not discharged until prompt and effective action has been taken.  "Effectiveness will be measured by the twin purposes of ending the current harassment and deterring future harassment—by the same offender or others."  *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1529 (9th Cir. 1995) (citing *Intlekofer v. Turnage*, 973 F.2d 773, 780–81 (9th Cir. 1992)).  A mere investigation does not substitute for the remedy itself.  *See Fuller*, 47 F.3d at 1529.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

### 2. Disparate Treatment

#### a. Burden of Proof

Under federal law, Plaintiffs must establish that, by preponderance of the evidence, their race or national origin was a motivating factor for Defendant's decision to take adverse action against them. Ninth Circuit Model Jury Instructions 10.1. Plaintiffs must show that "'race, color, […] or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.'" 42 U.S.C. § 2000e-2(m). An employer may be held liable for employment discrimination "even if it had a legitimate reason for its employment decision, as long as an illegitimate reason was a motivating factor in the decision." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1041 (9th Cir. 2005). To meet their burden, Plaintiffs may "simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *McGinest*, 360 F.3d at 1122. A motivating factor is a factor that "played a part in the employment decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989).

To prevail on their discrimination claims under Washington Law Against Discrimination, Plaintiffs must "present evidence sufficient for a trier of fact to reasonably conclude that the alleged unlawfully discriminatory animus was more likely than not a substantial factor in the adverse employment action" or adverse terms and conditions of employment. *Hill*, 144 Wn.2d at 185 (citing *Carle v. McChord Credit Union*, 65 Wn. App. 93, 102 (1992)); Washington Pattern Instructions 330.01. "[A] defendant is liable for a plaintiff's injury if the defendant's conduct was a substantial factor in bringing about the injury even though other causes may have contributed to it." *Allison*, 118 Wash.2d at 94. "[B]ecause both legitimate and illegitimate motives often lurk behind" employment decisions, Plaintiffs are not required to prove that the discriminatory motive was the "but for" reason. *Id.*

The burden-shifting framework set forth in *McDonnell Douglas* arises only in the context of summary judgment and motions for judgment as a matter of law, and should not be given to the jury. *See United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714–16 (1983); *Sanghvi v. City of Claremont*, 328 F.3d 532, 540 (9th Cir. 2003) ("[I]t is error to charge

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

the jury with the elements of the *McDonnell Douglas* prima facie case."); *Desert Palace*, 299 F.3d at 855 ("[I]t is not normally appropriate to introduce the *McDonnell Douglas* burden-shifting framework to the jury.").

       *b.   Employment Discrimination*

Clark County's COVID quarantine polices were unevenly applied and Plaintiff Pena was the victim of disparate treatment. Clark County management and supervisors allowed three white employees to quarantine and receive paid leave, but not Pena, even though all were exposed to the same co-worker who tested positive for Covid-19.  Plaintiff Pena can establish a disparate treatment claim under Title VII, Section 1981, and the WLAD: (1) under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework, or (2) alternatively, an employee may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason "more likely than not" motivated the employer.  *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 691 (9th Cir. 2010) (citation omitted); *see also Hawn v. Executive Jet Management, Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010) (explaining that a plaintiff may show an inference of discrimination "through comparison to similarly situated individuals, or any other circumstances surrounding the adverse employment action [that] give rise to an inference of discrimination.") (internal quotation marks and citation omitted).

Plaintiff Pena can establish a *prima facie* case of disparate treatment under the *McDonnell-Douglas* framework.  The burden then shifts to Defendant Clark County to provide a legitimate and lawful reason for the disparate treatment.  *Id.*  If Defendant Clark County can satisfy its burden, the burden shifts back to Plaintiff Pena to demonstrate that Defendant Clark County's disparate treatment is pre-textual.  *Id.*  Courts require "very little evidence" of the employee even at "summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotation marks and citation omitted).

