UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ELIAS PEŇA, ISAIAH HUTSON, and RAY ALANIS,<br><br>                           Plaintiffs,<br><br>      v.<br><br>CLARK COUNTY,<br><br>                        Defendant. | CASE NO. 3:21-cv-05411-DGE<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) |

## I    INTRODUCTION

This matter comes before the Court on Defendant Clark County's ("The County") motion for summary judgment.  (Dkt. No. 46.)  For the reasons discussed herein, the Court DENIES IN PART and GRANTS IN PART Defendant's motion.[1]  The Court dismisses Plaintiffs' disparate treatment claims under Title VII and the Washington Law Against Discrimination ("WLAD").  The Court also dismisses Plaintiffs' claims against the County under 42 U.S.C. § 1983 and

---

[1] Plaintiffs request oral argument.  (Dkt. No. 52 at 1.)  However, the Court determines oral argument would not be helpful to the Court's disposition of this motion and denies Plaintiffs' request.  *See* LCR 7(b)(4).

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) - 1

1  § 1981.  The Court denies the County's motion with respect to Plaintiffs' hostile work

2  environment claims under Title VII and WLAD.

3  **II      BACKGROUND**

4        Plaintiffs Elias Peña, Isaiah Hutson, and Ray Alanis are Latino employees of the Roads

5  Division of Clark County's Public Works Department.  (Dkt. Nos. 47-3 at 4; 53-1 at 5; 53-2 at

6  5.)  Alanis began his tenure at the Roads Division in 2014 (Dkt. No. 47-3 at 4); he now serves as

7  a heavy equipment specialist (Dkt. No. 53-1 at 5).  Hutson and Peña were hired as highway

8  maintenance workers in June 2016 and August 2017, respectively.  (Dkt. Nos. 53-2 at 5; 53-3 at

9  23.)  Both Hutson and Peña are now highway maintenance specialists for the Roads Division.

10  (Dkt. Nos. 47-5 at 14; 53-2 at 5.)  The County assigns Roads Division employees to crews that

11  are scheduled to work a variety of shifts out of sheds located throughout the County.  (Dkt. No.

12  46 at 2.)  Each shed location has a crew chief.  (*Id.*)  Crew chiefs report directly to one of three

13  superintendents.  (*Id.*)

14        Plaintiffs' claims arise out of interactions with Clark County employees Richard Harris,

15  Nick Eiesland,[2] John May, Jeff Kujava, Tim Waggoner, and Josh Lipscomb, as well as the

16  County's response to those interactions.

17  **A.  Racist Insults, Threats, and Jokes**

18        Hutson testified that his coworker Harris made threatening remarks in his presence while

19  working at the Finn Hill shed location during 2016 and 2017.  According to Hutson, Harris said

20  he admired Hitler and "all the work he did" while looking Hutson directly in the eye.  (Dkt. No.

21  53-2 at 13.)  Hutson also testified he was present when Harris spoke about past jobs in which he

22

23  _____
[2] The parties provide multiple spellings.  The Court uses the spelling "Eiesland" from Mr.

24  Eiesland's deposition.  (Dkt. No. 57-13 at 16.)

would sabotage Mexican workers' equipment and throw things off the roof at them because he believed they did not belong at job sites. (*Id.* at 14.) Hutson thinks Harris tried to hit him with a tree branch after he cut a large fir tree branch above Hutson's head, which fell within inches of hitting Hutson. (*Id.* at 15.) At some point during June to August 2017, Hutson heard second hand from his coworker, Gauge Bryant, that Harris said the County was "going to shit because it's hiring all these beaners and spics."[3] (*Id.* at 20.)

Harris was promoted to crew chief of the drainage crew to which Hutson was transferred. Shortly after his transfer, Hutson reported Harris' racist comments to Superintendent Waggoner in October 2017. (*Id.* at 23.) Hutson told Waggoner that Harris cursed at him daily and "belittl[ed] [him] in front of people." (*Id.*) Hutson also told Waggoner he believed Harris treated him so poorly because of his race. (*Id.* at 28.) Hutson testifies:

> When I went to [Waggoner's] office to report the things that happened[,] he told me ['] I don't believe you, Richard Harris wouldn't say those things.['] [Waggoner] began to say that I was a problem . . . [.]

(*Id.* at 29.) Waggoner concedes he did not further investigate or speak to Harris about Hutson's concerns. (Dkt. No. 53-7 at 4.) Waggoner testified that he told Human Resources Director Amanda Lawrence about Hutson's report but found "nothing [to be] actionable because what [he] was told was what some[one] else had heard someone else say." (*Id.*)

Also, during summer 2017, Hutson and Peña testified that their Crew Chief Eiesland said he was building a border wall around the Finn Hill shed and kicking out Mexican employees— referring to Hutson and Peña's transfer to another crew. (Dkt. Nos. 53-2 at 23–24; 53-3 at 24.) Eiesland later advanced to the role of superintendent. (Dkt. No. 52 at 10.)

---

[3] The County objects to Hutson's testimony about what Gauge Bryant told him as inadmissible hearsay. Gauge Bryant has not appeared as a witness in this action. *See infra*, Part III, Section F. (discussion on the County's evidentiary objections).

1    Since 2018, Peña testified he heard coworkers say, "there goes Manuel labor" or "here

2    comes the landscaping crew" when referring to him, Alanis, and Hutson.  (Dkt. No. 53-1 at 27.)

3    Hutson testified, beginning round 2019, crew chiefs, including Crew Chief May called Plaintiffs'

4    crew the "Manuel labor crew, the brown crew, [or] the landscaping crew."  (Dkt. No. 53-2 at 51.)

5    Hutson further testified May told him and Peña that they "worked for their white slave master."

6    (*Id.*)

7        In July 2019, Hutson testified that May approached him and Alanis in the crew chief's

8    room and "got right in [their] face[s]" and, pointing to Hutson and Alanis, said "you know

9    what's the problem here? . . . the country's got too much cancer, there's cancer here" and "the

10   only way to take care of cancer is to cut it out . . . people here at the county think that they're

11   untouchable, but they're not, I'm working on it . . . We're going to cut out the cancer[.]"  (*Id.* at

12   66.)

13       Also, in 2019, Huston testified that he heard coworker Kujava say, "[i]t's a good day in

14   the County boys, cops are killing n***ers and kicking out the Mexicans."  (Dkt. No. 53-2 at 37.)

15   According to Huston, Kujava said this in front of May, Harris, and another coworker.  (*Id.*)

16   Roads Operations Manager Josh Lipscomb testified that he removed from the Washougal shed

17   location a posting that insulted and degraded immigrants after it had remained posted for many

18   years.  (Dkt. No. 53-13 at 7.)

19   **B.  Allegedly Hostile Interactions with Waggoner**

20       Plaintiffs argue they were subjected to harassment in the form of heightened scrutiny

21   from their supervisors, Superintendent Waggoner in particular.  During Plaintiffs' tenure

22   working with Crew Chief Marc Smith, Plaintiffs would typically fill in for Smith whenever he

23   took vacation.  (Dkt. No. 53-8 at 6.)  Smith testified Waggoner "would prefer that Kenny [Hugo]

24

1    filled in" as crew chief when Smith went on vacation, but Hugo never actually did fill in as crew

2    chief. (*Id.* at 7.)

3        Hutson testified that Waggoner and Harris told him he needed to improve his numbers

4    while operating the vactor, even though his numbers were commensurate with other employees

5    who Waggoner did not hassle about improvement . (Dkt. Nos. 53-2 at 30–31; 53-20 at 4–5.)

