UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ELIAS PEÑA, ISAIAH HUTSON, and RAY ALANIS,<br><br>                  Plaintiffs,<br>  v.<br><br>CLARK COUNTY,<br><br>                  Defendant. | CASE NO. 3:21-cv-05411-DGE<br><br>ORDER DENYING MOTION TO EXCLUDE TESTIMONY OF DR. LAURA BROWN (DKT. NO. 44) |

This matter comes before the Court on Defendant's motion to exclude the testimony of Laura Brown, Ph.D. (Dkt. No. 44.) The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the record.

For the reasons set forth below, the Court DENIES Defendant's motion.

        I.        **FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs Elias Peña, Isaiah Hutson, and Ray Alanis are Latino employees of the Roads Division of Clark County's Public Works Department. (Dkt. Nos. 47-3 at 4; 53-1 at 5; 53-2 at 5.) Plaintiffs' claims arise out of interactions with Clark County employees Richard Harris, Nick

Eiesland, John May, Jeff Kujava, Tim Waggoner, and Josh Lipscomb, as well as the County's response to those interactions.

In their Amended Complaint, Plaintiffs filed claims for denial of equal protection under 42 U.S.C. § 1983 and disparate treatment under Title VII, 42 U.S.C. § 1981, and the Washington Law Against Discrimination ("WLAD"). (Dkt. No. 19.) Plaintiffs also filed hostile work environment claims under Title VII, 42 U.S.C. § 1981, and WLAD. (*Id*.) On April 28, 2023, the Court granted in part Defendant's motion for summary judgment, dismissing Plaintiffs' claims for disparate treatment brought pursuant to Title VII and WLAD, Plaintiffs' 42 U.S.C. § 1983 equal protection claim, and Plaintiffs' and 42 U.S.C. § 1981 claim against the County. (Dkt. No 90.) The Court denied Defendant's motion for summary judgment with respect to Plaintiffs' Title VII and WLAD hostile work environment claims. (*Id*.)

## II.     LEGAL STANDARD

**A. Federal Rules of Evidence**

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

ORDER DENYING MOTION TO EXCLUDE TESTIMONY OF DR. LAURA BROWN (DKT. NO. 44) - 2

B. *Daubert* Standard

"Before admitting expert testimony into evidence, the district court must perform a gatekeeping role of ensuring that the testimony is both relevant and reliable under Rule 702." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (internal quotation marks omitted) (quoting *Daubert*, 509 U.S. at 597). This requires the court to determine if the expert's reasoning or methodology underlying the testimony: (1) is scientifically valid (i.e. reliable); and (2) can be applied to the facts at issue (i.e. relevant). *Daubert*, 509 U.S. at 592–593.

The reliability inquiry "requires that the expert's testimony have a reliable basis in the knowledge and experience of the relevant discipline." *Ruvalcaba-Garcia*, 923 F.3d. at 1188–1189 (internal quotation marks omitted) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)). If an expert's opinion is found to be reliable, however, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 592, 596.

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)). "Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." *Id.*, citing *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir.2007).

The party seeking to introduce expert testimony evidence must show by a preponderance of the evidence that the testimony is admissible under Rule 702. *Daubert*, 509 U.S. at 592, n.10.

However, Rule 702 should be applied with a "liberal thrust" favoring admission. *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014).

### III.   DISCUSSION

**A. Dr. Brown**

    1.  <u>Dr. Brown's Background and Experience</u>

Plaintiffs' counsel retained Dr. Brown to conduct forensic psychological evaluations of Peña, Hutson, and Alanis.  Dr. Brown holds a Ph.D. in clinical psychology from Southern Illinois University and is a diplomate of the American Board of Professional Psychology.  (Dkt. No. 51-2 at 2.)

Dr. Brown is a clinical psychologist and Clinical Professor in the Department of Psychiatry and Behavioral Sciences at the University of Washington.  (*Id*.)  Dr. Brown was in private practice for nearly 40 years, and has held a variety of other academic and professional positions.  (*Id*. at 3.)  Dr. Brown has been active in the American Psychological Association, the Washington State Psychological Association, and other professional organizations.  (*Id*. at 36–38.)  Dr. Brown has provided expert testimony in ten state and federal court cases since 2018.  (Dkt. No. 45-6 at 2.)

    2.  <u>Dr. Brown's Reports</u>

Dr. Brown prepared three reports based on her evaluations of Peña, Hutson, and Alanis. (Dkt. Nos. 45-2; 45-3; 45-4.)  In arriving at her opinions, Dr. Brown stated that she utilized the "usual and customary methodology" for conducting a forensic evaluation.  (Dkt. No. 51-1 at 4.) Dr. Brown's methodology includes: "conducting assessments with both general and trauma-specific objective psychological instruments that contain embedded measures of validity"; reviewing medical and mental health records from Plaintiffs' treatment providers; in-person

interviews with Plaintiffs; and two formal assessments using the Personal Assessment Inventory ("PAI") and the Trauma Symptom Inventory-2 ("TSI-2"). (*Id*.) In her reports, Dr. Brown uses the terms "microaggression", "Betrayal Trauma", and "Institutional Betrayal Trauma" to describe Plaintiffs' experiences while working for Clark County.