To establish a *prima facie* case of disparate treatment under Title VII and Section 1981, Plaintiff Pena must establish that he: (1) belongs to a protected class, (2) performed according to

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

the employer's legitimate expectations, (3) suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *Hawn*, 615 F.3d at 1156; *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (citing *McDonnell Douglas*, 411 U.S. at 802); *see also Manatt*, 339 F.3d at 799 (federal courts apply the same standards in Section 1981 and Section 1983 actions as they do in Title VII race discrimination cases). Similarly, to establish a *prima facie* case of disparate treatment under the WLAD, Plaintiff Pena must demonstrate that he: (1) belongs to a protected class and (2) was treated less favorably in the terms and conditions of his employment than a similarly situated, non-protected employee. *See Jones*, 439 F. Supp. 2d at 1160. Plaintiff Pena must also show that he and the comparator-employee did substantially the same work. *See Boeing Co.*, 105 Wash. App. at 13.

First, Defendant Clark County cannot dispute the first element under Title VII or the WLAD because it is undisputable that Plaintiff Pena is Latino and/or Hispanic, and therefore, a member of a protected class under Title VII and the WLAD. *See Jones*, 439 F. Supp. 2d at 1161 ("Mr. Ortiz is Latino and meets the definition of a member of a protected class.").

Second, Plaintiff Pena performed according to Clark County's legitimate expectations. Plaintiff Pena's employment records demonstrate that he has never been disciplined, written-up, demoted, or suspended during his tenure with Clark County and that he is an exemplary, hardworking, and dedicated employee. Defendant Clark County cannot dispute that Plaintiff Pena did anything but satisfactory work.

Under the remaining elements for Title VII and the WLAD, Plaintiff Pena suffered an adverse employment action when Defendant Clark County allowed three white employees— Kenny Hugo, Aeron Morring, Micah Passmore—to quarantine following their exposure to Plaintiff Alanis, who had tested positive for Covid-19, but denied the same opportunity for Plaintiff Pena even though he had worked with Plaintiff Alanis. Employees Hugo, Morring, and Passmore informed Plaintiff Pena that they were automatically given Covid leave, or paid time off, to quarantine after their possible exposure to Covid-19. In contrast, HR Analyst Kara Hill told Plaintiff Pena that he must use his personal time for anything related to Covid-19 because

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

he was denied his request to take a Covid-19 test and quarantine.  Hill further told Plaintiff Pena that only the department of health has the authority to direct employees to quarantine; in contrast, employees Hugo, Morring, and Passmore told Plaintiff Pena that Hill directed them to quarantine, not the department of health.  Pena also can establish that he was denied a pay increase for his training activity, and for overtime pay on several occasions, when similarly situated White employees were paid without question.

Plaintiff Alanis also experienced disparate treatment when he was discouraged from applying for a crew chief position; non-Latinos were not discouraged from applying through berating, belittling, or disparaging conduct. *See Inter. Broth. of Teamsters v. U.S.*, 431 U.S. 324, 365 (1977) (holding that a plaintiff demonstrates disparate treatment when there is a "consistently enforced discriminatory policy" which discourages applicants from even attempting to apply, such as the employer's responses to inquiries and ethnic composition of the workforce).

In Spring 2022, Alanis applied for a crew chief position but withdrew his application after Roads Operations Manager Josh Lipscomb wrongly called him out for spending time on his phone dealing with county business during a meeting.  Alanis got the message that his supervisors would make his life difficult if he were to become a crew chief. Clark County's discriminatory policies deterred Alanis from applying for a crew chief position in the near future. *Teamsters*, 431 U.S at 365 (Applicants "suffer from discriminatory employment practices" when "[a] consistently enforced discriminatory policy" deters them from applying because they are "aware of it and unwilling to subject themselves to the humiliation of explicit and certain rejection.").

Plaintiffs were subjected to unequal treatment when they were singled out repeatedly with disparaging and belittling remarks that were based on their race or national origin. They were also treated unequally when supervisors refused to compensate them the increased pay to which they were entitled, while Whites routinely received such pay without incident.

**3.  Equal Protection Clause and Section 1983**

*a.  Burden of Proof*

Plaintiffs can establish that Defendant Clark County deprived them equal protection under the law because they are Latino and Defendant has failed to remedy the hostile work

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

environment.   "The Equal Protection Clause […] is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne.*, 473 U.S. at 439.  "To state a claim . . . for a violation of the Equal Protection Clause […] a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class*."  Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001); *see also Rosenbaum v. City & City of San Francisco*, 484 F.3d 1142, 1153 (9th Cir. 2007) ("To show discriminatory purpose, a plaintiff must establish that 'the decision-maker […] selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.'") (citations omitted).