6    Hutson also testified that Waggoner failed to clarify whether he was scheduled for overtime and

7    then accused Hutson of taking advantage of overtime unnecessarily when Hutson showed up at

8    the job site. (*See* Dkt. No. 53-2 at 33–35.)

9        Alanis testified that Waggoner phoned him while he was on vacation with his family and

10   yelled at him, even though Alanis obtained approval from his acting supervisor. (Dkt. No. 53-1

11   at 12–14.) Alanis continued to take his scheduled vacation. (Dkt. No. 47-14 at 5.) Alanis also

12   testified Waggoner regularly yelled at him while he worked at the Salmon Creek shed in 2019,

13   including a time in which Waggoner yelled at him for not wearing a headset in contravention of

14   a new requirement which Alanis was not yet aware. (Dkt. No. 53-1 at 15.) According to Alanis,

15   Waggoner directed his anger at Alanis even though his White coworker was also not wearing a

16   headset. (*Id.* at 41.) Alanis further testified that Waggoner accused him of "trying to break the

17   vactor" by leaving water inside of it on a cold day. (*Id.* at 19.) According to Alanis, no

18   significant amount of water was left and the vactor remained in commission. (*Id.* at 20.) Alanis

19   has declined to operate the vactor since Waggoner's accusation because he fears he would be

20   held unfairly responsible and terminated. (Dkt. Nos. 53-1 at 20, 24–25; 53-7 at 5.) Alanis

21   testified Waggoner did not accuse his coworker of sabotage even though he also operated the

22   vactor on the day in question. (Dkt. No. 53-1 at 40–41.)

23

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) - 5

1

**C. County's Response to Plaintiffs' Reports of Harassment**

2     In May 2019, the day after May referred to Hutson and Alanis as "a cancer," Hutson

3    reported this comment to Human Resources Director Lawrence.  (Dkt. No. 53-2 at 69.)

4    According to Hutson, Lawrence did not believe him.  (*Id.*)  Hutson also relayed Harris' 2016 and

5    2017 comments and Waggoner's failure to investigate his complaints.  (*Id.* at 70.)  Hutson

6    testified Lawrence then stated, "when people feel threatened sometimes[,] they threaten back."

7    (*Id.* at 71.)  Huston also told his then current Union President Darrel Young about May's

8    "cancer" comments.  (Dkt. No. 53-18 at 7.)  Young testified that Lawrence assured him she

9    would investigate.  (*Id.*)

10    In January 2020, Hutson reported to Hill his complaints about Waggoner and his belief

11   that Waggoner did not like him because of his race.  (Dkt. No. 53-12 at 4.)  Hill told Hutson she

12   would investigate.  (*Id.*)  A few days later, Hutson injured his shoulder.  (Dkt. No. 47-1 at 6, 15,

13   28.)  While recovering, Hutson remained absent from work from January 14, 2020 to September

14   20, 2021, while receiving workers' compensation.  (*Id.* at 6.)

15    Hill began investigating Hutson's complaint in March 2020.  (Dkt. No. 53-12 at 9.)

16   When Hutson followed up with Hill as to the status of his complaint, she responded she delayed

17   starting due to his workers' compensation leave.  (*Id.* at 7.)  During her investigation, Hill added

18   Peña and Alanis' complaints.  (*Id.* at 6.)  In April 2020, Hill interviewed Alanis and Peña.  (Dkt.

19   No. 53-27 at 3.)  Hill also interviewed Hutson.  (Dkt. No. 53-1 at 35.)   Alanis testified he told

20   Hill about how Waggoner accused him of sabotaging the vactor, which caused him to stop

21   operating it altogether.  (Dkt. Nos. 53-1 at 36; 53-18 at 14.)  Hutson recounted Kujava's

22   comment about Trump kicking out Mexicans.  (Dkt. No. 53-2 at 74.)  In total, Hill interviewed

23   around 19 other employees about Plaintiffs' complaints in May 2020.  (Dkt. No. 53-27 at 3.)  On

24

1    June 15, 2020, Hill issued an investigation report finding no discrimination or violation of

2    harassment policies by Waggoner.  (Dkt. No. 47-19 at 24, 36–39.)

3         Plaintiffs appealed to Clark County Manager Kathleen Otto.  In August 2020, Otto

4    interviewed Plaintiffs.  (Dkt. No. 47-20 at 10.)  Alanis testified his meeting with Otto was

5    unprofessional and unfriendly—Alanis felt it would not be productive to provide names or

6    details.  (Dkt. No. 53-1 at 39.)  Hutson told Otto about Kujava saying Trump was kicking out

7    Mexicans.  (Dkt. No. 53-2 at 75.)  On December 10, 2020, Otto denied Plaintiffs' appeal (*Id.* at

8    38.)  The County did not take disciplinary or remedial action based on Plaintiffs' complaints.

9    (*See* Dkt. No. 56) ("The County lacked evidence warranting disciplinary action against any

10   particular employee.").

11   **D.  Hutson's July 2019 Training Pay Grievance**

12        Hutson testified Waggoner refused to pay him wages owed for training other employees

13   on seven occasions.  (Dkt. No. 53-2 at 56.)  Waggoner directed Hutson to train employees on at

14   least two of these occasions.  (*Id.*)  These training assignments related to the one-year agreement

15   between Plaintiffs' union and the County "establishing that Roads [D]ivision employees could be

16   eligible for 5% pay for time spent training others during 2019."  (Dkt. No. 46 at 9.)  Carolyn

17   Heniges, Roads Operations Manager, testified she understood the Memorandum of

18   Understanding ("MOU") to require employees to submit their names to a list of employees

19   willing to train others "to qualify for premium pay."  (Dkt. No. 47-22 at 16.)  Because Hutson

20   did not sign up, Heniges found him ineligible for increased pay.  (*Id.*)  Hutson concedes he did

21   not sign up to be included on the list of employees willing to train others.  (Dkt. No. 53-2 at 58.)

22   However, Hutson testified several coworkers told him they received training pay without being

23   on the list.  (*Id.* at 58.)  On July 1, 2019, Hutson filed an official grievance form.  (Dkt. No. 47-

24

22 at 26.)  On July 10, 2019, Hutson emailed several supervisors including Heniges about his lack of training pay, identifying his coworkers Flores and Alanis as receiving training pay without being on the list.  (*Id.* at 39.)  The County denied Hutson's grievance at the first step. (Dkt. No. 53-10 at 7.)  At step two, the County reversed its denial, and Hutson received his requested pay as the County decided "there was some confusion on how [the policy] was being applied" and the County "had not applied it consistently across the board."  (Dkt. Nos. 53-10 at 4; 53-11 at 4.)

**E.  Peña's CDL Grievance during Summer 2019**

In May 2019, Peña signed up to operate the distributor which required he obtain an unrestricted commercial driver's license ("CDL").  (Dkt. No. 53-3 at 28.)  Initially, the County did not set a time limit in which Peña needed to obtain his unrestricted CDL.  (*Id.* at 32.)  Soon after he signed up to use the distributor, Peña went on vacation.  (*Id.*)  When he returned, Peña testified that Waggoner "hinted" that he would lose his position if he did not obtain his unrestricted CDL soon.  (*Id.* at 18.)  Peña's training was delayed for two weeks as he could not locate his birth certificate, which was required to receive a permit.  (*Id.* at 31, 33.)  According to Peña, the County allowed his coworker Aaren Morring one year to train and qualify before he obtained his unrestricted CDL.  (*Id.* at 32.)

Morring's testimony affirms and diverges from Peña's.  Morring testified he requested training from his superintendent for four months, and then he was permitted to train every day for one month, which enabled him to obtain his unrestricted CDL.  (Dkt. No. 47-25 at 6, 8.)