Based on her evaluations, Dr. Brown diagnosed all three Plaintiffs with other specified trauma and stressor related disorder ("OSTSRD"). (*Id*.) Dr. Brown opined that OSTSRD does not require the presence of Criterion A[1] trauma typically required by the DSM-5 for a diagnosis of post-traumatic stress disorder, which allows Dr. Brown to rely upon "the peer-reviewed science of psychology, in which the various forms of betrayal trauma and microaggressions have been described as having effects similar to those seen in people exposed to a Criterion A traumatic stressor."[2] (*Id*.)

Based on her evaluations, Dr. Brown opined that Peña would require between six and twelve months of individual psychotherapy and an additional 6 to 12 months of marital therapy to address his experiences. (Dkt. No. 45-2 at 19–20.) Dr. Brown similarly opined that Hutson would require an additional two to three years of weekly psychotherapy to address his trauma,

---

[1] Criterion A requires "[e]xposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways: (1) Directly experiencing the traumatic event(s); (2) Witnessing, in person, the event(s) as it occurred to others; (3) Learning that the traumatic event(s) occurred to a close family member or close friend. In cases of actual or threatened death of a family member or friend, the event(s) must have been violent or accidental; or (4) Experiencing repeated or extreme exposure to aversive details of the traumatic event(s) (e.g. first responders collecting human remains; police officers repeatedly exposed to details of child abuse)." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed.) [hereinafter DSM-5]; *see also Vaughn v. Hobby Lobby Stores, Inc.*, Case No. 6:19-cv-00293, 2021 WL 2008469 at * 3 (W.D. La. May 19, 2021).

[2] Unlike Plaintiffs Peña and Alanis, Dr. Brown found Hutson was repeatedly exposed to Criterion A traumatic stressors because he believed his life and safety were at risk from his co-workers. (Dkt. No. 45-3 at 16.) Dr. Brown diagnosed Huston with post-traumatic stress disorder in addition to OSTSRD. (*Id*. at 16–17.)

along with six to nine months of couples' therapy. (Dkt. No. 45-3 at 18–19.) With respect to Alanis, Dr. Brown stated he would require between 12 and 18 months of psychotherapy, along with 6 to 12 months of marital therapy. (Dkt. No. 45-4 at 13–14.) Dr. Brown opined that all three Plaintiffs would likely require "booster shot" therapy sessions if the case goes to trial. (Dkt. Nos. 45-2 at 19; 45-3 at 19; 45-4 at 13.)

3. <u>Analysis</u>

Defendant contends Betrayal Trauma ("BT"), Institutional Betrayal Trauma ("IBT"), and microaggression theories are not recognized by the DSM-5. (Dkt. No. 44 at 2–4.) Defendant argues that instead of relying upon the DSM-5 manual, Dr. Brown cited unspecified peer-reviewed literature on microaggressions, BT, and IBT. (*Id*. at 5–6.) Defendant contends Dr. Brown only cited four articles in support of her opinions, and argues these articles only provide general information and statistics about discrimination against Latinos and do not address microaggressions, BT, or IBT in the context of psychological assessments.[3] (*Id*. at 6.)

Defendant argues the Court should exclude those portions of Dr. Brown's testimony based upon microaggressions, BT, and IBT because they are not supported by the DSM-5 or otherwise based on good science. (*Id*. at 11.)

Plaintiffs contend the lack of any reference to concepts such as microaggressions, BT, or IBT in the DSM-5 is not dispositive here, because these terms appear in peer-reviewed scientific psychology literature and are recognized forms of trauma. (Dkt. No. 50 at 10.) Plaintiffs further

---

[3] Plaintiffs profess to be "quite puzzled" by Defendant's reference to these four articles, and state that Dr. Brown did not rely upon any of them in forming her opinions. (Dkt. No. 50 at 12.) Plaintiffs ask the Court to strike any references to these articles from Defendant's motion. (*Id*.) Defendant argues that the four articles cited in its motion are the only sources identified in Dr. Brown's disclosures and reports, but does not object to the Court disregarding these articles. (Dkt. No. 55 at 5, n. 3.) The Court declines to strike references to these articles in Defendant's motion, but will disregard them in the analysis that follows, as Defendant suggests.

contend that Dr. Brown referenced only two sources for her opinions during her deposition, a book on microaggressions and an article on institutional betrayal, both of which are peer-reviewed publications of the American Psychological Association. (*Id*. at 12.)

Plaintiffs argue Dr. Brown's OSTSRD diagnosis encompasses the trauma they experienced, and contend the DSM-5 is not a comprehensive treatise of the harms caused by discriminatory treatment. (*Id*. at 11.) Plaintiffs further argue Dr. Brown's method for determining the levels of psychological and emotional harm suffered by Plaintiffs is widely accepted. (*Id*. at 11–12.)