Clark County was aware of Plaintiffs' complaints about workplace discrimination, and its management and supervisors prevented Plaintiffs from providing additional information about the many discriminatory incidents to substantiate their claims.  Documents, including emails exchanged regarding Plaintiffs' many grievances, confirm that Clark County was aware about Plaintiffs' complaints about race discrimination.

### E.  Defendant's Affirmative Defenses Fail in this Case

#### 1.  Statute of Limitations

Defendant's argument that any of Plaintiffs' claims are untimely must fail.  This lawsuit was filed on June 1, 2021.

Because a hostile work environment claim is a single "unlawful employment practice" that occurs "over a series of days or perhaps years," Plaintiffs' hostile work environment claims under Title VII, Section 1981, and the WLAD are timely, so long as any act contributing to the hostile work environment occurred within the limitations period.  *See Morgan*, 536 U.S. at 117–118; *see also Antonius*, 153 Wn.2d at 268 ("Moreover, the nature of hostile work environment claim strongly indicates that it should not be parsed into component parts for statute of limitations purposes.").  In *National R.R. Passenger Corp. v. Morgan*, the Supreme Court held that:

> A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice."  42 U.S.C. § 2000e-

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

5(e)(1).  The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened.  ***It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability*** […] Given, therefore, that the incidents constituting a hostile work environment are part of one unlawful employment practice, ***the employer may be liable for all acts that are part of this single claim.  In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.***

*Morgan*, 536 U.S. at 117–118 (emphasis added).  Additionally, the Supreme Court explained that a gap in time between events which contributed to a plaintiff's hostile work environment claims does not mean that those events are not part of the same single unlawful employment practice.  *Id.* at 118; *see Antonius*, 153 Wn.2d at 271–72.  Here, Plaintiffs individually and collectively experienced various incidents over the course of many years.  As such, there are no real time gaps between the persistent harassment Plaintiffs suffered at Clark County to the present day.

Regardless, acts occurring prior to the limitations periods on non-harassment claims may be used as evidence of Defendant's motive or as background evidence to provide context for acts that occurred within the limitations period.  *See Carpinteria Valley Farms, Ltd. v. Cnty. of Santa Barbara*, 344 F.3d 822, 829 (9th Cir. 2003) (holding that a plaintiff may use time barred acts "as evidence to establish motive to put his timely-filed claims in context.); *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1062 (9th Cir. 2002) ("In assessing whether acts occurring within the limitations period are unconstitutional, we may look to pre-limitations period events as evidence of an unconstitutional motive […] Thus, we do not assess in a vacuum whether the acts falling within the limitations period raise an inference of discrimination.  We consider the evidence in its entirety.") (internal citations omitted).

### 2.  Accord and Satisfaction

The affirmative defense of accord and satisfaction is not applicable in this action. Accord and satisfaction occurs when there is "(1) a bona fide dispute; (2) an agreement to settle that

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

dispute (accord); and (3) execution of that agreement (satisfaction)." *Milgard Tempering Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 712 (9th Cir. 1990) (citation omitted).  Plaintiffs' claims are based on discrimination on the basis of their race and/or national origin.  Plaintiffs have alleged that the discrimination is ongoing, which defeats the satisfaction prong of this affirmative defense. Further, Defendant makes much of the fact that Plaintiffs are still employed and that plaintiffs were eventually paid or had some of their requests granted.   However, the issue is not that Plaintiffs were never paid, but rather that they experienced delay of payment and were forced to complain to get paid or receive what was otherwise due to them.   This factual dispute undermines Defendant's accord and satisfaction defense.

### 3.  Failure to Mitigate Damages

The burden of proving a failure to mitigate damages in an employment discrimination case falls on the defendant.  *IAS v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978);  Ninth Circuit Model Jury Instructions 5.3.   To satisfy this burden, Defendant Clark County must establish:

1.   That the plaintiff failed to use reasonable efforts to mitigate damages; and

2.   The amount by which damages would have been mitigated.

Ninth Circuit Model Jury Instructions 5.3.   The standards under Washington law are the essentially the same. *See Pub. Util. Dist. 2 of Pac. Cty. v. Comcast of Wash. IV, Inc.*, 336 P.3d 65, 76 (Wash. Ct. App. 2014) (The doctrine of mitigation of damages "prevents recovery for those damages the injured party could have avoided by reasonable efforts taken after the wrong was committed."); *Cobb v. Snohomish Cty.*, 935 P.2d 1384, 1389 (Wash. Ct. App. 1997) ("The party whose wrongful conduct caused the damages […] has the burden of proving the failure to mitigate.").