On July 24, 2019, Peña emailed Young claiming the County provided insufficient time for him to obtain his unrestricted CDL.  (Dkt. No. 47-24 at 6.)  Around July 29, 2019, Peña met with Young, Waggoner, and several others to discuss his training timeline with the anticipated

1    completion date of September 3, 2019.  (Dkt. No. 53-3 at 57.)  Sometime after this meeting, Peña

2    became aware that other employees were offered to attend outside trucking school to complete

3    their training.  (*Id.*)  Peña testified the County originally excluded him from the list of employees

4    able to attend school and agreed to send him only after he argued to be included.  (*Id.* at 58.)

5    Peña was one of the first employees to attend the outside school in August 2019 and he obtained

6    his unrestricted CDL.  (Dkt. Nos. 47-22 at 13; 53-3 at 58.)

**F.  Hutson and Peña's December 2019 Out-of-Class Pay Complaint**

8        In December 2019, Peña and Hutson filled in on the "asphalt guardrail crew."[4]  (Dkt.

9    Nos. 53-2 at 82; 53-3 at 6.)  Hutson and Peña were assigned bridge work under the job

10   classification "bridges, guardrail, asphalt," which, according to Hutson, was paid at a higher pay

11   rate than their standard pay per the terms of their MOU.  (Dkt. No. 53-2 at 83.)  Waggoner did

12   not approve the higher out-of-class pay for Peña and Hutson, claiming only asphalt work would

13   be eligible.  (*Id.*)  According to Hutson, two White employees told him they received the higher

14   pay rate even though they did the same work as Hutson and Peña and did not do any asphalt

15   work.  (*Id.* at 83–84.)  Hutson complained verbally to Hill and received payment "right away."

16   (*Id.* at 83.)

**G.  Denial of Peña's COVID-19 Leave in 2020**

18       Peña alleges the County denied him "the same process and benefits afforded to non-

19   Latino employees when [he] was exposed to another Clark County employee who was diagnosed

20   with COVID-19."  (Dkt. No. 19 at 6, 7.)  Alanis contracted COVID-19 around July 4, 2020.

21   (Dkt. No. 53-3 at 44.)  A few days before, Peña met with Alanis.  (*Id.*)  Upon receiving word of

22

23   ---
     [4] Witnesses use slightly different names to identify this crew.  For example, Deputy Public Works
     Director Les MacDonald referred to it as the "asphalt bridge/culvert crew" in his testimony.  (Dkt.
24   No. 57-6 at 7.)  The Court uses the name provided by Hutson in his testimony.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) - 9

his exposure from Alanis, Peña called Waggoner who directed him to contact Human Resources Analyst Kara Hill.  (*Id.* at 44.)  Peña testified that Hill said he would need to use his personal vacation time take a COVID test or to quarantine.  (*Id.* at 46.)  Hill claimed Peña was not a candidate to be sent home based on health department guidance.  (*Id.*)  Peña continued working and self-quarantined after work for a week but continued to feel physically fine.  (Dkt. No. 47-5 at 17.)

According to Peña, three White employees, Morring, Micah Passmore, and Kenny Hugo were sent home because of exposure to Alanis.  (Dkt. No. 53-3 at 48–49.)  Peña testified Passmore told him he was at home for two weeks on COVID quarantine leave.  (*Id.* at 50.)  Passmore testified he was sent home by Young.  (Dkt. No. 53-9 at 6.)  Morring testified he received government funded leave for four days before taking previously scheduled vacation.  (*See* Dkt. Nos. 47-25 at 12; 53-22 at 5.)  Hugo was released from work to take a COVID-19 test.  (Dkt. 47-19 at 13.)  Hugo took vacation time to stay home soon after because of a different exposure though his spouse.[5]  (*Id.*)

## H.  Peña's July 2021 Overtime Grievance

In June 2021, Peña filed a grievance for lost overtime because Eiesland gave overtime to a White employee that should have gone to Peña.  (Dkt. No. 53-3 at 53–54.)  Peña filed an official grievance with the County under the bargaining agreement.  (*Id.* at 53.)  Peña testified his grievance alleged nepotism, breach of contract, and retaliation.  (*Id.*)  Union President Clayton Tikka overhead Eiesland yelling at Peña from the office next door when Peña discussed his grievance with Eiesland.  (Dkt. No. 53-24 at 4.)

---

[5] Peña does not testify Hugo told him if he was taking personal leave or COVID-19 leave. Therefore, the Court relies on Hill's testimony.

1

**I.  Alanis' Crew Chief Application 2022**

2

        In Spring 2022, Alanis applied for the Mabry crew chief position.  (Dkt. No. 53-1 at 7.)

3

Alanis withdrew his application from consideration after Roads Operations Manager Josh

4

Lipscomb yelled at him for using his phone during a meeting.  (*Id.* at 8–9.)  Alanis told

5

Lipscomb he was using his phone for time-sensitive communications with his crew.  (*Id.*)  Alanis

6

reported the encounter to Human Resources by emailing Brianna Bradley, who told Alanis she

7

would investigate the incident.  (*Id.* at 31–32.)[6]

8

**J.  Peña's Coaching 2022**

9

        In late 2022, Peña received a "coaching" from Lipscomb and Eiesland.  (Dkt. No. 53-3 at

10

6.)  The coaching related to Peña asking in a meeting about the County's plan for the State's

11

changing mask mandate.  (*Id.* at 9, 14.)  Lipscomb described Peña's demeanor as argumentative.

12

(Dkt. No. 53-13 at 5.)   Peña testified that Human Resources Director William Winfield removed

13

the coaching documentation from Peña's file.  (Dkt. No. 53-3 at 16.)

14

**III      DISCUSSION**

15

**A.  Legal Standard**

16

        A "court shall grant summary judgment if the movant shows that there is no genuine

17

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

18

R. Civ. P. 56(a).  The moving party may meet this burden by showing the non-moving party has

19

failed to provide evidence in support of their case.  *See Fairbank v. Wunderman Cato Johnson*,

20

212 F.3d 528, 531 (9th Cir. 2000).  In determining whether a genuine dispute of material fact

21

22

23

24

---

[6] Plaintiffs argue Alanis was denied a crew chief position in an earlier application process because "Superintendent Kenny Price gave the answers to the standardized test to a White employee." Plaintiffs cite Alanis' deposition, but the page number identified does not say anything about Kenny Price or standardized tests—so Plaintiffs' argument is entirely unsupported.  (*See* Dkt. No. 52 at 16) (citing Dkt. No. 53-1 at 6.)

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) - 11

1  exists, "[t]he deciding court must view the evidence, including all reasonable inferences, in favor

2  of the non-moving party." *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017).  Disputed

3  facts "that might affect the outcome of the suit under the governing law will properly preclude

4  the entry of summary judgment," but irrelevant or inconsequential disputes will not preclude

5  summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

6  **B.  Relevant Statutes of Limitations**

7  As a threshold matter, the County argues all of all of Plaintiffs' claims are subject to a

8  three-year statute of limitations.  (Dkt. No. 46 at 5–6.)  Because Plaintiffs filed suit on June 1,

9  2021, the County argues the Court may not consider events that occurred prior to June 1, 2018.

10 (Dkt. No. 46 at 6.)  In so arguing, the County fails to identify the correct statute of limitations for

11 most Plaintiffs' claims.

12 In employment cases, the limitation is based on the type of claim.  Easily identifiable

13 discrete acts "such as termination, failure to promote, denial of transfer, or refusal to hire"

14 constitute a separate actionable unlawful employment practice which must occur within the

15 appropriate statute of limitation.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114

16 (2002).  A Title VII plaintiff suing over a discrete act must file a complaint with the U.S. Equal

17 Employment Opportunity Commission ("EEOC") within 180 days of the act, or within 300 days

18 if the complaint is made to a qualifying state or local agency.  *See id.  See also* 42 U.S.C.