Dr. Brown has extensive education and experience in the field of clinical psychology and has explained, in detail, the facts and research upon which her opinions are based. She has also explained the methodology used in reaching her conclusions, and her opinions are sufficiently reliable under *Daubert*. Dr. Brown's opinions, which explain the emotional trauma allegedly suffered by Plaintiffs due to conduct by County employees, is relevant to Plaintiffs' hostile work environment claims and to determining damages.

Defendant cites *United States v. Scholl* for the proposition that when an expert's proffered evidence regarding a psychological diagnosis contradicts the DSM or is not supported by DSM criteria, there is a risk that the testimony is "not relevant and could be confusing, inconsistent, and misleading to the jury." 166 F.3d 964, 971 (9th Cir. 1999).

*Scholl* involved a compulsive gambler charged with filing false tax returns and structuring currency transactions. *Id*. at 968. The defendant sought to have his expert on compulsive gambling "testify that pathological gamblers have distortions in thinking and 'denial,' which impact their ability and emotional wherewithal to keep records." *Id*. at 970. The defendant's expert "would have testified that compulsive gamblers do not want to keep records

because that would force them to confront the reality of losses, which creates too much upheaval." *Id*. The expert also "would have opined that a pathological gambler is not motivated by money, but believes that the next 'big win' will fix their lives." *Id*.

The district court found that a diagnosis of compulsive gambling disorder satisfied the validity prong of *Daubert*, and ruled that the expert could testify that the defendant was a compulsive gambler at the time the alleged crimes occurred. *Id*. However, the court limited the expert's testimony to the ten diagnostic criteria for pathological gambling set forth in the DSM, and excluded proffered evidence regarding "distortion in thinking and denial of the existence of a gambling problem." *Id*. The district court reasoned that "[d]istortion and denial are 'Associated Descriptive Features' but are not regarded as sufficiently sensitive or specific to be recognized as diagnostic criteria." *Id*. The Ninth Circuit found the district court did not abuse its discretion in excluding the expert's testimony under rules 402 and 403. *Id* at 971.

The defendant's expert acknowledged there was no support in the literature for the idea that pathological gamblers cannot truthfully report gambling income. *Id*. The Ninth Circuit reasoned that "evidence that compulsive gamblers are in denial, or that their thinking about gambling in relation to their life is distorted, would not tend to show that [the defendant] did not believe his tax return to be correct in reporting winnings and losses, or that he did not falsely subscribe to it specifically intending not to report gambling wins and losses." *Id*.

The Ninth Circuit further reasoned that the expert's testimony would have been misleading and confusing under Rule 403 because the jury may have misunderstood his opinion to mean that the defendant lacked intent to report wins or losses because of his disorder, a conclusion without support either in the scientific community or the expert's own experience. *Id*.

The facts in this case are distinguishable from those at issue in *Scholl*, and Dr. Brown's reliance on concepts like microaggression and constructs like BT and IBT does not present the same concerns regarding relevance and the possibility of confusion present in *Scholl*.

As explained in Dr. Brown's reports, the term microaggression is used to explain the interactions Plaintiffs had in the workplace; the terms BT and IBT are used to provide context for how the County's leadership responded when Plaintiffs raised concerns about their treatment. (Dkt. No. 45-3 at 10–11.)  These concepts are relevant to Plaintiffs' hostile work environment claims and to determining damages.  There is also little risk of confusion if Dr. Brown uses these terms in her testimony: the jury can easily understand that these terms are not present in the DSM and are concepts which inform a psychiatric diagnosis rather than diagnoses themselves.

Under *Daubert*, the district court serves as a gatekeeper, not a fact finder.  *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).  A district court must act as a gatekeeper to exclude "junk science," or expert testimony based only on "[p]ersonal opinion, not science." *Daubert*, 43 F.3d at 1319, 1321 n.18.

Where opinions are not the "junk science" that Rule 702 was meant to exclude, "the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system—'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof'—to 'attack[ ] shaky but admissible evidence[.]'" *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quoting *Daubert*, 509 U.S. at 596).

To the extent Defendant questions how broadly terms such as "microaggression", "Betrayal Trauma", and "Institutional Betrayal Trauma" are accepted and used by psychologists

in evaluating trauma and diagnosing trauma related disorders, Defendant may cross examine Dr. Brown or present contrary evidence or witnesses on this point.

To the extent Defendant questions the factual bases of Dr. Brown's opinions, this goes to the credibility of her testimony rather than its admissibility, and it is the role of the opposing party to examine the factual basis for the opinions on cross-examination. *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) (quoting *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004)). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Children's Broad. Corp.*, 357 F.3d at 865.

Defendant may properly cross-examine Dr. Brown about weaknesses in her method and opinions. However, the Court cannot say, as a matter of law, that Dr. Brown's opinions constitute the kind of "junk science" that Rule 702 was intended to exclude.

The Court therefore finds, by a preponderance of the evidence, that Dr. Brown's opinions meet the threshold for admissibility set forth in Rule 702 and *Daubert*.

## IV.   ORDER

Having considered the pending motion, the response and reply, and the remainder of the record, the Court finds and ORDERS:

Defendant's motion to exclude the testimony of Dr. Laura Brown (Dkt. No. 44) is DENIED.

Dated this 5th day of May, 2023.

David G. Estudillo
United States District Judge