In cases involving injuries, the defendant not only must establish that the injured party failed to use reasonable care to mitigate damages, but also show through expert testimony that the failure to mitigate aggravated the party's injury or otherwise increased the damage suffered. *See Fox v. Evans,* 111 P.3d 267, 270 (Wash. Ct. App. 2005) ("To support a mitigation instruction, expert testimony must establish that the alternative treatment would more likely than

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

not improve or cure the plaintiff's condition.").

"When an alleged failure to mitigate concerns the plaintiff's failure to secure or submit to medical treatment, a defendant must show that there were alterative treatment options available to the plaintiff and that the plaintiff acted unreasonably in deciding on treatment." *Salisbury v. City of Seattle*, 522 P.3d 1019, 1028 (Wash. Ct. App. 2023).  "A wide latitude of discretion must be allowed to the person who by another's wrong has been forced into a predicament where he is faced with a probability of injury or loss."  *Hogland v. Klein*, 49 Wash. 2d 216, 221 (1956).  Under Washington law, the standard of proof falls on the defendant:

> An injured party generally may not recover damages proximately caused by that person's unreasonable failure to mitigate.  Expert testimony is required in cases where a determination of causation turns on obscure medical factors.  Submitting the issue to the jury without such testimony is improper because the jury is thus invited to reach a result based on speculation and conjecture.  The issue should also not be submitted if the evidence shows that a proposed treatment might not be successful or if there is conflicting testimony as to the probability of a cure, because it is not unreasonable for a plaintiff to refuse treatment that offers only a possibility of relief.

*Cox v. Keg Restaurants*, 86 Wash. App. 239, 244 (1997).  The "mere possibility of a benefit" from a course of medical treatment is insufficient to warrant a failure to mitigate instruction.  *Id.* at 245.

Here, because of Defendant Clark County's discriminatory acts, Plaintiffs sought medical treatment to manage their worsening symptoms.  Beginning in 2018, Plaintiffs have engaged with counselors, physicians, therapists and have been prescribed, among other things, anti-anxiety medications to treat panic attacks and depression.

Defendant's assertion that Plaintiffs have failed to mitigate their damages is wholly incorrect.  Plaintiffs remain employed by Clark County, which continues to expose them to a constant environment of harassment and discrimination that exacerbates their symptoms. Plaintiffs brought this lawsuit to end the harassment and discrimination that they have experienced on almost daily basis in order to not only improve their working conditions but to improve their physical symptoms.  Furthermore, under Washington law, Defendant must put forward expert testimony and evidence to demonstrate that Plaintiffs have failed to mitigate their

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

damages.  Defendant has failed to do so.  As a result, Defendant's mitigation of damages defense fails as a matter of law and cannot be admitted into evidence.

### 4.  Prompt Remedial Action

Clark Country must demonstrate a valid and effective anti-harassment policy to raise an affirmative defense.  *Ellerth*, 534 U.S. at 765; *Faragher*, 524 U.S. at 807.  A policy that is contravened by actual practice or one that does not result in a prompt investigation is invalid. *See EEOC v. Management Hosp. of Racine*, 666 F.3d 422, 436 (7th Cir. 2012) (finding that an investigation commenced two months after complaints were received was not sufficiently prompt); *see also Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 774 (9th Cir. 2005) ("A written antidiscrimination policy does not insulate a company from liability if it does not enforce the antidiscrimination policy and, by its actions, supports discrimination.").

Here, Plaintiff tried several times to complain to supervisors about discriminatory conduct, and supervisors refused to accept their complaints.  The practice of supervisors refusing or failing to investigate complaints negates any written anti-discrimination policy Clark County might have in place to protect itself from liability.  When Plaintiffs complained to human resources or filed grievances with the union, there was no viable way for Plaintiffs to establish their complaints about ongoing harassment and discrimination.  It took months for investigations to commence, and if a complaint or grievance was investigated, it was handled as a discrete, separate incident, isolated from all the other instances of discrimination.  Finally, human resources discouraged Plaintiffs from complaining about repeated instances of harassment, and when Plaintiffs pressed their complaints, human resources delayed its investigations.