19 § 2000e-5(e)(1).  A plaintiff suing under the Washington Law Against Discrimination

20 ("WLAD") is not required to exhaust an administrative claim; thus, a three-year statute of

21 limitations applies for discrete acts.  *Antonius v. King Cnty.*, 103 P.3d 729, 732 (Wash. 2004)

22 (citing Wash. Rev. Code § 4.16.080(2)).  Cases arising under 42 U.S.C. § 1981 are subject to a

23

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) - 12

four-year statute of limitations.  (Dkt. No. 52 at 19) (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004)).

Courts treat hostile work environment claims different from discrete acts given "[t]heir very nature involves repeated conduct" over time.  *Morgan*, 536 U.S. at 115.  "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability" under Title VII.  *Id.* at 117.  District courts in the Ninth Circuit apply *Morgan* to both Title VII and § 1981 cases.

> In the Ninth Circuit, the continuing violations doctrine applies to claims pursuant to 42 U.S.C. sections 1981 and 1983 in the same manner as the doctrine applies to claims pursuant to Title VII—the doctrine is applicable to hostile work environment claims involving related acts that collectively constitute a single unlawful employment practice, but inapplicable to claims for discrete acts of discrimination and retaliation.

*Lelaind v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1093 (N.D. Cal. 2008); *Carter v. Verizon Nw. Inc.,* No. C09-1411RAJ, 2011 WL 221409, at *2 (W.D. Wash. Jan. 20, 2011) (permitting a § 1981 plaintiff to "challenge conduct occurring before the limitations period").  The Washington State Supreme Court also follows the rule set forth in *Morgan*.  *Antonius v. King Cnty.*, 153 Wash. 2d 256, 268, 103 P.3d 729, 736 (2004) ("We conclude that *Morgan* provides a logical analysis for determining liability under WLAD for a hostile work environment claim.")

> The acts must have some relationship to each other to constitute part of the same hostile work environment claim, and if there is no relation, or if 'for some other reason, such as certain intervening action by the employer' the act is 'no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts' as part of one hostile work environment claim.

*Id.* at 37 (citing *Morgan,* 536 U.S. at 118).

In this case, the County fails to correctly identify the statutes of limitation in its argument, and Plaintiffs fail to articulate the date of their EEOC filing beyond February 2021. Because the Court lacks the precise facts and helpful argument, it does not evaluate which discrete acts fall within the statute of limitations for Plaintiffs' disparate treatment claims. Further, this analysis unnecessary because the Court finds none of Plaintiffs' disparate treatment claims survive summary judgment on the merits.  *See infra* Part III.C.  Similarly, the Court does not evaluate the statute of limitations for Plaintiffs' *Monell* 42 U.S.C. § 1983 and § 1981 claims given it also fails on the merits.  *See infra* Part III.E.

Regarding Plaintiffs' hostile work environment claims, Hutson testified to racial insults and threats by Harris and Eiesland in 2016 and 2017.  Waggoner did not investigate or discipline Harris even though Hutson reported his comments in October 2017.  Racially coded jokes continued in 2018, including coworkers calling Plaintiffs "Manuel labor" and claiming they worked for a White master, as well as May's comments about cutting out cancer.  In 2019, Kujava made racist statements to the group.  In 2020, Plaintiffs complained to Human Resources about these incidents, but the County found no discrimination or harassment.

The Court finds this series of events to be related.  From Harris' comments in 2016 to the County's finding of no discrimination in December 2020, Plaintiffs allege a pattern of witnessing racist comments by their crew chiefs and coworkers, then reporting the comments to the County to no avail.  The comments are similar in nature as they are racially derogatory to Latinos, made in the presence of one or more Plaintiffs, and not disciplined by the County.

The County argues, because Plaintiffs have not alleged Harris or Eiesland racially harassed them after 2017, Harris and Eiesland's early comments are time barred.  (Dkt. No. 56 at 14) (citing *Leland v. San Francisco*, 576 F. Supp. 2d 1079, 1093 (N.D. Cal. 2008)).  However,

1    *Leland* is distinguishable.  In *Leland*, the district court found "the character and nature of the

2    unlawful conduct differs between the earlier and later periods" given that the later period

3    involved personnel management decisions like promotions and performance evaluations while

4    the earlier period involves overt racial harassment by hanging a noose in a coworker's

5    workspace.  576 F. Supp. 2d at 1102 (N.D. Cal. 2008).  Here, the conduct shares the same nature

6    as the insults and jokes occuring in 2018 and 2019.  Thus, the Court concludes a reasonable jury

7    could find the harassment occuring outside the statute of limitations is part of the same

8    continuing course of conduct.[7]

9    **C.  Disparate Treatment Claims Under Title VII and WLAD**

10        An employer is liable under Title VII and § 1981 for disparate treatment based on race.

11   *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 690 (9th Cir. 2017).  Under the *McDonnell*

12   *Douglas* framework, a plaintiff must establish "(1) the plaintiff belongs to a protected class, (2)

13   [they were] performing according to [their] employer's legitimate expectations, (3) [they]

14   suffered an adverse employment action, and (4) similarly situated employees were treated more

15   favorably, or other circumstances surrounding the adverse employment action give rise to an

16   inference of discrimination."  *Id.* at 690–91.  Regarding the third element, an adverse

17   employment action is one that "materially affect[s] the compensation, terms, conditions, or

18   privileges of . . . employment" including assigning more or more burdensome work

19

20   _____

     [7] Plaintiffs' response identifies several instances of alleged harassment towards Roads Division
21   employee Isidoro Flores.  Specifically, Plaintiffs allege an employee threatened to kill Flores
     around 2007 and between 2010 and 2015, Eiesland repeatedly asked Flores whether the
22   landscaping crews were his family members.  (Dkt. No. 52 at 26.)  The Court does not consider
     these points because they are unrelated to the conduct at issue, and thus, do not fall within the
23   statute of limitations for Plaintiffs' hostile work environment claims.  These allegations differ
     because they do not involve harassment directed at or witnessed by Plaintiffs, nor do Plaintiffs
24   allege they were reported to the County.  (*See generally* Dkt. No. 52.)

     ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO.
     46) - 15

1    responsibilities. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal

2    quotations omitted). "The Ninth Circuit has recognized that only 'non-trivial' employment

3    actions, such as 'termination, dissemination of a negative employment reference, issuance of an

4    undeserved negative performance review and refusal to consider for promotion' qualify as

5    adverse employment actions." *Knight v. Brown*, 797 F. Supp. 2d 1107, 1125 (W.D. Wash.

6    2011), *aff'd*, 485 F. App'x 183 (9th Cir. 2012) (quoting *Brooks v. City of San Mateo,* 229 F.3d

7    917, 928 (9th Cir. 2000)). Under WLAD, "[a]n adverse employment action involves a change in

8    employment conditions that is more than an inconvenience or alteration of one's job

9    responsibilities, such as reducing an employee's workload and pay[,]" a demotion, or unfavorable

10    transfer. *Alonso v. Qwest Commc'ns Co., LLC*, 315 P.3d 610, 617 (Wash. Ct. App. 2013).

11        If the plaintiff fulfills the prima facie elements, the defendant must "provide a legitimate,

12    non-discriminatory reason for the adverse employment action." *Reynaga*, 847 F.3d at 691.