### F.  Damages

### 1.  Remedies Available

Under each of Plaintiffs' claims, each of them may recover their economic and non-economic losses, attorneys' fees and costs.  *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460 (1975) (42 U.S.C. § 1981); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (42 U.S.C. § 1983); 42 U.S.C. § 1988; RCW 49.60.030.  Washington law provides for "actual damages sustained by the person, or both, together with the cost of suit including

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

reasonable attorneys' fees or any other appropriate remedy" authorized by Chapter 49.60 or Title VII of the Civil Rights Act of 1964.  RCW 49.60.030(2).

### 2. Economic Damages

To remedy Defendant's violations of Title VII, Section 1981, and the WLAD, Plaintiffs seek economic damages, including back pay.  Back pay awards under Title VII are not subject to statutory caps imposed by 42 U.S.C. § 1981a(b)(3).  If the jury finds that Defendant liable for violating Title VII and Section 1981, the Court will determine the amount of Plaintiffs' economic damages.  However, the Court may seek an advisory verdict from the jury.  *Traxler v. Multnomah Cnty.*, 2008 WL 270445, at *2 (D. Or. July 1, 2008), *aff'd* 596 F.3d 1007 (9th Cir. 2010).  If the jury finds that Defendant liable for violating the WLAD, the jury will determine the amount of Plaintiffs' economic damages.  *See Martini v. Boeing Co.*, 137 Wn.2d 357, 364 (1999).

### 3. Compensatory Damages

Plaintiffs seek emotional harm compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses."  *See Landgraf v. USI Film Products*, 511 U.S. 244, 253 (1994).  Under 42 U.S.C. § 1981a, Plaintiffs' compensatory damages are capped at $300,000. 42 U.S.C. § 1981a(b)(3)(D).  Compensatory damages for emotional distress and humiliation are also available under the civil rights statutes, Section 1981 and the WLAD, and such damages are not subject to Title VII's statutory cap.  *See Johnson*, 421 U.S. at 460 (compensatory damages available under Section 1981).

### 4. Emotional Distress Damages

In employment cases, plaintiffs are entitled to recover for personal injuries for emotional distress, humiliation, and pain and suffering.  *Cagle v. Burns and Roe, Inc.*, 106 Wn.2d 911, 726 P.2d 434 (1986); *Dean v. Mun. of Metro. Seattle*, 104 Wn.2d 627, 708 P.2d 393 (1985).  A plaintiff may recover damages for emotional distress so long as he or she presents evidence sufficient to support a damages award.  *Bunch v. King Cnty. Dep't of Youth Servs.*, 155 Wn.2d 165, 116 P.3d 381 (2005).  The plaintiff need only produce "sufficient evidence to convince an

CERTIFICATE OF SERVICE  - 34

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

'unprejudiced, thinking mind' of his anguish." *Bunch*, 155 Wn.2d at 181.  Such evidence can

be provided by the plaintiff's own testimony; evidence from a health care professional is not

required to prove emotional distress. *Bunch*, 55 Wn.2d at 181.

### 5.  Punitive Damages

An employer may be liable for punitive damages in any case where it "discriminate[s] in

the face of a perceived risk that its actions will violate federal law." *Kolstad v. American Dental*

*Assn.*, 527 U.S. 526, 535 (1999).  To establish that Defendant acted in reckless disregard of their

rights, Plaintiffs need not prove that Defendant's conduct as egregious or outrageous.  Rather,

they must prove that Defendant were aware that their conduct may have violated federal law and

acted in the face of that perceived risk.  *Id.*

> In a federal employment discrimination suit such as this one, punitive damages
> are available against an employer who "discriminate[s] in the face of a perceived
> risk that its actions will violate federal law" [. . .] although egregious conduct
> could be evidence of intent to break the law, such conduct [is] not required to
> establish punitive damages liability.  Thus, in general, intentional discrimination
> is enough to establish punitive damages liability.

*Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1041 (9th Cir. 2003) (quoting *Passantino*

*v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 515 (9th Cir. 2000)).