13    Then, the burden returns to the plaintiff to "raise a triable issue of material fact as to whether the

14    defendant's proffered reasons . . . are mere pretext for unlawful discrimination." *Id.* (quoting

15    *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010)). As an alternative to the

16    *McDonnell Douglas* burden shifting framework, the plaintiff may offer direct or circumstantial

17    evidence of discriminatory motive to establish their prima facie case. *Opara v. Yellen*, 57 F.4th

18    709, 722 (9th Cir. 2023). ["D]irect evidence has been defined as evidence of conduct or

19    statements by persons involved in the decision-making process that may be viewed as directly

20    reflecting the alleged discriminatory attitude." *Id.* at 723 (internal quotation marks and citations

21    omitted).

22        A disparate treatment claim under WLAD follows the same framework. *Alonso*, 315

23    P.3d at 616 ("[A] plaintiff may establish a prima facie case [for disparate treatment] either by

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) - 16

offering direct evidence of an employer's discriminatory intent, or by satisfying the *McDonnell Douglas* burden-shifting test that gives rise to an inference of discrimination."). Washington courts generally consider an employer's discriminatory remarks to be direct evidence of discrimination. *Id.*

        1.  Peña's Disparate Treatment Claims

Peña alleges the County subjected him to "disparate treatment and adverse action in the Roads Division on account of his race and national origin that materially affects the compensation, terms, conditions, or privileges of his employment" in violation of Title VII and WLAD. (Dkt. No. 19 at 6–7, 10.) Specifically, Peña alleges the County denied "training" and "opportunities for additional pay" as well as "the same process and benefits afforded to non-Latino employees when . . . exposed to another Clark County employee who was diagnosed with COVID-19." (*Id.*) The County does not dispute Peña has established the first two elements of the *McDonnell Douglas* framework as (1) he is a Latino employee (2) in good standing. The Court finds Peña's allegations fail to establish a prima facie case for disparate treatment under Title VII and WLAD because Peña did not suffer an adverse action that materially affected his compensation, terms, conditions, or privileges of employment.

          *i.*  *Training for Unrestricted CDL*

Peña alleges his experience training to obtain an unrestricted CDL differed from that of a White employee because Waggoner pressured him to obtain his CDL more quickly than his White coworker, he was not permitted to train on the County's equipment, and union representatives had to negotiate for him to be included on the list of employees sent to an outside trucking school for training. (Dkt. No. 52 at 12–13.) The County disputes Peña's

1   characterization of a protracted fight for this benefit—Peña was one of the first employees to be

2   sent to trucking school in August 2019 after filing his initial grievance in July 2019.

3           Regarding the third element and fourth elements, Peña fails to present conduct rising to

4   an adverse employment action not imposed on similarly situated employees under Title VII and

5   WLAD.  Although Waggoner implied Peña may lose his position if he did not complete his

6   training soon (Dkt. No. 53-3 at 18), no adverse action was taken.  *See Hellman v. Weisberg*, 360

7   F. App'x 776, 779 (9th Cir. 2009) ("[T]he mere threat of termination does not constitute an

8   adverse employment action.").

9           Peña testified he was not allowed train on the distributor until he received his "license"

10  nor was he allowed to train on the fifth wheel more than once, even though his White coworker

11  was allowed to train on County equipment.  (Dkt. No. 53-3 at 27, 34–35.)  At another point, Peña

12  testified he did train on the distributor before obtaining his unrestricted CDL, which raises

13  internal inconsistency.  (*Id.* at 34.)  Morring's testimony does not specify on which pieces of

14  equipment the County allowed him train.  (*See* Dkt. No. 53-22 at 4, 6) (stating he was able to

15  train on the lowboy but not on the distributor).  Thus, the record does not establish Peña was

16  treated differently from a similarly situated employee.

17          Further, the County did not treat Peña adversely when it sent him to outside trucking

18  school in August 2019.  Peña was not initially included but he was added after asking to be

19  included and his grievance was resolved within around one month.  *See Fonseca v. Sysco Food*

20  *Servs. of Arizona, Inc.*, 374 F.3d 840, 848 (9th Cir. 2004) (citing *Brooks v. City of San Mateo*,

21  299 F.3d 917, 930 (9th Cir. 2000) ("not[ing] that a successful grievance could change the

22  adverse nature of an employment action," where an employee files a single grievance without

23  "spend[ing] a significant amount of extra time simply to receive compensation to which [an

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) - 18

1    employee] was clearly entitled.").  The County explains Peña was not initially included on the
2    list given he had an in-house training plan in place.  (Dkt. No. 47-22 at 10.)  Peña fails to raise
3    evidence suggesting there was a different reason behind his late addition to the list.

4                    *ii.    Payment Related Grievances*

5            Peña was denied proper payment on two occasions—once in 2019 for disputed out-of-
6    class pay[8] and once in 2021 for an overtime shift erroneously given to a White employee.  In
7    2019, he was compensated "right away" (*see* Dkt. No. 53-2 at 83),[9] but in 2021, it took around
8    six months for Peña to receive the overtime payment (*see* Dkt. No. 53-3 at 55).  The County
9    argues "[a]ttempts to recast sporadic questions about overtime or out of class pay on a shift does
10   not transform such commonplace issues into 'denial of a pay increase.'"  (Dkt. No. 56 at 8.)

11           Peña fails to demonstrate this conduct amounts to an adverse employment action.[10]

12   _____

13   [8] Hutson verbally complained to Hill on behalf of himself and Peña for the shift they completed
     together.  (*See* Dkt. No. 53-2 at 83.)

14
15   [9] The Court assumes this timeline based on Huston's testimony; Plaintiffs do not provide testimony
     by Peña or other evidence suggesting Hutson's complaint resulted in differing compensation.  (*See
     generally* Dkt. No. 53-3.)

16   [10] In their response, Plaintiffs do not support their disparate treatment claims with case law.  In
17   arguing the County's actions are tangible for the purposes of a hostile work environment claim,
     Plaintiffs argue:

18           An act that causes significant disruption in an employee's earning potential and
19           working conditions is a tangible employment action. See Durham Life Ins. Co. v.
             Evans, 166 F.3d 139, 153 (3rd 1999). Waggoner repeatedly denied increased pay
20           owed to Plaintiffs, and Plaintiffs eventually received pay only after filing multiple
             grievances with the union and waiting months for a response. See Lovejoy-Wilson
21           v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223–224 (2nd Cir. 2001) (holding that
             the lost use of wages for a period, even if reimbursed, constitutes an economic
22           injury that can qualify as a tangible employment action).

23   (Dkt. No. 52 at 24.)  These cases are distinguishable.  In *Durham Life Ins. Co.*, the employer
     stripped a life insurance salesperson of her office, secretary, and files which prevented her from
24   being able to do you work. 166 F.3d at 153. In *Lovejoy-Wilson*, the plaintiff alleged her employer

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO.
46) - 19

The Court is guided by the Ninth Circuit holding in *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840 (9th Cir. 2004). At first blush, the facts appear similar but upon closer examination, Peña's situation falls short. In *Fonseca*, the Ninth Circuit found a Hispanic employee was adversely and disparately treated where, in less than a one-year period, "there were between ten and thirteen times when a . . . supervisor called at least one white employee to work overtime that should have been assigned to [the Hispanic employee] because he had seniority" and the record showed "only one occasion on which White employees were similarly passed over." 374 F.3d at 847. Further, the plaintiff "filed successful grievances for five of these occasions and eventually received lost overtime pay" after several weeks where White employees received payments by the next pay period. *Id.* at 844. The plaintiff consciously chose not to file the other grievances for fear he would get into trouble. *Id.* On these facts, the Ninth Circuit held "it is an adverse employment action when an employer knows its employees are entitled to certain opportunities, but forces only employees of a certain race to use the grievance procedure to obtain them." *Id.* at 848.