An employer cannot avoid liability for punitive damages merely because it has adopted a

written anti-discrimination or anti-harassment policy if it has failed to effectively implement that

policy.  *See Swinton v. Potomac Corp.*, 270 F.3d 794, 810–811 (rejecting employer's argument

that it was not liable for punitive damages because it had a written policy forbidding harassment

because "it is well established that it is insufficient for an employer simply to have in place anti-

harassment policies; it must also implement them."); *see also Bains LLC v. Arco Prods. Co.*, 405

F.3d 764, 774 (9th Cir. 2005) ("A written antidiscrimination policy does not insulate a company

form liability if it does not enforce the antidiscrimination policy and, by its actions, supports

discrimination."); *Arizona v. ASARCO*, 773 F.3d 1050, 1059–60 (9th Cir. 2014) (upholding

punitive damages award where management failed to respond to complaints harassment and

nothing, "to the extent ASARCO did have an antidiscrimination or harassment policy, the

existence of such a policy alone is not enough to save it.").  Regardless of the existence of written

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  policies regarding harassment and discrimination, the Ninth Circuit has held that punitive

2  damages are appropriate when management failed to provide prompt and effectual remedial

3  action when made aware of harassment complaints. *See id.* (upholding punitive damages award

4  where management "treated Aguilar's claims dismissively, did nothing to investigate Aguilar's

   claims or took steps that were not reasonably calculated to and did not the harassment.").

5       If punitive damages are awarded, the jury should determine an amount sufficient to fulfill

6  the purposes of punitive damages, which are "to punish a defendant and to deter similar acts in

7  the future." Ninth Circuit Model Instructions 5.5.  The purpose of punitive damages is to punish

8  a defendant, teach the defendant not to do it again, and to deter others from following the

9  defendant's example.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996); *Engquist v.*

10 *Oregon Dept. of Ag.*, 478 F.3d 985, 1004 (9th Cir. 2007); *see also Bains LLC*, 405 F.3d at 777

11 ("A punitive damages award is supposed to sting so as to deter a defendant's reprehensible

12 conduct, and juries have traditionally been permitted to consider a defendant's assets in

   determining an award that will carry the right degree of sting.").

13      Local governments are liable under Section 1981. "To establish municipal liability on a

14 § 1981 claim, plaintiff must allege that his injury was caused by an official policy or custom[.]"

15 *Nnachi v. City and County of San Francisco*, 2014 WL 4088149, at *6 (N.D. Cal. Aug. 19, 2014);

16 *see also Hailey v. City of Camden*, 631 F. Supp. 2d 528, 540 (D. N.J. 2009) ("[A] municipality

17 is liable under Section 1981 and 1983 only when 'execution of a government's policy or custom,

18 whether made by its lawmakers or by whose edicts or acts may fairly be said to represent official

19 policy, inflicts the injury.'*");  Hargett v. NYC Transit Authority*, 640 F. Supp. 2d 450, 472

20 (S.D.N.Y. 2009) ("A municipal entity and its employees acting in their official capacity may be

   liable under § 1981.").

21                                **IV. CONCLUSION**

22      For all the foregoing reasons, Plaintiffs are entitled to prevail in this matter and should

23 be entitled to recover damages and other relief authorized by law.

24

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

Dated: April 21, 2023

Respectfully submitted,

2

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**

3

4

*/s/ Luis Lozada*

Luis Lozada, pro hac vice
Fernando Nunez, pro hac vice
634 South Spring Street, 11th floor
Los Angeles, CA 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266
Email: llozada@maldef.org
        fnunez@maldef.org

5

6

7

8

*/s/ Leticia Saucedo*

Leticia Saucedo, pro hac vice
1512 14th Street
Sacramento, CA 95814
Telephone: (916) 444-3031
Email: lsaucedo@maldef.org

9

10

11

**BRESKIN, JOHNSON, TOWNSEND PLLC**

12

*/s/ Roger M. Townsend*

Roger M. Townsend, WSBA No. 25525
1000 Second Avenue, Suite 3670
Seattle, WA 98104
Telephone: (206) 652-8660
Facsimile: (206) 652-8290
Email: rtownsend@bjtlegal.com

13

14

15

16

*Attorneys for Plaintiff*

17

18

19

20

21

22

23

24

CERTIFICATE OF SERVICE  - 37