Here, from December 2019 to June 2021, there have been two pay disputes involving Peña, one of which was resolved "right away" after Hutson raised the issue to Hill and the other which followed the full grievance procedure before being resolved six months later due to the County's erroneous conclusion that the overtime should have been awarded to a different employee. Even when combined with Peña's grievance about his unrestricted CDL training

---

retaliated against her by suspending her without pay after she filed a charge of discrimination with the EEOC. 263 F.3d at 223. In this case, Plaintiffs were not suspended without pay and do not allege retaliation. The Supreme Court "clarified that adverse actions encompass a narrower range of conduct in disparate treatment claims than in retaliation claims." *Edwards-Yu v. DeJoy*, No. C21-156-RSM-MLP, 2022 WL 16816529, at *5 (W.D. Wash. Oct. 4, 2022) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006)).

1   timeline, the Court finds these disputes do not rise to the level of the significant burden

2   illustrated in *Fonseca*.  Additionally, the record shows two non-Latino employees have

3   experienced pay disputes.  (*See* Dkt. No. 47-10 at 5) (Chad Weiker, a White employee, testified

4   he was denied both training pay and overtime); (*see also* Dkt. No. 57-13 at 63) (David Lubinski,

5   a Native American employee, testified to missing out on an overtime opportunity to which he

6   was entitled).

7            *iii.*     *Uneven Application of COVID Quarantine Policy*

8            Peña argues he "suffered an adverse employment action when [the County] allowed three

9   White employees to quarantine following their exposure to Alanis, who had tested positive for

10  COVID-19, but denied the same opportunity for Peña even though he also had contact with

11  Alanis." (Dkt. No. 52 at 28.)  The Court agrees Peña shows the County treated him differently

12  than three White employees given that Passmore and Morring received pay to quarantine at

13  home for two weeks and four days, respectively, and the County released Hugo from work to

14  take a COVID-19 test.  Despite this uneven application, Peña fails to establish an adverse

15  employment action.

16           Although a close and novel question, the Court finds the County's unequal application of

17  its COVID-19 quarantine policy in this circumstance did not materially affect Peña's

18  compensation, terms, conditions, or privileges of employment; thus, does not qualify as an

19  adverse employment action under Title VII and § 1981.  Likewise, it does not constitute an

20  adverse employment action because remaining at work did not involve a change in Peña's job

21  responsibilities surpassing an inconvenience or alteration of responsibilities.  Peña was not sent

22  home from work and, therefore, he did not lose pay nor was he compelled to use his personal

23

24

leave.  As the County argues, being directed to quarantine after being exposed to a coworker with COVID is not a benefit equivalent to paid vacation.

Even if the Court were to find Peña suffered an adverse employment action, Plaintiffs fail to raise a material fact as to whether Hill acted with a discriminatory motive.  Plaintiffs do not allege Hill has made racial remarks or harassed them.  Hill testified Peña told her that his contact with Alanis occurred from far enough away he was not at risk as it did not qualify as a close contact. (Dkt. No. 47-19 at 14.)  Peña testified he never told Hill that he was fine and did not need to test or quarantine. (Dkt. No. 53-3 at 47–48.)  Hill further testified Morring was sent home to quarantine because "had been riding in the vehicle that [Alanis] had been in the entire day" without it being cleaned, and Passmore spent hours with Morring shortly after. (Dkt. No. 47-19 at 14) (Admitting "[s]ince COVID was still so new, no one knew what you could or could not get COVID from.").  Although Peña and Hill relay different versions of their conversation, Peña does not show Hill's explanation is merely pretext.  "[A] plaintiff can prove pretext either (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002) (internal quotation marks omitted).  Peña provides neither circumstantial nor direct evidence of unlawful motive.  Accordingly, Peña fails to establish a prima facie disparate treatment claim under Title VII, § 1981, and WLAD.

2.  Alanis' Disparate Treatment Claim

Alanis argues he experienced disparate treatment because after he applied for a crew chief position, Lipscomb "wrongly called him out for spending time on his phone . . . during a meeting." (Dkt. No. 52 at 28.)  Alanis then withdrew his crew chief application and felt deterred

1   from applying again in the future.  (*Id*. at 28–29.)  Citing *Inter. Broth. of Teamsters v. U.S.*, 431

2   U.S. 324, 365 (1977), Alanis argues a consistently enforced discriminatory policy deterring

3   people from applying for a position is a discriminatory employment practice.  However,

4   "[y]elling at or otherwise using a harsh tone towards an employee is not an adverse employment

5   action for the purposes of a discrimination claim."  *Tavares v. ASARCO LLC*, No. CV-20-01596-

6   PHX-SPL, 2022 WL 1811166, at *3 (D. Ariz. June 2, 2022).  And while Alanis asserts he "got

7   the message that his supervisors would make his life difficult if he were to become a crew chief,"

8   there is no evidence the motive behind Lipscomb's verbal reprimand was to make Alanis

9   withdraw his application or deter him from applying again in the future.  In addition,

10  *International Brotherhood of Teamsters* is inapposite.  The passage Alanis cites pertains to a

11  court's ability under Title VII to remedy an employer's discriminatory seniority system.  *Inter.*

12  *Broth. of Teamsters*, 431 U.S. at 365.  The Court held employees who never explicitly applied

13  and were denied promotion were not necessarily precluded from seniority relief given the

14  employer's discriminatory policy would have deterred job applications from subjecting

15  themselves to certain rejection.  431 U.S. at 365.  This case does not involve the court's available

16  remedies under Title VII.  Accordingly, Alanis fails to establish a prima facie disparate treatment

17  claim under Title VII, § 1981, and WLAD.

18          3.  Hutson's Disparate Treatment Claim

19          Plaintiffs allege they were "treated unequally when supervisors refused to compensate

20  them the increased pay to which they were entitled, while Whites routinely received such pay

21  without incident."  (Dkt. No. 19 at 29.)  Hutson was denied pay on two occasions in 2019—once

22  when he did not receive out-of-class pay for work completed on the asphalt guardrail crew and

23  when he was denied training pay.  As already identified, *see supra* Part III.C.1, Hutson's out of

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) - 23

class pay issue was resolved "right away" and does not evidence an adverse employment action. With respect to training pay, the County argues Hutson was denied because Hutson was not included on the list of employees eligible for training pay.  Hutson filed a grievance pointing out that Alanis and Peña received training pay despite not signing up for the list.  Further, Weiker, a White employee, was also denied training pay during the same period.  Therefore, Hutson does not show he was treated differently than similarly situated employees outside of his protected class.  Accordingly, Hutson does not establish a prima facie disparate treatment claim under Title VII, § 1981, or WLAD.

The Court GRANTS summary judgment as to Plaintiffs' disparate treatment claims under Title VII and WLAD.[11]

### D.  Hostile Work Environment Claims Under Title VII and WLAD

A prima facie hostile work environment claim under Title VII requires the plaintiff "raise a triable issue of fact as to whether (1) [they were] 'subjected to verbal or physical conduct' because of [their] race, (2) 'the conduct was unwelcome,' and (3) 'the conduct was sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive work environment." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (quoting *Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 817 (9th Cir.2002)).  Then, to survive summary judgment, the plaintiff "must show the existence of a genuine factual dispute as to

---

[11] It is unclear from Plaintiffs' response whether Peña intends to base a disparate treatment claim on the coaching he received from Lipscomb and Eiesland in 2022.  To the extent Peña pleads disparate treatment based on this coaching, he fails to establish an adverse employment action. *See Edwards-Yu v. DeJoy*, No. C21-156-RSM-MLP, 2022 WL 16816529, at *5 (W.D. Wash. Oct. 4, 2022) (holding an unpublicized warning letter is not an adverse employment action).

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) - 24

. . . whether [the defendant], once apprised of [the situation], failed to take adequate remedial and disciplinary action[.]" *Reynaga*, 847 F.3d at 686–87.

Neither Title VII nor § 1981 is a general civility code. *Manatt*, 339 F.3d at 798. "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)' are not sufficient to create an actionable claim under Title VII [or § 1981], but the harassment need not be so severe as to cause diagnosed psychological injury." *Reynaga*, 847 F.3d at 687 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  The plaintiff must show that the work environment was both subjectively and objectively hostile. *Id.*  To show subjective hostility, a plaintiff may rely on their repeated complaints about the conduct. *Id.*  As to objective hostility, a court considers the workplace from "the perspective of a reasonable person belonging to the plaintiff's racial or ethnic group[.]" *Id.*

Similarly, the Revised Code of Washington § 49.60.180(3) "prohibits harassment based on a protected characteristic that rises to the level of a hostile work environment." *Blackburn v. State*, 375 P.3d 1076, 1081 (2016).  To state a prime facie case, "[a]n employee must demonstrate four elements for a hostile work environment claim: that the harassment (1) was unwelcome, (2) was because of a protected characteristic, (3) affected the terms or conditions of employment, and (4) is imputable to the employer." *Id.*  Under Title VII, § 1981, and WLAD, "the court examines the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Reynaga*, 847 F.3d at 687; *Blackburn*, 375 P.3d at 1082 n.4.  "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005).

1        1.   Racially Hostile Work Environment

2        The County argues Plaintiffs lack evidence to establish a hostile work environment

3    because Waggoner's conduct was not racially motivated and was not objectively hostile, and

4    because Plaintiffs "cite various isolated instances where they either disagreed with an operation

5    decision or felt offended because Waggoner seemed angry at them[.]"  (Dkt. No. 56 at 6.)  The

6    County's argument fails to account for the severe and pervasive racial harassment experienced

7    by Plaintiffs.  Plaintiffs testify to multiple racial insults implying Latinos should not have been

8    employed by the County: Harris saying he tried to harm Mexican workers at prior work sites as

9    they did not belong, Eiesland saying he was building a wall to kick Mexican people out, May

10   saying he was working to "cut out cancers" like Hutson and Alanis, and Kujava saying it was a

11   good Trump was "kicking out Mexican" people.  Several of these comments were threatening—

12   Harris implied he would harm Hutson as he did prior Mexican coworkers and May stated people

13   at the County were not "untouchable."  Less severe racial harassment was pervasive.  Peña

14   testified he heard coworkers say, "there goes Manuel labor" or "here comes the landscaping

15   crew" when referring to him, Alanis, and Hutson.  Hutson testified, beginning round 2019, crew

16   chiefs, including Crew Chief May called Plaintiffs' crew the "Manuel labor crew, the brown

17   crew, [or] the landscaping crew."  Based on this evidence, Plaintiffs have clearly raised a dispute

18   of material fact from which a reasonable jury could conclude Plaintiffs' work environment to be

19   both subjectively and objectively hostile such that it effected the terms and conditions of their

20   employment.

21       2.   Racial Harassment Imputed to the County

22       The standard for employer liability under Title VII and WLAD differs based on whether

23   the plaintiff was harassed by a supervisor or by a coworker.  In this case, Plaintiffs argue they

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) - 26

1   were harassed by coworkers, crew chiefs, and superintendents.  The County argues, to the extent

2   Plaintiffs experienced harassment, their harassers were coworkers because crew chiefs do not

3   qualify as supervisors and no evidence shows Superintendent Waggoner used "racially-related

4   language" or "racially-derogatory comments."  (Dkt. No. 56 at 6–7.)

5          "An employer is subject to vicarious liability to a victimized employee for an actionable

6   hostile environment created by a supervisor . . . [but] [w]hen no tangible employment action[12] is

7   taken, a defending employer may raise an affirmative defense[.]"  *Burlington Indus., Inc. v.*

8   *Ellerth*, 524 U.S. 742, 765 (1998).  This affirmative defense, sometimes referred as the

9   Faragher/Ellerth defense, requires (1) "that the employer exercised reasonable care to prevent

10  and correct promptly any [racially] harassing behavior," and (2) "that the plaintiff employee

11  unreasonably failed to take advantage of any preventive or corrective opportunities provided by

12  the employer or to avoid harm otherwise."  *See id.*  On the other hand, when a plaintiff is

13  subjected to coworker harassment, the employer "is only liable if it knew or should have known

14  of the harassing conduct and failed to take reasonably prompt and adequate corrective action."

15  *Silbaugh v. Buttigieg*, No. C17-1759RSM, 2021 WL 3565431, at *7 (W.D. Wash. Aug. 12,

16  2021), *aff'd*, No. 21-35694, 2022 WL 1641696 (9th Cir. May 24, 2022).

17         This distinction is not relevant to the current motion for summary judgment given that

18  Plaintiffs have raised a genuine dispute of material fact even under the less rigorous coworker

19

20  ――――――――――――――
    [12] Plaintiffs also argue, as supervisors, crew chiefs and Superintendent Waggoner took tangible
21  employment actions against Plaintiffs, including denying increased and overtime pay, unequal
    application of COVID-19 quarantine protocol, and Waggoner's sabotage accusation against Alanis
22  as well as Lipscomb yelling at Alanis about using his phone in a meeting.  (Dkt. No. 52 at 24.)
    The Court has already determined this conduct does not qualify as an adverse employment action
23  for the purposes of a disparate treatment claim.  Plaintiffs do not provide compelling arguments to
    show these actions qualify as tangible employment action as the Court has distinguished all cases
24  Plaintiffs cites (*Durham* and *Lovejoy-Wilson*).  *See supra* Part III.C.

1   standard for liability.  The parties' evidence differs greatly as to exactly what conduct Plaintiffs

2   reported to the County.  Viewing the evidence in the light most favorable to Plaintiffs, their

3   testimony confirms multiple detailed reports.  First, Hutson reported Harris' threats to Waggoner

4   in October 2017, but Waggoner did not take an action beyond informing Human Resources

5   Director Lawrence.  Then, in 2019, Hutson reported May's threats to Lawrence who, according

6   to Huston's testimony, did not believe May made such comments.  In January 2020, Hutson

7   testified he told Hill about all of the racial harassment he had experienced over the years, but Hill

8   delayed investigating for two months.  She ultimately found no instances of discrimination and

9   recommended no corrective action.  A reasonable jury could find the County knew of the anti-

10  Latino remarks and insults made by Plaintiffs' coworkers but failed to take reasonable corrective

11  action.  Accordingly, Plaintiffs have raised a genuine dispute of material fact to survive summary

12  judgment with respect to their hostile work environment claims under Title VII, § 1981, and

13  WLAD.

14      **E.  42 U.S.C. § 1981 and § 1983 Municipal Liability Claims**

15          In their amended complaint, Plaintiffs allege the County "intentionally discriminates

16  against Plaintiffs when [it] enforces its official practice, policy, and/or custom that treats Latinos

17  differently than similarly situated non-Latino employees."  (Dkt. No. 19 at 8.)  Plaintiffs further

18  allege the County "maintain[s] an official practice, policy, and/or custom of depriving Latinos of

19  their constitutional right to equal protection because [the County] is deliberately indifferent to

20  the discriminatory conduct of non-Latino employees by not reprimanding harassers or putting an

21  end to the hostile work environment."  (*Id.*)  In its response, Plaintiffs argue the County is liable

22  under both § 1983 and § 1981 because:

23          [T]he County's official policy allowed supervisors the discretion to refer
            complaints they received to HR, creating an environment that contravened its

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) - 28

1
2
3

> written open door policy.  The County's practice was reinforced when HR failed to investigate supervisors' failure to refer complaints and did nothing to reprimand supervisors. The County endorsed this policy, despite the existence of a written anti-discrimination statement.

4   (Dkt. No. 52 at 30.)  Plaintiffs do not cite any part of the record in support of its claims.  (*See id.*)

5   In the Ninth Circuit, an employee has a private right of action against a municipal employer

6   under § 1981, if the disparate treatment or hostile work environment is the result of the

7   municipality's policy or custom.  *Fed'n of Afr. Am. Contractors v. City of Oakland*, 96 F.3d

8   1204, 1214–15 (9th Cir. 1996).  Like § 1983, § 1981 does not impose respondeat superior

9   liability on state actors.  *Id.* at 1215.

10       To bring a successful § 1981 claim, Plaintiffs must show the County violated their rights

11   guaranteed by § 1981 by acting pursuant to an official municipality policy, which includes

12   express policies, longstanding customs, actions by final policy makers, ratification of an

13   employee's actions, or failure to train employees with deliberate indifference to the

14   consequences. *Zhu v. Bridgeport Sch. Dist. No. 75*, No. 2:15-CV-0263-TOR, 2016 WL

15   7330583, at *6 (E.D. Wash. Dec. 16, 2016) (citing *Christie v. Iopa*, 176 F.3d 1231, 1235–40 (9th

16   Cir. 1999)).   In the same vein, a § 1983 claim requires Plaintiffs alleged equal protection

17   violation occurred as a result of a policy, practice, or custom.  *Id.*

18       The County argues Plaintiffs' § 1981 claim fails "to establish any unconstitutional

19   County policy that allegedly *caused* such discrimination."  (Dkt. No. 56 at 13.)  The County

20   further argues Plaintiffs do not provide evidence of discriminatory intent by county decision-

21   makers.  (*Id.*)  The Court agrees Plaintiffs have failed to articulate a policy or practice required

22   for municipal liability.  Plaintiffs allege the County gave supervisors discretion about reporting

23   to HR; however, this is not the alleged cause of the disparate treatment, hostile work

24

1   environment, or equal protection violation.  Plaintiffs reporting largely occurred to Human

2   Resources employees or employees within the County management—Plaintiffs only allege one

3   circumstances in which reporting occurred to a supervisor.  Hutson reported Harris' conduct to

4   Waggoner in October 2017.  Waggoner testified he conferred with Human Resources Director

5   Lawrence.  Therefore, the lack of action on the part of the County does not relate to Plaintiffs

6   alleged policy.  Moreover, Plaintiff provides no citations to the record in support of its

7   allegations which is insufficient to survive summary judgment.  The Court grants summary

8   judgment in favor of the County on Plaintiffs' claims under § 1981 and § 1983.

9   **F.  Retaliation**

10      Plaintiffs do not plead a retaliation claim in their complaint.  (*See generally* Dkt. No. 19.)

11   In their response to the County's motion for summary judgment, Plaintiffs argue they establish a

12   prima facie retaliation case because their evidence shows Plaintiffs "engaged in protected

13   activity when they complained about anti-Latino and anti-immigrant remarks and conducts, and

14   in retaliation Clark County supervisors denied them pay increases, overtime opportunities, and

15   prevented them from applying for promotions."  (Dkt. No. 52 at 25.)  In its reply, the County

16   argues the Court should strike or disregard Plaintiffs' retaliation argument given it was never

17   plead.

18      Plaintiffs do not provide legal authority that would permit them to bring a retaliation

19   claim not plead in their complaint.  Admittedly, the Country raises its argument to strike or

20   disregard in its reply.  However, this makes sense given that Plaintiff had not raised a retaliation

21   argument at any point in the case prior to its response to the Country's motion for summary

22   judgment.  Accordingly, the Court agrees with the County and finds Plaintiffs have not

23

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) - 30

1    adequately plead a retaliation claim.  Because this claim has not been plead, the Court disregards

2    Plaintiffs' retaliation argument.

3        **G. Evidentiary Objections**

4            In its reply, the County makes several evidentiary objections.  The County argues

5    Hutson's testimony about what Gauge Bryant told him is inadmissible hearsay.  (Dkt. No. 56 at

6    11.)  Hearsay is any out-of-court statement offered into evidence to prove the truth of the matter

7    asserted.  *See* Fed. R. Evid. 801(c).  The Court can imagine a situation in which this statement is

8    not offered to prove the truth of the matter, i.e., that Harris said to Bryant "the County is going to

9    shit because it keeps hiring these beaners and spics."  Bryant passing along that information

10   could be considered harassment regardless of its truth.  However, because Plaintiffs' hostile

11   work environment claims do not rely upon the admissibility of this statement, the Court does not

12   need to make an evidentiary ruling at this time.

13           The County also argues the Court should strike or disregard parts of Clayton Tikka's

14   declaration.  In its analysis, the Court relies on only one portion of Tikka's declaration which

15   says he heard Eiesland yelling at Peña about his grievance from the office next door.  *See supra*

16   Part II.H. (citing Dkt. No. 53-24 at 4–5.)  Therefore, the Court considers only the objection

17   relating to this statement at paragraph ten of Tikka's declaration.  The County argues this

18   paragraph violates Federal Rule of Evidence 601 because it "lack[s] foundation/personal

19   knowledge."  Tikka states he was in the next room at the time Eiesland was yelling at Peña and

20   he could "overhear the conversation."  At this point, the Court finds this sufficient evidence of

21   Tikka's personal knowledge.  Moreover, Peña's hostile work environment claim does not rely on

22   the admissibility of this statement.

23

24

1    The County objects to the Declaration of Larry Jones on a number of grounds.  The Court

2    does not consider this Declaration in its analysis; thus, no evidentiary ruling is required.

3    Finally, the County objects to "references to hearsay deposition testimony, e.g., Smith p.

4    82" under Federal Rule of Civil Procedure 56.  The Court considers only the County's objection

5    to Smith's testimony given it fails to articulate any other explicit objection and the Court

6    declines to try to decern which pieces of evidence the County intends to include.  Federal Rule of

7    Civil Procedure 56(c)(2) allows a party to object "that the material cited to support or dispute a

8    fact cannot be presented in a form that would be admissible in evidence."  On page 82, Smith

9    testified Waggoner communicated to him that he preferred an employee named Kenny Hugo fill

10   in as crew chief when Smith was on vacation.  (Dkt. No. 53-8 at 7.)  The Court does not base its

11   decision on summary judgment on this part of Smith's testimony and thus, does not decide

12   whether it must be stricken at the summary judgment stage.

13                                    **IV    CONCLUSION**

14   Accordingly, and having considered the County's motion, the briefing of the parties, and

15   the remainder of the record, the Court finds and ORDERS that the County's motion for summary

16   judgment is GRANTED IN PART and DENIED IN PART.

17             1.  Plaintiffs' disparate treatment claims brough pursuant to Title VII and the

18                 Washington Law Against Discrimination are DISMISSED with prejudice.

19             2.  Plaintiffs' 42 U.S.C. § 1983 equal protection claim and 42 § 1981 claim against

20                 the County are DISMISSED with prejudice.

21             3.  The County's motion for summary judgment is DENIED as it relates to Plaintiffs'

22                 Title VII and Washington Law Against Discrimination hostile work environment

23                 claims.

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 46) - 32

1

2      Dated this 28th day of April, 2023.

3

4

5                                               David G. Estudillo
                                                United States District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO.
46) - 33