The Honorable David G. Estudillo

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT TACOMA

ELIAS PENA, ISAIAH HUTSON, and
RAY ALANIS,

                           Plaintiffs,

    v.

CLARK COUNTY, WASHINGTON,

                           Defendant.

No. 3:21-cv-05411-DGE

DECLARATION OF
JAYNE L. FREEMAN

I, Jayne L. Freeman, declare as follows:

1.     I am over the age of 18 and am otherwise competent to testify as to all matters herein, and make the following statements based on my own personal knowledge. I am one of the attorneys representing Defendant Clark County,

2.     Attached as **Exhibit A** are true and correct copies of deposition transcript excerpts of Ray Alanis;

3.     Attached as **Exhibit B** are true and correct copies of deposition transcript excerpts of Isaiah Hutson;

4.     Attached as **Exhibit C** are true and correct copies of deposition transcript excerpts of Elias Pena;

5.     Attached as **Exhibit D** are true and correct copies of interrogatory responses of Plaintiffs Elias Pena, Isaiah Hutson and Ray Alanis.

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

1

2

       I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

3

4

       Dated this 15th day of May, 2023, at Seattle, Washington.

5

6

                             */s/ Jayne L. Freeman*

7

                             Jayne L. Freeman, WSBA #24318

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE:  (206) 623-8861
FAX:  (206) 223-9423

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Attorneys for Plaintiffs**

Roger M. Townsend, WSBA #25525
Daniel F. Johnson, WSBA #27848
BRESKIN JOHNSON & TOWNSEND
PLLC
1000 Second Ave., Suite 3670
Seattle, WA  98104
Phone: 206-652-8660
Fax: 206-652-8290
Email:  rtownsend@bjtlegal.com
        djohnson@bjtlegal.com
        jmcclure@bjtlegal.com
        admin@bjtlegal.com

**Attorneys for Plaintiffs**

Luis L. Lozada
(Pro Hac Vice) NY Bar No. 5742945
Fernandez Nunez
(Pro Hac Vice) CA Bar No. 327390
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND
634 S. Spring Street, 11th Floor
Los Angeles, CA  90014
Phone: 213-629-2512
Email:  llozada@maldef.org
        fnunez@maldef.org
        mcorona@MALDEF.org

**Attorneys for Plaintiffs**

Leticia Saucedo
(Pro Hac Vice) NY Bar No. 2953255
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND
1512 Fourth Street
Sacramento, CA  95814
Phone: 702-324-6186
Email:  lsaucedo@maldef.org

**Attorneys for Attorney for Defendant
Clark County**

Leslie Anne Lopez, WSBA # 46118
Chief Civil Deputy Prosecuting Attorney
CLARK COUNTY PROSECUTING
ATTORNEY
PO Box 5000
Vancouver, WA 98666-5000
Phone: (564) 397-4755
Email:  Leslie.Lopez@clark.wa.gov
        nichole.carnes@clark.wa.gov

DATED:  May 15, 2023

/s/ Jayne L. Freeman
Jayne L. Freeman, WSBA #24318
Email: jfreeman@kbmlawyers.com

DECLARATION OF JAYNE L. FREEMAN - 3
3:21-cv-05411-DGE
1135-00007/622238

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

**EXHIBIT A**

# Deposition of Ray Valentino Alanis

# Pena, et al. v. Clark County, Washington

# July 27, 2022



**206.287.9066  |  800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Pena, et al. v. Clark County, Washington                                    Ray Valentino Alanis

---

Page 1

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

ELIAS PENA, ISAIAH HUTSON, and    )
RAY ALANIS,              ) No. 3:21-cv-05411-DGE
                    )
        Plaintiffs,    )
                    )
    v.              )
                    )
CLARK COUNTY, WASHINGTON,        )
                    )
        Defendant.    )

VIDEO RECORDED DEPOSITION OF RAY VALENTINO ALANIS
Taken on behalf of Defendant
* * *

BE IT REMEMBERED THAT, pursuant to the
Washington State Court Rules, the video recorded
deposition of RAY VALENTINO ALANIS was taken before Tevin
Hinson Green, a Washington Certified Shorthand Reporter,
on Wednesday, July 27th, 2022, commencing at the hour of
9:25 a.m., in the PUBLIC SERVICE CENTER BUILDING, 1300
Franklin Street, Vancouver, Washington.

---

Page 3

1          (Exhibits 31-37 premarked.)
2          THE VIDEOGRAPHER:  Good morning.  This is
3    volume 1 in the deposition of Ray Alanis, represented by
4    Andres Holguin-Flores in the matter of Pena et al., versus
5    Clark County Washington, case number 321CV05411DGE, in the
6    United States District Court for the Western District of
7    Washington at Seattle.
8          The time now is approximately 9:25 a.m. on
9    Wednesday of July 27th, 2022, and we are convening at
10   Public Service Center Building, 1300 Franklin Street,
11   Vancouver, Washington.
12          My name is Allyson Salud from Buell Reporting,
13   LLC, located at 1325 4th Avenue, Suite 1840 in Seattle,
14   Washington 98101.  Starting on my left, will counsel and
15   all present please identify themselves for the record.
16          MR. HOLGUIN-FLORES:  Andres Holguin-Flores
17   on behalf of plaintiff, Ray Alanis.  And I am an attorney
18   from the Mexican American Legal Defense and Educational
19   Fund.
20          MS. FREEMAN:  Jayne Freeman, I'm a special
21   prosecuting attorney for Clark County from Keating,
22   Bucklin & McCormack, and I am representing defendant Clark
23   County in this matter.
24          THE VIDEOGRAPHER:  The court reporter may
25   now swear in the witness.

---

Page 2

1        APPEARANCES:
2
3    MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
       BY MR. ANDRES HOLGUIN-FLORES
       634 S Spring Street, 11th Floor
4      Los Angeles, CA  90014
       213-629-2512 .  aholguin-flores@maldef.org
5      Attorney for Plaintiffs
6
7    MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
       BY MS. LETICIA SAUCEDO
8      1512 Fourth Street
       Sacramento, CA 95814
9      702-324-6186 .  lsaucedo@maldef.org
       Attorney for Plaintiffs
10
11   KEATING BUCKLIN MCCORMACK, INC.
       BY MS. JAYNE LYN FREEMAN
12     801 2nd Avenue, Suite 1210
       Seattle, WA  98104
13     206-623-8861 .  jfreeman@kbmlawyers.com
       Attorney for Defendant
14
15   ALSO PRESENT:  Allyson Salud (Videographer), Luis L.
16   Lozada, Gabriela MacPherson, Diego Haro, Nichole Carnes
17   (where noted)
18                * * *
19
20
21
22
23
24
25

---

Page 4

1
2          RAY VALENTINO ALANIS,
3    Having first been sworn by the Certified Shorthand Reporter
4    to tell the truth, testified under oath as follows:
5
6          EXAMINATION
7    MS. FREEMAN:
8    Q   Good morning.
9    A   Good morning.
10   Q   I'm still dealing with some technical issues --
11   A   You're fine.
12   Q   -- so I'm just trying to see if someone can help me
13   out with that.
14          Mr. Alanis, am I pronouncing that correctly?
15   A   Yes, you are.
16   Q   Okay.  We met earlier.  My name is Jayne Freeman, and
17   I'm representing Clark County, the defendant, in this
18   lawsuit.  You are a plaintiff in this lawsuit; is that
19   right?
20   A   Yes, ma'am.
21   Q   And you are pursuing discrimination claims against
22   Clark County?
23   A   Yes, ma'am.
24   Q   Could you please state and spell your full name for
25   the record and the court reporter?

---

1 (Pages 1 to 4)

Pena, et al. v. Clark County, Washington

Ray Valentino Alanis

---

Page 241

1  John May?
2  A  They work underneath him.
3  Q  As do you; correct?
4  A  No.  They work under Tim Waggoner.  He's their
5  superintendent.
6  Q  Okay.  Are there other crew chiefs who also work
7  under Tim Waggoner?
8  A  Justin Meats, I believe.
9  Q  Are you alleging that Justin Meats has engaged in any
10  racially discriminatory conduct?
11  A  I'm not saying that about Justin.  Okay.
12  Q  That's all the questions I have today.  Thank you.  I
13  think.
14      THE VIDEOGRAPHER:  All right.  We are now
15  off the recorded.  The time is 4:27 p.m.
16      (DEPOSITION ADJOURNED AT 4:27 P.M.)
17      (SIGNATURE RESERVED.)
18      (NOTE:  Untranscribed steno notes archived
19      ten years on computer; transcribed English
20      files archived five years on computer.)
21          * * *
22
23
24
25

---

Page 243

1          EXHIBIT INDEX
2          (Continued)
3  Exhibit 34    Memo from Kara Hill        172
4      To Ray Alanis
5      Dated 06-18-2020
6  Exhibit 35    E-mail from Ray Alanis        179
7      to Kathleen Otto and
8      Ahmad Qayoumi
9      Dated 6-23-2020
10  Exhibit 36    (Not used in deposition)
11  Exhibit 37    Human Resources Briefing        186
12      Report:  Public Works
13      Operations Road Maintenance
14      Staff Feedback
15
16
17
18
19
20
21          * * *
22
23
24
25

---

Page 242

1          EXAMINATION INDEX
2                          Page
3  Examination by Ms. Freeman          4
4  Examination by Mr. Holguin-Flores        229
5  Further Examination by Ms. Freeman        336
6          * * *
7          REFERENCED EXHIBITS
8  No.        Item              Page
9  Exhibit 1              206
10  Exhibit 2              208
11  Exhibit 4              208
12  Exhibit 10              204
13  Exhibit 12              161
14  Exhibit 13              165
15  Exhibit 18              167
16  Exhibit 19              167
17  Exhibit 20              167
18
19
20          EXHIBIT INDEX
21  Exhibit 31    Charge of Discrimination    97
22  Exhibit 32    Discovery Requests        121
23  Exhibit 33    E-mail from Ray Alanis    146
24      to Kara Hill
25

---

Page 244

1          CERTIFICATE
2      I, Tevin Hinson Green, a Washington Certified
3  Court Reporter, hereby certify that said witness
4  personally appeared before me at the time and place set
5  forth in the caption hereof; that at said time and place I
6  reported in stenotype all testimony adduced and other oral
7  proceedings had in the foregoing matter; that thereafter
8  my notes were transcribed through computer-aided
9  transcription, under my direction; and that the foregoing
10  pages constitute a full, true and accurate record of all
11  such testimony adduced and oral proceedings had, and of
12  the whole thereof.
13      I further certify that review of the transcript was
14  reserved.
15      Witness my hand at Portland, Oregon, this 10th
16  day of August, 2022.
17
18
19          _____
20          Tevin Hinson Green
21          Washington CCR No. 3460
22          Expires 09/14/2022
23
24
25

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Pena, et al. v. Clark County, Washington                                        Ray Valentino Alanis

Page 25

1   A   It was -- it was cordial at first.
2   Q   What types of situations would bring you and
3   Mr. Lipscomb together to -- to directly interact?
4   A   He would come to the job sites to see the process of
5   what we do.
6   Q   And so were there times that Mr. Lipscomb came to the
7   job site and you showed him what was going on or talked to
8   him about what you were doing?
9   A   He seen us working in the field and was cordial prior
10  to this incident.  He was so fresh on the -- as a county
11  worker in that position.
12  Q   Prior to -- so this interaction that you were
13  describing in the crew chief meeting with Mr. Lipscomb
14  that occurred in, when, about in March of 2022?
15  A   March of 2022, that I can recall.
16  Q   So Mr. Lipscomb was not even working for the county
17  yet when you filed this lawsuit; is that correct?
18  A   He wasn't presently.
19  Q   Okay.  So he -- he was not a person -- there was
20  nothing that Mr. Lipscomb had done prior to your filing
21  your lawsuit that you base your lawsuit on at that time;
22  is that right?
23  A   He's so fresh.
24  Q   Is that a, no, he was not someone that you were --
25  A   No.

Page 26

1   Q   -- basing your claims on?
2        Are you currently intending to pursue claims
3   against the county based on this interaction with
4   Mr. Lipscomb in March of 2022?
5   A   I believe it's discrimination and harassment.
6   Q   And you believe that it's -- Mr. Lipscomb was
7   discriminating and harassing you in this March 2022
8   meeting because of your race being Latino?
9   A   I believe I was discriminated at -- towards me from
10  what he's heard from others.  I believe it stems from
11  that.
12  Q   And you believe it stems from what he has heard from
13  you from other -- heard about you from Tim Waggoner and
14  nick Eisland; is that right?
15  A   Those are the only people that rub shoulders with
16  him.
17  Q   Okay.  Do you actually have any idea what Tim
18  Waggoner or Nick Eisland may have shared with Josh
19  Lipscomb?
20  A   I don't at this moment.
21  Q   Has Mr. Lipscomb ever asked you about the claims
22  you're making in this case or about your lawsuit?
23  A   He hasn't.
24  Q   Are you claiming in this lawsuit that Carl Oman
25  discriminated or harassed you based on your race?

Page 27

1   A   I don't believe so.
2   Q   Are you claiming in this lawsuit that Carolyn Heniges
3   discriminated against you or harassed you because of your
4   race?
5   A   I don't believe Carolyn.
6   Q   Are you alleging in this lawsuit that Ahmad
7   Qayoumi -- I'm not great at pronouncing his name, but the
8   former public works director discriminated against or
9   harassed you because of your race?
10  A   I believe there's discrimination in that aspect,
11  because it was never brought to light or addressed, and he
12  was aware of it.
13  Q   Okay.  So just to clarify, are you alleging that --
14  aside from concerns about whether Ahmad did not address
15  something he may have been aware of, are you alleging that
16  Ahmad Qayoumi, the former public works director, engaged
17  in any racially harassing conduct directly towards you?
18  A   He hasn't done that other than not addressing it,
19  enabling it to happen.
20  Q   Are you alleging in this lawsuit that Darrell Young
21  engaged in any discriminatory or harassing behavior or
22  conduct toward you because of your race?
23  A   I don't believe so.
24  Q   Is Darrell Young a coworker?
25  A   He's a coworker, but he's a person in position as a

Page 28

1   crew chief currently.
2   Q   What crew is he -- is Darrell Young a crew chief for
3   currently?
4   A   Fin Hill.
5   Q   Have you ever worked with Mr. Young in his capacity
6   as crew chief?
7   A   Have I worked underneath him is the question?
8   Q   Yes.
9   A   I believe so.  When they need the help.
10  Q   How long has Mr. Young been a crew chief?
11  A   I can't recall.  Maybe a year.
12  Q   Is Mr. Young also a member of the same local
13  307 union that you are a member of?
14  A   He is.
15  Q   And has he also served as the union president?
16  A   He has.
17       (Court reporter requested clarification.)
18       MS. FREEMAN:  "Has he also served as a
19  union president?"
20  Q   BY MS. FREEMAN:  Has Mr. Young represented you in his
21  capacity as a union president in union business with the
22  county?
23  A   He has.
24  Q   Is he currently the union president?
25  A   No.

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Pena, et al. v. Clark County, Washington                    Ray Valentino Alanis

Page 213

1    A    At this time.
2    Q    Like within the last two or three years or before
3    that?
4    A    That's a tough one.
5    Q    Okay.  I mean --
6    A    I -- I don't know on that time.
7    Q    Okay.
8    A    I don't know that time frame.
9    Q    Do you know what information or whether Brandon Pilot
10   would have information related to the claims you're making
11   in this lawsuit?
12   A    From what I had heard is he was in the room when
13   those comments were being made.
14   Q    Which comments?
15   A    Trump's doing a good job:  Cops are killing niggers,
16   and he's building a wall to keep the Mexicans out.
17   Q    And who told you that Brandon Pilot was in the room
18   when those comments were made?
19   A    I believe it was Isaiah Hutson.
20   Q    And you -- you were not there yourself; correct?
21   A    No.
22   Q    Do you know information that Isidoro -- it's Isidoro
23   or Chilo -- two and the same person --
24   A    Yes.
25   Q    -- Isidoro or Chilo Flores might have related to the

Page 214

1    claims that you're making in this case?
2    A    Repeat the beginning of that again.
3    Q    Sure.  Do you know what information Isidoro, or
4    Chilo, Flores may have that is related to the claims that
5    you are making in this case?
6    A    The discrimination, he's seen it firsthand, I would
7    say.
8    Q    Is -- are you saying that Chilo has seen
9    discrimination against you firsthand?
10   A    I can't recall that.  What instance at this time.
11   Q    Is Chilo Flores Hispanic?
12   A    He is.
13   Q    Has Chilo Flores shared with you that he has been
14   discriminated against or harassed based on his race?
15   A    I believe he has.
16   Q    And why do you believe that Chilo Flores has been
17   discriminated against because of his race?
18   A    From what I recall that he was told by another
19   crew chief, at the time, that he would kill him, his wife,
20   and his family.  He would kill them all.  Those were words
21   spoken to Chilo.
22   Q    And who spoke those words to Chilo?
23   A    That was Richard Wanke.
24   Q    Who?
25   A    Richard.

Page 215

1    Q    Richard who?
2    A    Wanke.
3    Q    How do you spell that?
4    A    W-A-N-K-E.
5    Q    And when did -- does Richard Wanke work for the
6    county anymore?  Still?
7    A    I believe so.
8    Q    Do you know what his position is?
9    A    I don't.
10   Q    Did hear him make that statement?
11   A    No, I didn't.
12   Q    Where did you hear it from?
13   A    I believe it was Isidoro himself.
14   Q    And do you know what Mr. Wanke's position is?  Did
15   you say you did or --
16   A    (Shaking head.)
17   Q    -- didn't know?
18        Does he work in the roads division?
19   A    I don't think so.  It may be water somewhere.  He
20   left Clark County, and then he came back in a different
21   position, role, or something like that.
22   Q    Did Chilo tell you that he thought that Mr. Wanke
23   made this comment to him because of his race?
24   A    I don't recall him saying that.
25   Q    Did he tell you why he thought he made that comment?

Page 216

1    A    Not to my knowledge.
2    Q    Did Mr. -- did Chilo tell you he took that comment as
3    a threat?
4    A    Yes.
5    Q    So you said that you believed Chilo had been
6    discriminated against based on his race.  My question was
7    a little different than that.
8        Has Mr. Flores ever expressed to you or shared
9    with you that he believes he has been discriminated
10   against or harassed because of his race in his employment
11   with the county?
12   A    I believe he has expressed, yes.  As far as
13   discriminating, harassing.
14   Q    And what has Mr. Flores expressed to you that he has
15   experienced that he feels is discriminating or harassing
16   because of his race?
17   A    His comments are always, "Don't trust nobody here.
18   Don't trust nobody."
19   Q    Have you heard that comment from anyone else?
20   A    Nope.
21   Q    And has Mr. Flores told you that he makes that
22   comment because he is Hispanic?
23   A    I believe so.
24   Q    Does his comment about not trusting anyone include
25   other Hispanic employees?

54 (Pages 213 to 216)

Pena, et al. v. Clark County, Washington                     Ray Valentino Alanis

Page 217

1   A   Absolutely.  Discrimination and harassment, what he's
2   seen and experienced.
3   Q   Maybe my question wasn't clear.  Has Mr. Flores
4   indicated that he also doesn't trust his coworkers who are
5   Hispanic?  Has he told you that's not no one who is not
6   Hispanic, or has he told you don't trust no one at all?
7   A   He hasn't clarified as far as Hispanics.
8   Q   But you have taken that comment to mean that he
9   distinguishes --
10   A   There's a distinguishing line there.
11   Q   -- the people to trust and not trust based on race?
12   A   It's hard to make that judgment call for Chilo
13   Isidoro.
14          MR. HOLGUIN-FLORES:  Counsel, do you
15   anticipate how much longer we will go?
16          MS. FREEMAN:  Yeah.  Not very much longer.
17   I think why don't we just try to go and finish before we
18   start taking --
19          MR. HOLGUIN-FLORES:  Sounds.
20          MS. FREEMAN:  -- more breaks.
21          MR. HOLGUIN-FLORES:  No.  Thank you.
22          MS. FREEMAN:  Yep.
23   Q   BY MS. FREEMAN:  Are you familiar with Julio Morales?
24   A   Absolutely.
25   Q   And what position does he hold at the county?

Page 218

1   A   He's at the Sign Shop right now.
2   Q   Do you know whether Mr. Morales has any information
3   you feel is related to the claims you're making in
4   this case?
5   A   I believe he can testify of what we're dealing with
6   and what he's experienced.
7   Q   And has Mr. Morales shared with you that he feels he
8   has been discriminated against or harassed because of his
9   race?
10   A   He has expressed discrimination by them not paying
11   him as filling in as head crew chief.  He was denied his
12   pay by Kenny Price.
13   Q   Do you know why?
14   A   Kenny Price was the type that would -- more of the
15   demand type.
16   Q   He was the what?
17   A   More of a demanding type.
18   Q   Oh, a demanding type.  Okay.
19          Have you heard other people complain that Kenny
20   Price denied them pay when they filled in as a crew chief?
21   A   He denied my boot hours.  Work-boot hours.
22   Q   What are work-boot hours?
23   A   Work-boot hours are when you're working in asphalt
24   and after so many hours you get so many hours in asphalt,
25   you get an extra per diem allowance for work boots,

Page 219

1   because the asphalt eats up your boots pretty good.  I was
2   denied those hours by Kenny Price, personally.
3   Q   Have you ever heard anyone else complain about Kenny
4   Price denying them pay for filling in as work chief or
5   working out of class?
6   A   Not that I can recall at the moment.
7   Q   So aside from -- was it just one time that
8   Mr. Morales told you that Kenny Price denied him
9   out-of-class pay for working as a crew chief?
10   A   Was that the only time you asked?
11   Q   Yeah.  Did he tell you that happened more than once
12   or that it happened one time?
13   A   It was weeks that he filled in as a crew chief and
14   was denied the pay.  Weeks.
15   Q   So it was weeks that Mr. Morales filled in as an
16   acting crew chief, and that Kenny Price denied him pay for
17   that entire time?
18   A   Yes.  It could even be possibly months.
19   Q   Do you recall around the time period that was?
20   A   I can't tell you the time period.  That would have to
21   be a Julio question.
22   Q   Was that Julio who shared that with you himself?
23   A   Julio Morales.
24   Q   And did Mr. Morales tell you that he believed Kenny
25   Price denied him out-of-class pay for filling in as crew

Page 220

1   chief for weeks or up to months, because he's Hispanic?
2   A   He'd considered it harassment, discrimination.
3   Q   Did he tell you he considered -- he thought that he
4   was denied the pay because of his race?
5   A   He didn't come out and say that.
6   Q   Anything else that Mr. Morales shared with you
7   about -- or where he told you he believed he had been
8   discriminated against or harassed because of his race?
9   A   Not that I can recall at this moment.
10   Q   Who is Joey Morris?
11   A   Joey Morris is an ex-county worker.
12   Q   And do you believe he may have any information
13   related to the claims you're making in this case?
14   A   He could be a good witness.
15   Q   What information would he have?
16   A   Just things he's seen here at Clark County, how
17   things have taken place.
18   Q   Have you talked to Mr. Morris about being a good
19   witness in your case?
20   A   I will say he came to me.
21   Q   And what did he come to you about?
22   A   And he asked me if it was anything that he's ever
23   done concerning these allegations.
24   Q   When did he do that?
25   A   We were on chip seal one summer.  Maybe last season,

55 (Pages 217 to 220)

**EXHIBIT B**

# Deposition of Isaiah Hutson

# Pena, et al. v. Clark County, Washington

# July 25, 2022



**206.287.9066  |  800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Pena, et al. v. Clark County, Washington                    Isaiah Hutson

---

Page 1

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

ELIAS PENA, ISAIAH HUTSON,    )
and RAY ALANIS,               )
                              )
        Plaintiffs,           )
                              )
v.                            )No. 3:21-cv-05411-DGE
                              )
CLARK COUNTY, WASHINGTON,     )
                              )
        Defendant.            )
_____)

VIDEOTAPED DEPOSITION OF
ISAIAH J. HUTSON
Taken in behalf of Defendant
* * *

July 25, 2022
1300 Franklin Street
Vancouver, Washington

Priscilla (Pia) Harris, CCR
Court Reporter

---

Page 2

1          APPEARANCES:
2   For the Plaintiff:
3   MALDEF
    By: Andres Holguin-Flores
4       Luis L. Lozada (Via Zoom)
    11th Floor
5   634 S. Spring Street
    Los Angeles, CA  90014
6   (213)629-2512
    aholguin-flores@maldef.org
7   llozada@maldef.org
8
9   For the Defendant:
10  KEATING, BUCKLIN & MCCORMACK
    By: Jayne L. Freeman
11      Suite 1210
    801 2nd Avenue
12  Seattle, WA 98104
    (206)623-8861
13  jfreeman@kbmlawyers.com
14  Also Present:
15  KATHLEEN OTTO (Via Zoom)
    DIEGO HARO (Via Zoom)
16  LETICIA SAUCEDO (Via Zoom)
    GABRIELA MACPHERSON (Via Zoom)
17  LESLIE LOPEZ (Via Zoom)
    AMANDA MIGCHELBRING (Via Zoom)
18  STEPHANIE SPEAR, Videographer
19
20          INDEX
21  EXAMINATION BY:           PAGE NO.
22  MS. FREEMAN......................4
23
24
25

---

Page 3

1          INDEX TO EXHIBITS
2   1 Complaint.........................4
3   2 First Amended Complaint Demand for Jury Trial...4
4   3 Charge of Discrimination......................4
5   4 Plaintiffs' Initial Disclosures.................4
6   5 Interrogatories/RFP's.........................4
7   6 Appeal of Discrimination/Harassment Complaint
        Decision.......................................4
8
9   7 Request for Investigation of Discrimination and
        Harassment....................................4
10  8 Elias Conversation With Kara 6/30/30............4
11  9 E-mail Re Appeal of Discrimination/Harassment
        Decision......................................4
12
13  10 12/10/20 Letter Re Response to Request for
        Investigation of Discrimination and Harassment..4
14  11 6/18/20 Letter Re Investigation Conclusion Memo.4
15  12 Job Posting.............................4
16  13 Photo of Chalk Board.......................4
17  14 E-mail Re Need to talk....................163
18  15 E-mail Re Ray Alanis Grievance..............163
19  16 E-mail Re Out of Class Pay...................163
20  17 E-mail Re Performance and Conduct Standards and
        Expectations Meeting.........................163
21
22  18 Agreement - 7/1/18 to 6/30/21.................163
23  19 Agreement - 7/1/15 to 6/30/18.................163
24  20 Human Resources Policy Manual.................163
25

---

Page 4

1      VANCOUVER, WASHINGTON; MONDAY, JULY 25, 2022
2          9:31 A.M.
3          * * *
4          ISAIAH J. HUTSON
5   called as a witness on behalf of the Defendants,
6       having first been sworn by the Notary,
7           testifies as follows:
8
9          (Deposition Exhibits 1-13 were marked for
10          identification.)
11          EXAMINATION
12      VIDEOGRAPHER:  Here begins the
13  video-recorded deposition of Isaiah Hutson in the
14  matter of Peña, et al versus Clark County, et al.
15  Today is July 25th, 2022 and the time is 9:31.  Would
16  attorneys please state their appearances for the
17  record.
18      MR. HOLGUIN-FLORES:  Andres Holguin-Flores
19  from the Mexican American Legal Defense and
20  Educational Fund on behalf of plaintiff Isaiah Hutson.
21      MS. FREEMAN:  Jayne Freeman from
22  Keating, Bucklin & McCormack on behalf of defendant
23  Clark County.
24      VIDEOGRAPHER:  Will the court reporter
25  please swear in the witness.

1 (Pages 1 to 4)

Pena, et al. v. Clark County, Washington                                    Isaiah Hutson

---

Page 253

1    pulled Ray aside, he wasn't concerned about anybody
2    else knowing, you know, what he had just said. He
3    dismissed everybody and pulled Ray aside. So that,
4    Ray was filing a discrimination and nepotism
5    complaint. Brianna --
6        Q   And the nepotism was because this guy said
7    he knew Nick, are they related?
8        A   Yeah. The county says friends or family I
9    believe. And Nick told him he can't know anybody and
10   grade them, so Ray's perspective was that you said I
11   can't know somebody and grade them, not be family.
12       Q   I'm sorry, I'm confused. There's a nepotism
13   policy at the county that says something about friends
14   and family, what, not being able to work at the
15   county?
16       A   No, you can't supervise I think is what it
17   is, close friends or family, you cannot -- so -- so if
18   you're a superintendent or a crew chief you cannot be
19   in a direct leadership role of a individual that
20   you're a close friend or family member with.
21       Q   So what's the definition of a close friend,
22   are you not close friends with people that you work
23   with right now?
24       A   No, I'm not close friends with people I work
25   with, I go -- I have friends and family outside of

---

Page 254

1    work, I go to work to work. I have people that I'm
2    acquainted with.
3        Q   So you could not, you could not be in any
4    supervisory role over Ray Alanis or nor he over you?
5        A   Correct.
6        Q   Has that ever occurred or have you ever had
7    to do anything to avoid that?
8        A   Not that I remember.
9        Q   But you're family, you're related; right?
10       A   Well, we're -- he's my brother-in-law, so I
11   don't know if they consider that family.
12       Q   Okay. Would you consider him a close friend
13   as well?
14       A   No.
15       Q   Can you look at Exhibit 5 please?
16       MR. HOLGUIN-FLORES: Before we jump into
17   this exhibit, Counsel, can we take a quick break?
18       MS. FREEMAN: Sure.
19       VIDEOGRAPHER: The time is 4:44 and we are
20   off the record.
21       (Recess was taken.)
22       (This portion is on the stenographic record
23       only.)
24       MS. FREEMAN: We're going back on the record
25   now, it's 4:40 p.m. We've had some discussion off the

---

Page 255

1    record with counsel, and I've expressed some concern
2    over discovery documents that I think have not been
3    produced, including notes and photographs and phone
4    information and potentially social media, texts, et
5    cetera, and/or things that have been destroyed.
6        So I am going to recess the deposition at
7    this point so that we can finish up when we follow up
8    on those issues and can complete the deposition when
9    we have a more complete production, and if we have to
10   deal with something with counsel between now and then
11   we will do that.
12       And we've also issued an authorization, a
13   release for medical records for Mr. Hutson that we're
14   asking plaintiff to sign so we can follow up on
15   getting that stuff too. So thank you for your
16   cooperation and we will continue this at a later date.
17
18       (This deposition was adjourned at 4:50 p.m.)
19       (Signature reserved.)
20
21
22
23
24
25

---

Page 256

1              REPORTER'S CERTIFICATE
2    STATE OF WASHINGTON    )
                            ) ss.
3    COUNTY OF CLARK        )
4
5        I, PRISCILLA (PIA) HARRIS, a Certified
6    Shorthand Reporter for Washington, do hereby
7    certify that, pursuant to stipulation of counsel for
8    the respective parties hereinbefore set forth,
9    ISAIAH J. HUTSON, personally appeared before me at the
10   time and place set forth in the caption hereof; that
11   at said time and place I reported in Stenotype all
12   testimony adduced and other oral proceedings had in
13   the foregoing matter; that thereafter my notes were
14   reduced to typewriting under my direction; and that
15   the foregoing transcript, pages 1 to 255, both
16   inclusive, constitutes a full, true and accurate
17   record of all such testimony adduced and oral
18   proceedings had, and of the whole thereof.
19       WITNESS my hand and CSR stamp at Vancouver,
20   Washington, this 16th day of August 2022.
21
22
23       _____
         PRISCILLA (PIA) HARRIS
         Certified Court Reporter
24       OR CCR No. 01-0377
         WA CCR No. 2963
25

Pena, et al. v. Clark County, Washington                                    Isaiah Hutson

Page 93

1    around Finn Hill, he already got rid of two of us and
2    there's only one more to get rid of.  Because he
3    got -- me and Elias have both since been moved to the
4    Central location.
5           And then there's another Mexican that works
6    there, Heritage is the, oh gosh, Julio, Julio
7    De Morales, he was in the room when Nick Eisland said
8    that, and he was referring to Julio still being there
9    and they already got rid of me and Elias, so the wall,
10   Trump wall is almost up, he already got rid of two of
11   us and now he just needs to get rid of Julio.
12      Q    Were you present when Nick Eisland said
13   that?
14      A    Yes.
15      Q    Where did that occur?
16      A    Finn Hill shed.
17      Q    When did that occur?
18      A    That occurred in the summer of 2017.
19      Q    You're not sure if you shared that
20   information with Tim Waggoner in 2017 when you talked
21   to him?
22      A    Correct.
23      Q    Was this just one conversation with
24   Mr. Waggoner that you told him that Rich Harris made a
25   Hitler comment and the comment about sabotaging

Page 94

1    equipment and throwing things off the roof and that he
2    was harassing and belittling you?
3       A    Was that the only conversation?
4       Q    Did all that occur in one conversation with
5    Mr. Waggoner?
6       A    Yes.
7       Q    And during that one conversation you had
8    with Mr. Waggoner about the Hitler comment, the
9    sabotage comment, and the harassing/belittling comment
10   did you tell Mr. Waggoner that Rich Harris had said
11   that the county was hiring all these beaners and
12   spics?
13      A    Yes, I did tell Tim Waggoner that.
14      Q    Did you tell him whether or not you heard
15   that directly?
16      A    I did.
17      Q    What did you tell him about that?
18      A    I told him that it was something that Gauge
19   Bryant had told me and warned me to look out and I
20   felt that the threats from 16 and that comment that he
21   made was playing out against me on the drainage crew,
22   and that this continued thing I asked for him to
23   intervene and help.
24      Q    So at the time you spoke with Tim Waggoner
25   about Rich Harris in 2017 were you still at Finn Hill

Page 95

1    or were you working on the drainage crew?
2       A    I was on the drainage crew now, Tim had
3    become my superintendent.
4       Q    Were you telling Tim Waggoner about things
5    that had happened -- did these things happen to you
6    while you were on the drainage crew?
7       A    Some of the -- the hara -- the daily
8    harassment, almost daily harassment it seemed is --
9    was happening on the drainage crew and in Finn Hill,
10   so yes, I told some of it happened at Finn Hill, some
11   of it happened while I was on the drainage crew.
12      Q    So you testified earlier that Gauge Bryant
13   told you in May of 2017 that Rich Harris made this
14   comment about beaners and spics, do you recall that?
15      A    Yes.
16      Q    How long after Gauge Bryant told you that
17   was it that you shared that information with Tim
18   Waggoner?
19      A    October.
20      Q    So about six months later, five, since
21   months later?
22      A    It was actually probably June because it was
23   as I was going to the Vactor he told me in a warning
24   way that this had just occurred and he knew Richard
25   Harris was going to be my crew chief, so it was

Page 96

1    probably June, towards, it was the middle of June-ish,
2    pushing towards August when he told me this.
3       Q    When Gauge Bryant told you --
4       A    When Gauge Bryant told me this, yes.
5       Q    -- that he had heard Rich Harris make the
6    comment?
7       A    Say the county's going to shit because it
8    keeps hiring all these beaners and spics.
9       Q    When Gauge Bryant told you he had heard Rich
10   Harris make that comment had it just occurred or had
11   it occurred several months earlier?
12      A    It had just, I believe it had just occurred
13   over lunch when Gauge Bryant told me that.
14      Q    And it's your testimony that when you spoke
15   with Tim Waggoner in October of 2017 you specifically
16   told him that it was Gauge Bryant, the temporary
17   worker, and you gave him his name, who had told you he
18   heard this comment from Rich Harris?
19      A    Yes.
20      Q    And that you specifically told Tim Waggoner
21   in October of 2017 that the comment Gauge Bryant
22   reported to you was that Rich Harris said the county's
23   going to shit because they're hiring all these beaners
24   and spics?
25      A    That's what I reported to Tim Waggoner.

24 (Pages 93 to 96)

Pena, et al. v. Clark County, Washington                              Isaiah Hutson

Page 113

1    Q   When -- are you alleging that Gauge Bryant
2  discriminated against you or racially harassed you in
3  this case?
4    A   No.
5    Q   Are you alleging that Carol Heniges harassed
6  you, racially harassed you in this case?
7    A   I believe that Carolyn Heniges's commitment
8  in the room with Ahmad Qayoumi, Kara Hill, Larry
9  Clark, and Darrell Young to do an investigation into
10  my claims that were just made to them about
11  discrimination and harassment, that she ignored them
12  too after they permitted they were going to do it so I
13  feel like yes, that that was a part of discrimination
14  and harassment.
15    Q   Okay, so I just want to clarify though, are
16  you alleging in this case that Carolyn Heniges engaged
17  in any racially harassing or racially derogatory
18  conduct directly towards you?
19    A   I believe her conduct in not doing the
20  investigation when I asked for it to be done and was
21  committed to be done and she didn't do it, I believe
22  that was based on my race and that that's
23  discriminatory conduct.
24    Q   So again, I just want to clarify, are you
25  alleging that Ms. Heniges made any racially derogatory

Page 114

1  comments to you or about you?
2    A   Comments, no.
3    Q   Are you alleging that Isidoro Flores made
4  any racially derogatory comments or racially harassed
5  you?
6    A   No.
7    Q   Are you alleging that Brandon Pilot made any
8  racially derogatory comments or racially harassed you?
9    A   Kind of.
10    Q   What did Brandon Pilot kind of do?
11    A   He was in the room of crew chiefs, it was
12  Brandon Pilot, John May, Richard Harris.  Richard
13  Harris, John May, Brandon Pilot and Justin Meats were
14  in the crew chief room talking.  I had used the crew
15  chief's bathroom, they -- I don't think they knew I
16  was in there, I was using the restroom.
17      Isidoro Flores had come in the back door of
18  the crew chief room because they had split the crew
19  chief room for crew chiefs so he was back there.  That
20  morning was on the heels of a black man being shot in
21  Portland, and it was a pretty racially charged
22  gathering going on in Portland the day before over
23  this shooting.
24      And Jeff Kujava came in and he said well,
25  it's a good day at the county boys, cops are killing

Page 115

1  niggers and Trump's kicking out the Mexicans.  And I
2  heard Brandon Pilot, John May, and Richard Harris all
3  abrupt in laughter.  I didn't hear Justin Meats
4  laughter.  So I guess in that case I would say that
5  that made all of them a part of it.
6    Q   So you heard this one coming out of the
7  bathroom?
8    A   I heard it while I was in the bathroom,
9  that's how loud it was.
10    Q   When did this occur?
11    A   This occurred the summer-ish of 2019.
12    Q   So before COVID?
13    A   Yes.
14    Q   While you were still working, and before you
15  went out on leave; correct?
16    A   Yes.
17    Q   And did you ever talk to Isidoro Flores
18  about it?
19    A   Isidoro Flores, I came out of the bathroom
20  and when the door shut like the people just kind of
21  looked at me, but I beelined for the door, you know,
22  to get out of the there.
23      Isidoro came out the back door and he gets
24  in the truck and he goes hey, you're not -- you know
25  what I just heard in there?  And I go, oh, yeah, I was

Page 116

1  in there, and we discussed what we both heard and we
2  both heard the same thing.
3    Q   So this was in the summer of 2019.  Did you
4  talk, did you ever talk with Richard Harris, Justin
5  Meats, or Brandon Pilot about what you had overheard?
6    A   No.
7    Q   Did you tell anyone else about it?
8    A   Yes.
9    Q   Who did you tell?
10    A   Kara Hill.
11    Q   When did you tell --
12    A   Mande Lawrence.  Wait, wait, wait, wait,
13  wait, wait.  Yeah, Kara Hill during the investigation,
14  not Mande Lawrence.  I didn't speak to Mande Lawrence
15  again after May I think of 2018.  So I told Kara Hill
16  about it, and then I also told Eileen, Eileen Bryant,
17  I'm sorry, Kathleen Otto about it in our investigative
18  meeting.
19    Q   Okay, so this conversation you overheard,
20  you heard a comment from Brandon Pilot in the summer
21  of 2019?
22    A   No, the comment was from Jeff Kujava.
23    Q   Sorry, Jeff --
24    A   Brandon Pilot --
25    Q   -- Kujava?

BUELL REALTIME REPORTING, LLC
206.287.9066 l 800.846.6989

Pena, et al. v. Clark County, Washington                                    Isaiah Hutson

Page 165

1    A   Yes.
2    Q   Okay.  So was there any other day or meeting
3  that you had or communication you had with Mande
4  Lawrence where you relayed to her all of these
5  specific comments that you've outlined in your
6  response to interrogatory No. 12?
7    A   Was there any other meeting I had with her,
8  is that what you're asking?
9    Q   Yeah.
10   A   No.
11   Q   So during that meeting in May of 2019, are
12  you saying that you told Mande Lawrence that Nick
13  Eisland made a comment about the new Trump wall is
14  working because we only have one Mexican left to get
15  rid of?
16   Q   And you also told Mande Lawrence in May of
17  2019 that a crew chief in 2017 said the county's going
18  to shit because they keep hiring all of these beaners
19  and spics?
20   A   Yes.
21   Q   Did you tell her that it was Rich Harris who
22  said that?
23   A   Yes.
24   Q   Did you tell her anyone else who was there
25

Page 166

1  who may have heard it?
2    A   Yes.
3    Q   Who did you tell her, who did you tell Mande
4  Lawrence was there and heard the beaners and spics
5  comment from Rich Harris in 2017?
6    A   I told her that Gauge Bryant had told me
7  about it.
8    Q   And during this conversation with Mande
9  Lawrence on May 24th of 2019 did you tell her, tell
10  Mande that in the summer of 2018, a year earlier, a
11  crew chief said it's a good day at the county boys,
12  Trump is kicking out the Mexicans and cops are killing
13  niggers?
14   A   No, I said -- I'm sorry, I think that's a
15  typo, that happened summer of '19, that hadn't
16  happened yet.
17   Q   That hadn't happened yet at the time that
18  you spoke with Mande Lawrence in May of 2019?
19   A   Yes.
20   Q   Had it happened when you spoke with Kara
21  Hill and Carolyn Heniges and Ahmad during the step 3
22  grievance meeting in July of 2019?
23   A   It was around that time.  It was I believe
24  right before, because I talked with Kara Hill about it
25  in 2020, so it was -- it was around that time.

Page 167

1    Q   Okay, so bouncing forward, in the spring of
2  2020 Kara Hill interviewed you as part of an
3  investigation; correct?
4    A   Yes, yes.
5    Q   So are you saying that in April of 2020 when
6  Kara Hill interviewed you you told her that you heard
7  a crew chief say it's a good day at the county boys,
8  Trump is kicking out Mexicans and the cops are killing
9  niggers in the summer of 2019?
10   A   Yes, but that wasn't a crew chief that said
11  it, it was Jeff Kujava in the crew chief room.
12   Q   And Jeff Kujava was not a crew chief?
13   A   No.
14   Q   He's a coworker?
15   A   Yes.
16   Q   Or was?
17   A   At a different shed.
18   Q   At a different shed?
19   A   Yeah.  He just came into Central for
20  something, I don't know.
21   Q   Is he someone you ever worked with?
22   A   Yes.
23   Q   Did you work with him regularly?
24   A   When I first got here he was in the rural
25  shed, so when I was at Finn Hill I worked with him a

Page 168

1  lot more because I was stationed out there.
2    Q   Okay, so you told Mande Lawrence in April of
3  2020 during her interview of you that Jeff Kujava said
4  about nine months earlier, in the summer of 2018, it's
5  a good day at the county boys, Trump is kicking out
6  the Mexicans and cops are killing niggers?
7    A   No, no, I must have made that mistake.  I
8  told Kara Hill that in 2020.
9    Q   That's what I'm asking, you told Kara Hill
10  that in 2020 --
11   A   Yes, I did not tell Mande --
12   Q   -- when she interviewed you?
13   A   -- the Trump, that didn't happen yet.
14   Q   When you met with Kathleen Otto in August of
15  2020 did you tell her that an employee named Jeff
16  Kujava, in the summer of 2019, said it's a good day at
17  the county boys, Trump is kicking out the Mexicans and
18  cops are killing niggers?
19   A   Yes.
20   Q   Did you tell her who else was there who
21  heard that comment?
22   A   Yes.
23   Q   Who was there who heard that comment?
24   A   It was Brandon Pilot, John May, Richard
25  Harris, and, I always forget his name, I just said his

42 (Pages 165 to 168)

Pena, et al. v. Clark County, Washington                                    Isaiah Hutson

Page 169

1   name earlier.  It's on the record, but -- and Isidoro
2   Flores heard it.
3        Q   Did you let -- did you tell Kara Hill in
4   April of 2020 during your interview that Isidoro
5   Flores had heard that comment?
6        A   Yes.
7        Q   Do you know if she talked to him?
8        A   There was quite a few people that I asked
9   that were involved in my discrimination complaints
10   that said that they had never been talked to.  I don't
11   recall if -- I don't think she talked to Isidoro, I
12   think he's one of them.  I'm sorry, I'm not exact on
13   that, but I'm pretty sure that Isidoro said that she
14   had never talked to him.  I'm almost positive.  You
15   have to ask Isidoro.
16        Q   Can you turn to Exhibit 17 please?  I know
17   I'm not doing these all just right in order.  It's
18   another one of the smaller ones.
19        A   Gosh, I need to keep these in order.  So 14,
20   15, the flip trick.
21        Q   If you flip them over like that -- I know
22   you don't do this everyday.  Do you have it?
23        A   Yes, 17?
24        Q   Yes.  Sorry.  Okay, this is a two-page
25   document with the, well, it's three but there's

Page 170

1   nothing on the third page.  In the bottom there's the
2   numbers CC_00751 and 00752.  Do you recognize this
3   e-mail chain?  It looks like it's between you and Kara
4   Hill in 2020?
5        MR. HOLGUIN-FLORES:  I'm sorry, Counsel, my
6   17 is another copy of 14.
7        MS. FREEMAN:  This is it then, mark that one
8   17.
9        MR. HOLGUIN-FLORES:  Thank you very much.
10        Q   (By Ms. Freeman) Do you recognize this
11   e-mail chain?
12        A   Yes, ma'am.
13        Q   Let's start at the, because this e-mail,
14   kind of start at the bottom so I just want to run
15   through it.  It looks like Kara Hill e-mailed you on
16   January, Monday, January 13th, 2020 copying Tim
17   Waggoner and Darrell Young, and the subject is
18   performance and conduct standards and expectations
19   meeting.  Do you see that?
20        A   Yes.
21        Q   She said she would like to schedule a
22   meeting with you and Tim this week to discuss
23   performance and conduct standards and expectations
24   concerning some information I received during my
25   employee check-ins and also recent e-mails you have

Page 171

1   sent.
2        Do you remember getting this e-mail from
3   her?
4        A   Yes.
5        Q   Okay.  Did you, do you know what she was
6   talking about?
7        A   No.
8        Q   And she informed you that this meeting she
9   wanted to have with you and Tim was not discipline but
10   could lead to discipline in the future so you're able
11   to bring a union representative with you.
12        Did you see that?
13        A   Yes.
14        Q   And she had only included Darrell in the
15   invite as he is aware that she was planning on
16   scheduling the meeting, but you can feel free to bring
17   whichever union rep you would like.
18        Is that what she told you?
19        A   Yes.
20        Q   Did that meeting ever occur?
21        A   No.
22        Q   Why not?
23        A   You'd have to ask Kara.
24        Q   What date was it that you went out on L&I
25   leave?

Page 172

1        A   January 14th.
2        Q   So the next day after she sent you this
3   e-mail?
4        A   Must be.  It was January 14, 2020.
5        Q   Was January 14 the day you had the accident
6   that hurt your shoulder?
7        A   Yeah.  It may be 17th, it might be
8   January 17th.  It was within that week.
9        Q   Did you go -- so you said the day you hurt
10   your shoulder you went to the ER?
11        A   Yes.
12        Q   So you were out that day, it wasn't like a
13   delayed --
14        A   Right.
15        Q   -- you went back to work a few days then you
16   went out?
17        A   You're correct.
18        Q   So it looks like you responded to Ms. Hill
19   on that same day, January 13th, this is while you were
20   still working at the county, right, while you're
21   still -- before you went out on leave?
22        A   I'm sorry, I was reading this.
23        Q   Yeah, so right up above there, on
24   January 13th you responded to Ms. Hill's request for a
25   meeting?  I'm looking at the second --

Pena, et al. v. Clark County, Washington                                    Isaiah Hutson

Page 241

1      Q    And then did she change her position?
2      A    Yes.
3      Q    And how did that position change?
4      A    I don't recall exactly. I know there was
5   some conversation between the union and her, and the
6   reality is is that I worked over four hours on it, I
7   worked the whole day, and plus that says except for,
8   what did you say, I think except for cracked filling?
9      Q    Assigned only to crack filling, cracked
10  sealing, and flagging?
11     A    Yeah, that's not bridges, so bridges aren't
12  exempt, so I don't know how they read that. It was
13  just a horrible interpretation, it never excluded
14  bridge work.
15     Q    Okay, but your understanding was after then
16  some sort of discussion or negotiation between the
17  union and HR and management that you were, they
18  decided to award the pay?
19     A    Yeah, especially after they found out that
20  Norm, Norm Marlboro and, what's his name, were paid
21  for it. It was kind of like oops. Micah Pasmore.
22     Q    Is it your -- is it your allegation that
23  Ahmad, the public works director, and Les MacDonald
24  were also trying to deny this pay as a way to harass
25  you because of your race?

Page 242

1      A    I think I would be speculating. I don't
2   know why they did.
3      Q    You don't know why they did that?
4      A    I don't know why they -- I mean, it was
5   clear, I don't know how they interpreted it that way,
6   you just read it and it was very clear that bridges
7   was not exempt from the work out of class pay, so I
8   guess you'd have to ask them how they got to that
9   interpretation.
10     Q    Okay.
11     A    But I am not claiming that Ahmad or Les
12  MacDonald --
13     Q    Les?
14     A    I don't know. I don't know what their
15  intention was. I know -- I believe what Tim
16  Waggoner's intention was in denying us and then
17  allowing Micah Pasmore and Norm Marlboro to be paid
18  for it as far as why they agreed with them, and it
19  doesn't seem like they looked into it too much because
20  they didn't know that Norm Marlboro and Micah Pasmore
21  were paid for it, so --
22     Q    I'm trying to get an understanding of the
23  allegations you're making in this complaint and sort
24  of, you know, where they start, where they stop, and
25  where they go.

Page 243

1      A    I hear you.
2      Q    Are you alleging in this lawsuit that Ahmad
3   or Les MacDonald harassed you because of your race?
4      A    I think they should answer why they did
5   that. I mean, maybe.
6      Q    Do you have any -- what would lead you to
7   believe that Les MacDonald or Ahmad were harassing you
8   because of your race or made any decisions on contract
9   interpretation because of your race?
10     A    Because I think it's systemic and I think
11  that they are allowing it to happen and thereby are
12  engaging in systemic racism.
13     Q    So describe to me what systemic racism means
14  to you.
15     A    Systemic racism means that there's a culture
16  of racism. I believe systemic racism, there's some
17  that engage in acts of racism and words of racism, and
18  others engage in the racism systemically by allowing
19  and giving cover to those individuals.
20          And I think those individuals have rooted
21  racism in their heart and that's why they allow it to
22  happen. Because I can't see why anybody that didn't
23  have a racist bone in their body would cover for
24  individuals like this.
25     Q    Are you alleging that any Hispanic or Latino

Page 244

1   employees at the county engaged in racism or racial
2   harassment towards you?
3      A    Can you reword that, or can you word that
4   again? I didn't --
5      Q    Sure.
6      A    Are you asking if I'm alleging that
7   Hispanics have engaged in racism towards me?
8      Q    Yeah.
9      A    No, I'm not alleging that.
10     Q    Have any other Hispanic or Latino coworkers
11  besides the other two plaintiffs in this case, Elias
12  Peña and Ray Alanis, told you that they felt they were
13  harassed or discriminated against because of their
14  race?
15     A    Isidoro Flores has told me that, and John
16  Flores has filed complaints against crew chiefs for
17  discrimination while I was working at the county. He
18  was at the sign shop, John Flores.
19     Q    And which crew chief did he file a
20  complaint --
21     A    I don't know if --
22     Q    -- against?
23     A    I don't know if -- I'm sorry, I did it
24  again, that's four, I was trying to stay at three.
25          He -- I know for sure of one and his is

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Pena, et al. v. Clark County, Washington                                    Isaiah Hutson

---

Page 245

1    elude -- Russ Bartowski.  I don't know if he included
2    others in his complaint of discrimination, but I know
3    for sure that he filed a discrimination complaint.
4        Q    How long ago was that?
5        A    2018.  I'm guessing.  I --
6        Q    Does John Flores still work for the county?
7        A    No, he has since left.
8        Q    Is Mr. Bartowski still at the county?
9        A    He retired.
10       Q    What is your understanding of why John
11   Flores filed a complaint of race discrimination
12   against Russ Bartowski?
13       A    He said he -- I heard very little from him
14   about it, but he was saying that he was being treated
15   differently than his white counterparts, he was the
16   only Mexican on the crew and Russ Bartowski would yell
17   and scream at him and treat him differently than other
18   situated people on the crew, and that was the jiff of
19   it.  And I was like huh, that's kind of interesting,
20   that's what I'm going through.
21       Q    And then Mr. Flores, Gelo did you say?
22       A    Yes.
23       Q    Shared with you that he felt he was
24   discriminated against or harassed because of his race?
25       A    Yes.

---

Page 246

1        Q    What did he tell you about that?
2        A    He told me that a crew chief was moved
3    because there was some discrimination going, that he
4    felt discrimination towards him, and a crew chief told
5    him in the morning in front of the crew that he was
6    gonna kill him and his whole family if he said
7    anything.
8        Q    Which crew chief was that?
9        A    He's not a crew chief now, they moved him.
10   The name's eluding me right now, it'll probably pop up
11   here in a minute.
12       Q    Is it someone who still works in the roads
13   division?
14       A    I don't think he's considered roads
15   division, he might be clean water.  He still did work
16   in the roads division after that, and then I think he
17   quit the county and then went to Battle Ground city,
18   and then I think he came back to the county in the
19   water division.
20       Q    And did Gelo report that to somebody?
21       A    Well, yeah, the guy was moved.
22       Q    Who did Gelo report that incident to?
23       A    You'd have to talk to him.
24       Q    So you don't know?
25       A    I don't know.

---

Page 247

1        Q    Do you know of anyone in the roads division
2    who has been disciplined or terminated for any
3    racially related conduct?
4        A    No.
5        Q    In your position as a roads maintenance
6    specialist have you ever supervised anyone?
7        A    I've filled in for crew chief, but I
8    never -- superintendent would be a supervisor.
9        Q    Okay.
10       A    I don't know, a crew chief, I mean, I guess
11   technically I was a crew chief, so you line out work
12   and --
13       Q    So a crew chief is just the line levels
14   or -- I'm trying to think of another term for it, but
15   yeah, you just line out, like you said line out tasks
16   during the day, who's going to be working on which
17   machinery and whatnot?
18       A    No, I think they're a supervisory role
19   because when I got hired on I was told that you take
20   any issue you have to the crew chief, and that's the
21   chain of command, and they -- they are the ones.
22            And that's who I went to at the very
23   beginning, Jeff Tuttle, and did exactly what Carl Oman
24   told me to do and Mike Shaw (phonetic), the operations
25   manager, when they interviewed me.

---

Page 248

1            And then when I got hired they instructed
2    me, chain of command, so I saw crew chiefs as
3    supervisory role, and then superintendents are
4    superintendents.
5        Q    And you understand a superintendent like Tim
6    Waggoner and now Nick Eisland are your supervisors?
7        A    They're more superintendent.  My supervisor
8    is Chad Weiker, he's alone there, I come in, he
9    reports if I'm late.  He can talk to you about
10   disciplinary issues, if he sees you doing something
11   and --
12       Q    He can't actually issue discipline to you,
13   you know that; right?
14       A    I didn't say he issues, he can talk to you
15   about discipline, like if you're late again, he's in
16   that chain of command so --
17       Q    He can report --
18       A    -- I'm just telling you how I see it.
19       Q    He can report if you're late to the
20   superintendent; correct?
21       A    I don't know -- I don't know how much
22   authority he has.
23       Q    You are well aware that a crew chief does
24   not have authority to issue discipline to you are you
25   not?  As a long-term member of the, of the union, and

---

62 (Pages 245 to 248)

**EXHIBIT C**

# Deposition of Elias C. Pena

# Pena, et al. v. Clark County, Washington

# July 26, 2022



**206.287.9066 l 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Pena, et al. v. Clark County, Washington

Elias C. Pena

---

Page 1

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

ELIAS PENA, ISAIAH HUTSON,   )
and RAY ALANIS,              )
                             )
        Plaintiffs,          )
v.                           )No. 3:21-cv-05411-DGE
                             )
CLARK COUNTY, WASHINGTON,    )
                             )
        Defendant.           )
_____)

VIDEOTAPED DEPOSITION OF
ELIAS C. PEÑA
Taken in behalf of Defendant
* * *

July 26, 2022
1300 Franklin Street
Vancouver, Washington

Priscilla (Pia) Harris, CCR
Court Reporter

---

Page 2

1           APPEARANCES:
2   For the Plaintiff:
3     MALDEF
      By: Andres Holguin-Flores
4          Luis L. Lozada (Via Zoom)
      11th Floor
5     634 S. Spring Street
      Los Angeles, CA  90014
6     (213)629-2512
      aholguin-flores@maldef.org
7     llozada@maldef.org
8
    For the Defendant:
9
      KEATING, BUCKLIN & MCCORMACK
10    By: Jayne L. Freeman
         Suite 1210
11    801 2nd Avenue
      Seattle, WA 98104
12    (206)623-8861
      jfreeman@kbmlawyers.com
13
    Also Present:
14
15    KATHLEEN OTTO (Via Zoom)
      DIEGO HARO (Via Zoom)
16    LETICIA SAUCEDO (Via Zoom)
      GABRIELA MACPHERSON (Via Zoom)
17    LESLIE LOPEZ (Via Zoom)
      AMANDA MIGCHELBRING (Via Zoom)
18    NICOLE CARNES (Via Zoom)
      STEPHANIE SPEAR, Videographer
19
20
             INDEX
21
    EXAMINATION BY:            PAGE NO.
22
    MS. FREEMAN......................4
23
    MR. HOLGUIN-FLORES.............301
24
25

---

Page 3

1            INDEX TO EXHIBITS
2   21 Interrogatories/RFP's...........................4
3   22 Charge of Discrimination......................4
4   23 Official Grievance Form........................4
5   24 E-mail Re Unrestricted CDL Meeting Follow Up....4
6   25 E-mail Re COVID-19.............................4
7   26 E-mail Re Harassment/Discrimination.............4
8   27 E-mail Re Discrimination/Retaliation Complaint..4
9   28 E-mail Re Harassment Appeal/Hearsay.............4
10  29 E-mail Re Discrimination/Retaliation Complaint..4
11  30 E-mail Re Meeting Forward Notification
        Discussion....................................4
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1      VANCOUVER, WASHINGTON; TUESDAY, JULY 26, 2022
2             9:21 A.M.
3             * * *
4            ELIAS C. PEÑA
5   called as a witness on behalf of the Defendants,
6      having first been sworn by the Notary,
7          testifies as follows:
8
9      (Deposition Exhibits 21-30 were marked for
10     identification.)
11          EXAMINATION
12      VIDEOGRAPHER:  Here begins the
13  video-recorded deposition of Elias Peña in the matter
14  of Peña, et al versus Clark County, et al.  Today is
15  July 26, 2022 and the time is 9:21.  Would attorneys
16  please state their appearances for the record.
17      MR. HOLGUIN-FLORES:  Andres Holguin-Flores
18  on behalf of Elias Peña from the law firm of the
19  Mexican American Legal Defense and Educational Fund.
20      MS. FREEMAN:  Jayne Freeman, special
21  assistant prosecuting attorney from Keating, Bucklin &
22  Mccormack on behalf of defendant Clark County.
23      VIDEOGRAPHER:  Will the court reporter
24  please swear in the witness.
25      (Oath was administered.)

1 (Pages 1 to 4)

Pena, et al. v. Clark County, Washington                    Elias C. Pena

```
                                          Page 305
 1              REPORTER'S CERTIFICATE
 2      STATE OF WASHINGTON    )
                               ) ss.
 3      COUNTY OF CLARK        )
 4
 5          I, PRISCILLA (PIA) HARRIS, a Certified
 6      Shorthand Reporter for Washington, do hereby
 7      certify that, pursuant to stipulation of counsel for
 8      the respective parties hereinbefore set forth,
 9      ELIAS C. PEÑA, personally appeared before me at the
10      time and place set forth in the caption hereof; that
11      at said time and place I reported in Stenotype all
12      testimony adduced and other oral proceedings had in
13      the foregoing matter; that thereafter my notes were
14      reduced to typewriting under my direction; and that
15      the foregoing transcript, pages 1 to 304, both
16      inclusive, constitutes a full, true and accurate
17      record of all such testimony adduced and oral
18      proceedings had, and of the whole thereof.
19          WITNESS my hand and CSR stamp at Vancouver,
20      Washington, this 18th day of August 2022.
21
22
        _____
23      PRISCILLA (PIA) HARRIS
        Certified Court Reporter
24      OR CCR No. 01-0377
        WA CCR No. 2963
25
```

77 (Page 305)

Pena, et al. v. Clark County, Washington                                    Elias C. Pena

Page 41

```
 1      A    Best of my knowledge I believe I applied
 2   before I actually temped again.
 3      Q    Okay.  Did you have to test again?
 4      A    Yes.
 5      Q    And how did that testing go?
 6      A    I passed.
 7      Q    Do you recall -- and then did you interview
 8   with anyone when you applied?
 9      A    Yes.
10      Q    Were you hired that time?
11      A    Yes.
12      Q    Into what position?
13      A    Maintenance 1.  Finn Hill shed originally.
14      Q    And who hired you?
15      A    I don't recall.
16      Q    Do you recall who interviewed you?
17      A    It was a panel interview, I remember Carl
18   Oman, Kenny Price, I believe Sheila was in there as
19   well, and I don't recall who else was in there.  I
20   know it was a panel interview.
21      Q    Was it your understanding that those
22   panelists recommended that the county hire you?
23      A    Yes.
24      Q    And you don't remember who actually made the
25   decision, or do you know who made the decision to
```

Page 42

```
 1   approve hiring you?
 2      A    I know who called me and told me I got the
 3   job.
 4      Q    Who was that?
 5      A    Carl Oman.
 6      Q    Was he a superintendent at the time?
 7      A    Yes, he's been a superintendent since I've
 8   been here.
 9      Q    He's still a superintendent?
10      A    Yes.
11      Q    When you first worked at Finn Hill did you
12   report up to Carl Oman?
13      A    Yes.
14      Q    As your superintendent?
15      A    Yes.
16      Q    Are you alleging in this case that Carl Oman
17   harassed you because of your race?
18      A    No.
19      Q    Are you alleging that Carl Oman ever
20   discriminated against you or treated you disparately
21   or differently because of your race?
22      A    No, I was under Carl only for two weeks.
23      Q    Have you had any interactions with Carl
24   since then?
25      A    Yes.
```

Page 43

```
 1      Q    What kind of interactions do you have with
 2   Carl?
 3      A    Just brief ones, just like, you know, chip
 4   seal, what we're into now, just he'll come out, do a
 5   meeting, talk to everybody about what their, tasks
 6   they're doing.
 7      Q    And are those meetings that Carl Oman, where
 8   you attend and Carl Oman is talking to people about
 9   what tasks they're doing, are those meetings with
10   multiple crews together at the same time?
11      A    Yes.
12      Q    Are those meetings that Tim Waggoner would
13   attend also as a superintendent?
14      A    Sometimes.
15      Q    So are these like morning meetings that you
16   have everyday at the beginning of shift?
17      A    No.
18      Q    What kind of meetings are they?
19      A    Just for projects like we've got going on
20   now.
21      Q    So sometimes those meetings are run by Tim
22   Waggoner, sometimes by Carl Oman, are they sometimes
23   run by Nick Eisland too?
24      A    So Nick came in later on.
25      Q    Came in as a superintendent later on?
```

Page 44

```
 1      A    Yes.
 2      Q    Who is currently your superintendent?
 3      A    Nick Eisland.
 4      Q    How long has he been your superintendent?
 5      A    The last two years, maybe a little bit
 6   longer.
 7      Q    So we're in July of 2022 right now, so since
 8   about July of 2020 or longer than that?
 9      A    Probably a little bit longer, I'm not
10   entirely sure.  My best guess would be, I don't know.
11      Q    Did he take the place of a different
12   superintendent?
13      A    Yes.
14      Q    Who did he replace?
15      A    Kenny Price.
16      Q    So was Kenny Price your superintendent for a
17   time?
18      A    No.  Oh, for a time?
19      Q    Yes.
20      A    So a lot of stuff happened there.  Kenny
21   Price was, then he got removed, then he got back to my
22   superintendent, then he got removed, there was Tim and
23   Kenny, Tim and Kenny.
24      Q    Okay.  So --
25      A    Yeah.
```

11 (Pages 41 to 44)

Page 85

1    A    Correct.
2    Q    And what comments were made at that time?
3    A    Nick Eisland made a comment that they're
4  building a wall around Finn Hill, kicking the Mexicans
5  out.
6    Q    And did you hear him make that comment?
7    A    Yes.
8    Q    Where were you when you hear Nick
9  Eisland make that comment?
10   A    In the crew room in Finn Hill shed.
11   Q    Who else was there?
12   A    Me, Isaiah Hutson, Julio Morales, John
13  Mulanote, Leif William.
14   Q    John who, Mula?
15   A    Mulanote.
16   Q    Julio Morales, John Mulanote, Leif Williams,
17  Isaiah did you say?
18   A    Yes.  And then Nick Eisland.
19   Q    Were you all having a conversation together?
20   A    We were in the room when he made the
21  conversation, yeah.
22   Q    Were you all talking together or were you in
23  the same room talking together?
24   A    We weren't.  They were in the same room but
25  we were having different conversations.

Page 86

1    Q    So you were not part of the conversation
2  with Nick Eisland?
3    A    No, I was in the room with Nick Eisland.
4    Q    Eisland, okay.
5    A    But I was talking to Isaiah about something
6  because he was moving to town, and I'm like hey, I got
7  told I'm gonna move to Mabry crew too.  And then Nick
8  made the comment, yeah, we're building a wall around
9  Finn Hill and kicking the Mexicans out.
10   Q    Did you understand that comment to be in
11  response to the conversation you and Isaiah were
12  having about the two of you moving to Mabry?
13   A    Yes.  Well, I was moving to Mabry, I don't
14  know where he was moving to, he was telling me he's
15  moving to town.
16   Q    So Nick Eisland said that to you?
17   A    Yes, he said it just blatantly outright.
18   Q    Did you say anything in response?
19   A    No.
20   Q    Did anyone else saying any?
21   A    No, but John Mulanote pulled me aside, after
22  we walked outside, pulled me off to the side and said
23  hey, I could tell it upsets you, but you're new here
24  and they'll get rid of you before they get rid of him,
25  so I wouldn't make any waves.

Page 87

1    Q    What was John Mulanote's position at the
2  time?
3    A    He was a 10-yard driver.
4    Q    Was he on your crew?
5    A    He was on Finn Hill's crew, yeah, we were on
6  the crew together when I got hired on.
7    Q    Was he a highway maintenance worker or a
8  specialist?
9    A    He was a specialist.
10   Q    Does John Mulanote still work at the county?
11   A    He retired.
12   Q    Has he ever served as your supervisor?
13   A    No.
14   Q    Did you ever talk to anyone else about the
15  comment that you heard from Nick Eisland in 2017 at
16  that time?
17   A    At the time, no.
18   Q    Have you ever shared that comment with
19  any -- that Nick Eisland made in 2017 at the Finn Hill
20  shed with anyone?
21   A    Yeah, I shared it with Kara when she, we did
22  our thing.
23   Q    And when you say you did your thing with
24  Kara, is that that meeting in April of 2020 when she
25  interviewed you?

Page 88

1    A    Yes.
2    Q    And what did you tell Kara at that time
3  about Nick Eisland?
4    A    I told her the same thing I said here today,
5  that Nick Eisland made a comment about building a wall
6  around Finn Hill, kicking the Mexicans out.
7    Q    Is that the first time you ever shared that
8  story with anyone in human resources?
9    A    Yes.
10   Q    Had you -- was that the -- had you ever
11  shared that story about what Nick Eisland on 2017 with
12  any supervisors?
13   A    I believe Isaiah did that for me, on my
14  behalf, as well as hisself.  I don't know if he -- I
15  know he wrote a letter concerning stuff.  I believe, I
16  don't -- I'm not entirely sure.
17   Q    So you're not sure but you believe Isaiah
18  may have written a letter to someone at the county on
19  your behalf that described Nick Eisland saying that
20  they built a wall around Finn Hill and are kicking the
21  Mexicans out back in 2017?
22   A    Yes.  I know he made complaints, and I know
23  he was making them on my behalf as well as his own.
24   Q    Do you know when he made complaints?
25   A    I don't know.

22 (Pages 85 to 88)

Pena, et al. v. Clark County, Washington                                      Elias C. Pena

---

Page 165

1     Q    When was that?
2     A    It was summertime, I know that much.  He was
3  getting water and I was sitting at my desk where my
4  desk sits at the time in Central.  Here's the water,
5  here's my desk, and he looked over and he says I'm
6  working on getting rid of these cancers.
7     Q    Was anyone else there?
8     A    I don't know who else was in the room.
9     Q    Did you know what he was talking about?
10    A    My best guess would be me.
11    Q    What lead you to believe he was talking
12  about you?
13    A    Because when you're staring at an individual
14  and you're saying that kind of quote it means, or not
15  quote, but saying that statement and they're looking
16  directly at you when they say it, I mean, I don't know
17  who it was for.
18    Q    Was he saying it, I'm just trying to
19  understand the context, was he saying -- making this
20  comment to somebody else but looking at you as if it
21  was about you?
22    A    He looked like he was making the comment
23  directly to me.
24    Q    To you?
25    A    At me.

---

Page 166

1     Q    And did he say anything else?
2     A    No.
3     Q    Was John May your crew chief?
4     A    No.
5     Q    What position was he in?
6     A    He was a crew chief, but not mine.
7     Q    Okay.  Did John May ever take any particular
8  action against you while you were working at the
9  county?
10    A    No.
11         MS. FREEMAN:  It sounds like it's a good
12  time to take a lunch break, so let's do that.
13         MR. HOLGUIN-FLORES:  Before we do I just
14  want to clarify my previous objection regarding social
15  media.  Under RCW 49.44.200, even log-in and user
16  names are under the protected information, so raising
17  a belated objection.
18         MS. FREEMAN:  Again, I did not ask for
19  log-in or user names, I just asked for the address,
20  like the public address, so I don't think there's
21  anything private about that.
22         MR. HOLGUIN-FLORES:  I think the user name
23  includes the name that is available on the public
24  Website.
25         MS. FREEMAN:  Not usually but --

---

Page 167

1         MR. HOLGUIN-FLORES:  That is a user name.
2         MS. FREEMAN:  Sorry, can you tell me the
3  statute that you're referring to again?
4         MR. HOLGUIN-FLORES:  Yes, RCW 49.44.200.
5         MS. FREEMAN:  Is that in reference to
6  employers asking for social media address log-ins,
7  user names in terms of during your employment?
8         MR. HOLGUIN-FLORES:  Yes.
9         MS. FREEMAN:  So that would not apply to
10  litigation, that is an employment context and this is
11  not in the employment context, this is in litigation
12  and I'm conducting discovery, so let me know if
13  there's anything that you find that would apply that
14  to discovery.
15         MR. HOLGUIN-FLORES:  Okay.
16         MS. FREEMAN:  I can just clarify now, Clark
17  County as the employer isn't asking for that, I am
18  asking for it in the course of conducting discovery in
19  this lawsuit.
20         Okay, we can go off now, thanks.
21         MR. HOLGUIN-FLORES:  Thank you.
22         VIDEOGRAPHER:  The time is 12:57 and we are
23  off the record.
24         (Lunch recess was taken.)
25         VIDEOGRAPHER:  The time is 1:51 and we are

---

Page 168

1  on the record.
2     Q    (By Ms. Freeman) Okay, Mr. Peña, we've had
3  a lunch break.  Are you ready to proceed?
4     A    Yes.
5     Q    Earlier in your testimony you said that you
6  had taken a couple of photos at work, we discussed a
7  photo that you took of a hat, but you also said you
8  took a photo of Eddie's name crossed out on a sign-up
9  sheet; is that right?
10    A    Correct.
11    Q    I think, could you find Exhibit 12 in your
12  pile, I just want to ask you if this is the photo that
13  you're referring to.
14    A    I don't know if I took this one or Isaiah
15  took this one, but it's similar.
16    Q    Is this -- okay, so you did take a photo of
17  the sign-up sheet?
18    A    Yes.
19    Q    But you're not sure if this is the one that
20  you took?
21    A    Right, what you have presented in front of
22  me.
23    Q    What did you do with the photo when you took
24  it?
25    A    I believe I sent it to my attorneys.

---

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Pena, et al. v. Clark County, Washington                                    Elias C. Pena

---

Page 169

1    Q   What prompted you to take a picture of the
2    sign-up sheet?
3        A   You have a Hispanic's name crossed out with
4    Donald Trump below it.
5        Q   Do you know who crossed out Eddie Perez's
6    name?
7        A   I do not.
8        Q   Did you ever ask Mr. Perez if he crossed out
9    his own name?
10       A   I did not.
11       Q   Is it your assumption that somebody else
12   crossed out Eddie's name?
13       A   Yes.
14       Q   But you never asked him?
15       A   No.
16       Q   Is there anything else that lead you to
17   believe that somebody else crossed out Eddie's name?
18       A   Sorry, my brain is completely off.
19       Q   I want to make sure your brain is in the
20   right place.
21       A   Can you reask that, sorry, I totally blanked
22   out when you said that.
23       Q   That's okay.  You said you didn't ask Eddie
24   if he crossed out his own name, do you have any other
25   information that leads you to believe that someone

Page 170

1    else crossed out Eddie's name?
2        A   No.
3        Q   You're just assuming that?
4        A   Yes.
5        Q   Why is that?
6        A   Because it was in the common break room
7    where a lot of the racial slurs were being said.
8        Q   And seeing the name Donald J. Trump written
9    on this piece of paper, was that, do you consider that
10   a racial slur towards you?
11       A   Well, doing that -- the policies he was
12   preaching about Mexicans and stuff, yes, and there's,
13   once again, I believe, in our policies zero tolerance
14   for political stuff.
15       Q   And did you consider this to be something
16   political by someone writing the name Donald Trump on
17   this piece of paper?
18       A   Yes.  And you said political, correct?
19       Q   Pardon me?
20       A   You said political?
21       Q   Yes.
22       A   Yes.
23       Q   Did you consider this, this sign-up sheet
24   where someone wrote the name Donald Trump on it to be
25   threatening to you?

Page 171

1        A   The nature of it being out there like that
2    and no repercussions or not even an e-mail about it, I
3    feel it is like a message.
4        Q   Okay.  So you took a photo of this when you
5    saw it, it looks like this was, has a date of
6    February 2021 on it; is that right?
7        A   Uh-huh.
8        Q   So is that around the time you took the
9    photo?
10       A   Around, yes, it's only up for so many days,
11   so I --
12       Q   And you gave it to your attorneys, did you
13   give a copy of the photos to anyone else?
14       A   I shouldn't have to, this goes to the
15   superintendents.
16       Q   What goes to the superintendents?
17       A   This piece of paper does.
18       Q   My question was did you give a, did you give
19   a copy of the photo that you took to anyone at the
20   county?
21       A   No.
22       Q   Did you tell anyone at the county that you
23   were offended by seeing the name Donald Trump written
24   on there?
25       A   It's a political statement, due to our

Page 172

1    policy our supervisor should have stepped in and said
2    something.
3        Q   My question was did you talk to anybody
4    about it?
5        A   No.
6        Q   Which supervisor do you think should have
7    stepped in and done something about the sign-up sheet?
8        A   It went to all three, or two.  It says right
9    there, Carl and Tim, as well as Sheila, somebody
10   should have approached it right way.
11       Q   Do you know, was the sheet -- do you know
12   where this one was posted, was this posted at the
13   Central location?
14       A   Yes.
15       Q   Do you know who took it down?
16       A   Superintendent usually takes it down.
17       Q   I'm asking if you know who took this
18   particular one down.
19       A   My best assumption and guess would be a
20   superintendent like they always do in the past.
21       Q   My question was do you know who took it
22   down?
23       A   My best guess would be a superintendent.
24       Q   So you don't -- and, again, I understand
25   what a guess is, I'm asking if you actually know who

43 (Pages 169 to 172)

Pena, et al. v. Clark County, Washington                                    Elias C. Pena

Page 173

1   took this particular sheet down that had the words
2   Donald Trump on it?
3       A   No.
4       Q   And you did not take it down?
5       A   No.
6       Q   What policy is it that you're referring to
7   that you are saying that would be violated by the word
8   Donald Trump being written on this list?
9       A   There's a policy that he sent out recently
10  about it, it's actually an FYI, a policy update about
11  this again.
12      Q   Are that they often sent out during election
13  times?
14      A   I'm unclear, I don't know.
15      Q   Do you have an understanding of what the
16  policy provides?
17      A   I do know as we get hired in as well as from
18  what I read last time it was, by seeing it it's zero
19  political, even with the signs in the roadway, if you
20  take one out, replace it back in, if you're mowing
21  around it, because you can't have any favoritism
22  towards any political party.
23      Q   Meaning that if you're out mowing and there
24  are political signs posted by someone in the public
25  that you need to replace those signs, you can't choose

Page 174

1   to take them down and --
2       A   I can't.
3       Q   -- and throw them away?
4       A   Yes.  I gotta work around them.
5       Q   Did you consider that to be part of a
6   racially hostile work environment if you had to work
7   around political signs that were placed out in the
8   public?
9       A   Out in the public, no, this is a workplace
10  where it's zero tolerance, public is different.
11      Q   I'm just asking because you brought up the
12  mowing around the signs when you were talking about
13  the policy, so I wasn't sure what the connection was.
14      A   I was just saying like this is not supposed
15  to be, the entire is not supposed to be at our sheds
16  in a county building, but it's out in the road, that's
17  all I was just saying, like we have to bypass their
18  signs and make sure that we don't show any political
19  favorite, favoritism, that's what I'm getting at.
20      Q   Did you understand that someone writing the
21  name Donald Trump in February 2021 was a political
22  endorsement or political advertisement?
23      A   I understand as you crossed out a Hispanic's
24  name, you put somebody who's been talking about
25  Hispanics in the news over and over and over as a

Page 175

1   threatening --
2       Q   That's what I'm trying to understand, so is
3   what was offensive to you the fact that any person's
4   name is crossed out and the word Donald Trump is
5   written in below, would this strike you as the same if
6   Eddie Perez's name was not on there but it just said
7   Donald Trump?
8       A   Yes.
9       Q   And why is that?
10      A   Because his political stance against
11  Hispanic.
12      Q   And so this would not be offensive to you if
13  someone had written in the word Joe Biden or Hillary
14  Clinton or somebody else?
15      A   It wouldn't have mattered, it's still
16  inappropriate.
17      Q   But would it still feel threatening to you?
18      A   They weren't attacking Hispanics.
19      Q   So you said you didn't know whether you took
20  this picture that's Exhibit 12 or not, but whatever
21  picture you took you did provide it to your attorneys?
22      A   Correct.
23      Q   And you also said that you took a picture of
24  something at John May's workspace, you described it as
25  a hangman at his desk?

Page 176

1       A   Yeah, it's like a linchpin.
2       Q   When did you take a photo of whatever's on
3   John May's desk?
4       A   When I was walking through and I seen it.
5       Q   When was that?
6       A   Could have been the summertime of 2020.
7       Q   So it could have been two years ago?
8       A   Sorry, 2021.  No.
9       Q   So it could've been a year ago?
10      A   It's been about a year ago.
11      Q   Okay.  Is the thing you took a picture of
12  still there on John May's desk?
13      A   Yes, it is.
14      Q   Did you tell John May or anyone else at the
15  county that -- why did you take the photograph?
16      A   Because it's a guy hanging.
17      Q   Do you know where it came from?
18      A   No.
19      Q   Did you know why it's there?
20      A   No, you'd have to ask John.
21      Q   And so because there's a guy hanging what
22  prompted you to take a photo of it?
23      A   Because John made comments about how he's
24  gonna cut cancers out and you have a hangman in your
25  office like that or above your desk, kind of a little

44  (Pages 173 to 176)

Pena, et al. v. Clark County, Washington                                    Elias C. Pena

Page 261

1   had, ever, conversation with her, but she was my
2   operations manager and Kara Hill was her boss, so I
3   guess I didn't really deal with Heniges.
4       Q   It was your understanding that Kara Hill was
5   Carolyn Heniges's boss at some point?
6       A   Yeah.  Well, she was the HR rep, so I was
7   dealing with HR.
8       Q   Is it your understanding that an HR rep is
9   the supervisor over the operational folks in the roads
10  division like the operations manager and the public
11  works director?
12      A   Yes.
13      Q   Any experience you had with Carolyn Heniges
14  that lead you to believe that she was discriminating
15  against you because of your race?
16      A   No.
17      Q   What about Ahmad, is it Qayoumi?  Sorry, I'm
18  bad at pronouncing his name.
19      A   I don't know how to pronounce it either.
20      Q   Ahmad used to be the public works director;
21  is that right?
22      A   Correct.
23      Q   And he was the public works director in 2019
24  when you had that meeting in, over your grievance?
25      A   Correct.

Page 262

1       Q   Is that right?  Okay.  Are you alleging in
2   this case that Ahmad, as public works director, ever
3   harassed you because of your race?
4       A   No.
5       Q   Are you alleging that Ahmad ever
6   discriminated against you or treated you differently
7   because of your race?
8       A   He never brought the concerns forward so I
9   don't know if I'll label that as how you should label
10  that, so there was concerns I brought to him but never
11  got brought forward or handled so...
12      Q   Do you know why?
13      A   You have to ask Ahmad.
14      Q   Did you ever ask Ahmad?
15      A   No.
16      Q   Did you ever ask Ahmad if he shared any
17  information with anyone else that you had told him
18  about?
19      A   No.
20      Q   Can you find Exhibit 11 please?
21      A   That's it.
22      Q   This looks like it's a memo from Kara Hill,
23  senior HR representative to you dated June 18, 2020.
24  Do you recognize this?
25      A   Yeah.

Page 263

1       Q   And it's regarding an investigation
2   conclusion memo.  Is this the memo that Ms. Hill sent
3   to you advising you that she had finished her
4   investigation regarding this complaint that you
5   referenced in your e-mail in March?
6       A   Yeah.
7       Q   In this memo she told you that you provided
8   Clark County human resources with a complaint that you
9   received continued harassing behavior from Tim
10  Waggoner, the roads operations superintendent.  Is
11  that the complaint that you had made that you
12  understood Kara was investigating?
13      A   Yes.
14      Q   And Ms. Hill told you that she did not find
15  a violation of county HR policies regarding
16  interactions with the staff?
17      A   Yes.
18      Q   And that her investigation was concluded; is
19  that right?
20      A   Yes.
21      Q   Did she tell you in this memo that you're
22  encourage to report conduct that could violate the
23  policies?  It's in that third paragraph she said, you
24  are encouraged to report conduct that could violate
25  our policies; is that right?

Page 264

1       A   Yes.
2       Q   At any point when you met with Kara Hill in
3   April of 2020 did you provide her any documents or
4   notes or e-mails or anything like that?
5       A   No, like I said, the way she was very
6   dismissive, brought my notebook in because I knew
7   about it then, and I just refound it.
8       Q   You had brought your notebook into her?
9       A   Of all the days.
10      Q   During that meeting?
11      A   Yes, I would've.
12      Q   Wait, you're saying you would've brought the
13  notebook in that you just found in your lunch box this
14  year?
15      A   I knew about it then, I had it then.
16      Q   But you did not bring it in with you?
17      A   No.
18      Q   So I understand I think your description
19  that you felt that Kara Hill was dismissive of you
20  during your meeting in April.  Were you prepared for
21  her to be dismissive of you and not to listen to you
22  before you ever went into the meeting?
23      A   No.
24      Q   So why wouldn't you bring the notebook with
25  you?

66 (Pages 261 to 264)

**EXHIBIT D**

The Honorable David G. Estudillo

1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                      WESTERN DISTRICT OF WASHINGTON

10

11    ELIAS PEÑA, ISAIAH HUTSON, and          Case No.: 3:21-CV-05411-DGE
      RAY ALANIS,

12                          Plaintiffs,        PLAINTIFF RAY ALANIS'S RESPONSES TO
                                               DEFENDANT'S FIRST INTERROGATORIES
13              v.                             AND REQUESTS FOR PRODUCTION

14    CLARK COUNTY, WASHINGTON,

15                          Defendant.         JUDGE: Hon. Judge David G. Estudillo

16

17         TO:        Defendant Clark County, Washington

18                    Jayne L. Freeman, Audrey M. Airut Murphy

19                    KEATING BUCKLIN & MCCORMACK, INC., P.S.

20                    Attorneys for Defendant

21

22

23

24

25

26

27

28

proportional to the needs of the case.  Plaintiff further objects to this request on the basis that it calls for information protected by the attorney-client privilege and attorney work-product doctrine.  Plaintiff objects that this question seeks disclosure of witnesses and information collected by interviews, and therefore violates the attorney work product exemption and seeks information protected by attorney-client privilege.

Without waiving these objections, particularly because Plaintiffs are still discovering relevant information, Plaintiff responds that his allegations are in his Complaint, paragraphs 1 to 82, and his Answer to Interrogatory No. 12.  Plaintiff's may recover wage-related damages, including back pay for lost promotions or additional pay opportunities that would have garnered Plaintiff wages into the future.

**REQUEST FOR PRODUCTION NO. 12.:**  Please produce true and correct copies of any documents related to or supporting your response to the preceding Interrogatory.

**RESPONSE:**

Plaintiff asserts all the  General  Objections listed above.  In particular, Plaintiff objects to the Request to the extent that it seeks information which is privileged under attorney-client privilege and/or protected from disclosure under the work-product doctrine, including draft reports.  Plaintiff also objects to the extent Defendant seeks documents or information that is readily or more accessible to Defendant from Defendant's own files, from documents or information in Defendant's possession, or from documents or information that Defendant previously produced to Plaintiff, and which Plaintiff is therefore not under the obligation to produce.

Subject to, and without waiving the foregoing objections, Plaintiff responds as follows:

- Appeal of Discrimination and Harassment Decision (June 22, 2020)
- Discrimination and Retaliation Complaint (Aug. 18, 2020)
- FWD: Status on Decision for Discrimination and Harassment (Oct. 5, 2020))
- Response to Appeal of Discrimination and Harassment (Dec. 10, 2020)
- Workplace Sign-Up Sheet

Plaintiff reserves the right to supplement this answer.

1

2

3

4

5

6

7

8

9

10

11

12

**INTERROGATORY NO. 14.:** Please state all the facts, including names, addresses and telephone numbers of witnesses with knowledge of such facts, supporting your allegations in paragraph 8 of your Complaint that Roads Division supervisors and employees subject Plaintiffs to anti-Latino remarks and conduct, including racial jokes and insults about Latinos and immigrants and "Roads Division supervisors and employees have referred to Latinos as 'beaners,' 'spics,' and 'a cancer.'" In your response, describe specific instances where you, Plaintiff Alanis, were subjected to such remarks and conduct and include a detailed description of the conduct, identify the date that such conduct occurred, state the name and contact information for each individual who you claim engaged in such conduct. For each instance identified, please explain whether you reported the incident, and please set forth the identity of each individual to whom you reported the incident, the date the instance was reported, and the circumstances of the report.

13

**ANSWER:**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff incorporates his General Objections above as though fully set forth herein. Plaintiff further objects to this request as premature, burdensome, oppressive, harassing, and abusive of the discovery process to the extent the interrogatory, individually and cumulatively, calls for the disclosure of information that supports the contentions and allegations in the Complaint.  Contention interrogatories are premature and improper at this juncture of the litigation before discovery has not been completed.  Also, Plaintiff objects that this request is premature because the answer depends on information in Defendant's possession.  Plaintiff further objects that this request calls for information that is more readily available to Defendant, including information contained in Defendant's files, and which Plaintiff is therefore not under the obligation to produce.  Plaintiff further objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, oppressive, and disproportional to the needs of the case. Plaintiff further objects to this request on the basis that it calls for information protected by the attorney-client privilege and attorney work-product doctrine.  Plaintiff objects that this question seeks disclosure of witnesses and information collected by interviews, and therefore violates the attorney work product exemption and seeks information protected by attorney-client privilege.

Plaintiff also objects that this question is unduly burdensome, oppressive, and harassing in nature, and/or would require Plaintiff to incur an undue expenditure of money and time to respond to the request for every person who witnessed Defendant's discrimination.

Without waiving these objections, particularly because Plaintiffs are still discovering relevant information, Plaintiff responds that his allegations are in his Complaint, paragraphs 1 to 82 and described above in Answer to Interrogatory No. 12.  Defendant is in the best position to ascertain the contact information for its current and former employees.  Plaintiff reserves the right to supplement this answer.

**REQUEST FOR PRODUCTION NO. 13.:**  Please produce true and correct copies of any documents or tangible items related to or supporting your response to the preceding Interrogatory.

**RESPONSE:**

Plaintiff asserts all the  General  Objections listed above.  In particular, Plaintiff objects to the Request to the extent that it seeks information which is privileged under attorney-client privilege and/or protected from disclosure under the work-product doctrine, including draft reports.  Plaintiff also objects to the extent Defendant seeks documents or information that is readily or more accessible to Defendant from Defendant's own files, from documents or information in Defendant's possession, or from documents or information that Defendant previously produced to Plaintiff, and which Plaintiff is therefore not under the obligation to produce.

Subject to, and without waiving the foregoing objections, Plaintiff responds as follows:

- Appeal of Discrimination and Harassment Decision (June 22, 2020)
- Discrimination and Retaliation Complaint (Aug. 18, 2020)
- FWD: Status on Decision for Discrimination and Harassment (Oct. 5, 2020))
- Response to Appeal of Discrimination and Harassment (Dec. 10, 2020)
- Workplace Sign-Up Sheet

Plaintiff reserves the right to supplement this answer.

1

**ANSWER:**

2    Plaintiff incorporates his General Objections above.  Plaintiff further objects to this

3 request as burdensome, oppressive, harassing, and abusive of the discovery process to the extent

4 the interrogatory, individually and cumulatively, calls for the disclosure of information that is

5 not relevant to any contentions and allegations in the Complaint, and irrelevant to any party's

6 claim or defense and proportional to the needs of the case.  Plaintiff further objects that this

7 question invades his right to privacy because it requests information from individuals who are

8 not persons referred to or reference a person in the Complaint.  Plaintiff further objects to this

9 question because it seeks information that is neither relevant to the subject matter of this action

10 nor reasonably calculated to lead to the discovery of admissible evidence.

11    Subject to, and without waiving the foregoing objections, Plaintiff responds as follows:

12    • Martha Alanis (wife)

13

14 Dated:  January 14, 2022                              MEXICAN AMERICAN LEGAL
                                                          DEFENSE AND EDUCATONAL FUND
15
                                                          By:    /s/Andrés R. Holguin-Flores
16                                                               Leticia Saucedo
                                                                 Andrés R. Holguin-Flores
17                                                               Luis L. Lozada
                                                                 634 S. Spring Street, 11th Floor
18                                                               Los Angeles, California 90014
                                                                 lsaucedo@maldef.org
19                                                               aholguin-flores@maldef.org
                                                                 llozada@maldef.org
20                                                               scontreras@maldef.org
21
                                                          *Attorneys for Plaintiffs*
22

23                                                        BRESKIN, JOHNSON, TOWNSEND PLLC
24
                                                          Roger M. Townsend, WSBA No. 25525 1000
25                                                        Second Avenue, Suite 3670
                                                          Seattle, WA 98104
26                                                        Telephone: (206) 652-8660 Facsimile: (206) 652-
                                                          8290 rtownsend@bjtlegal.com
27
                                                          *Attorneys for Plaintiffs*
28

1

## <u>VERIFICATION</u>

2

3    I, _Ray Alanis_, certify and declare under penalty of perjury under 28 U.S.C. §1764

4    and the laws of the United States of America that the foregoing answers and responses to

5    DEFENDANT CLARK COUNTY'S INTERROGATORIES AND REQUEST FOR

6    PRODUCTION OF DOCUMENTS, SET ONE TO PLAINTIFF _Ray Alanis_ are true

7    and correct.

8

9

10    Dated: 1/14/2022  _Ray Alanis_

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the State of California that on

January 14, 2022, a true and correct copy of the foregoing was served upon the parties listed

below *via email*:

| **Attorney for Plaintiffs** | **Attorneys for Defendant** |
|---|---|
| Roger M. Townsend<br>BRESKIN JOHNSON & TOWNSEND PLLC<br>1000 Second Ave., Suite 3670<br>Seattle, WA  98104<br>Phone: 206-652-8660<br>Fax: 206-652-8290<br>Email:  rtownsend@bjtlegal.com | Jayne L. Freeman<br>Audrey M. Airut Murphy<br>KEATING BUCKLIN & MCCORMACK, INC., P.S.<br>801 2nd Avenue, Suite 1210<br>Seattle, Washington 98104<br>Phone: 206-623-8861<br>Fax: 206-223-9423<br>Email:  JFreeman@kbmlawyers.com<br>amurphy@kbmlawyers.com<br>LWalker@kbmlawyers.com<br>LMartin@kbmlawyers.com |

DATED this 14th day of January 2022 in Sacramento, California.

*/s/* Susana Contreras

Susana Contreras

The Honorable David G. Estudillo

1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT

9                           WESTERN DISTRICT OF WASHINGTON

10

11   ELIAS PEÑA, ISAIAH HUTSON, and         Case No.: 3:21-CV-05411-DGE
     RAY ALANIS,

12                    Plaintiffs,            PLAINTIFF ISAIAH HUTSON'S RESPONSES
                                             TO DEFENDANT'S FIRST
13          v.                               INTERROGATORIES AND REQUESTS FOR
                                             PRODUCTION
14   CLARK COUNTY, WASHINGTON,

15                    Defendant.

16                                           JUDGE: Hon. Judge David G. Estudillo

17

18          TO:          Defendant Clark County, Washington

19                       Jayne L. Freeman, Audrey M. Airut Murphy

20                       KEATING BUCKLIN & MCCORMACK, INC., P.S.

21                       Attorneys for Defendant

22

23

24

25

26

27

28

**RESPONSE:**

Plaintiff asserts all the General Objections listed above. In particular, Plaintiff objects that this Request is overbroad and unduly burdensome, in that it specifies no time period for the documents sought. Plaintiff objects to the extent that this Request seeks information that is not relevant to the subject matter or reasonably calculated to lead to the discovery of admissible evidence. Plaintiff also objects to the Request to the extent it is vague, ambiguous, oppressive, and unduly burdensome. Plaintiff further objects to the extent the Request seeks documents that are irrelevant to any party's claim or defense and proportional to the needs of the case. Plaintiff responds as follows: Plaintiff does not possess any non-privileged information to establish that he was a party to a previous civil or criminal lawsuit that is relevant under Federal Rule of Evidence 609.

**INTERROGATORY NO. 12.:** Please state each and every fact, including names, addresses and telephone numbers of witnesses with knowledge of such facts, upon which you base your allegation in paragraph 1 of Plaintiff's Complaint that Defendant Clark County discriminated against Plaintiff Hutson on the basis of race and national origin. Please include in your response the name, phone number, and address of each witness with knowledge of such facts.

**ANSWER:**

Plaintiff incorporates his General Objections above as though fully set forth herein. Plaintiff further objects to this request as premature, burdensome, oppressive, harassing, and abusive of the discovery process to the extent the interrogatory, individually and cumulatively, calls for the disclosure of information that supports the contentions and allegations in the Complaint. Contention interrogatories are premature and improper at this juncture of the litigation before discovery has not been completed. Also, Plaintiff objects that this request is premature because the answer depends on information in Defendant's possession. Plaintiff further objects to the extent Defendant seeks information that is readily or more accessible to Defendant from Defendant's own files, from documents or information in Defendant's possession, or from documents or information that Defendant previously produced to Plaintiff,

and which Plaintiff is therefore not under the obligation to produce.  Plaintiff further objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, oppressive, and irrelevant to any party's claim or defense and proportional to the needs of the case.  Plaintiff further objects to this request on the basis that it calls for information protected by the attorney-client privilege and attorney work-product doctrine. Plaintiff objects that this question seeks disclosure of witnesses and information collected by interviews, and therefore violates the attorney work product exemption and seeks information protected by attorney-client privilege. Plaintiff also objects that this question is unduly burdensome, oppressive, and harassing in nature, and/or would require Plaintiff to incur an undue expenditure of money and time to respond to the request for "each and every" person who witnessed Defendant's discrimination.

Without waiving these objections, particularly because Plaintiffs are in the process of discovering relevant information, Plaintiff responds that his allegations are in his Complaint, paragraphs 1 to 82.  He further responds that, sometime in 2017, Plaintiff heard a crew chief tell the crew "[the] new Trump wall is working because we only have one Mexican left to get rid of."

In the latter part of 2017, Plaintiff's supervisors began to treat him with hostility in contrast to their non-Latino colleagues.  Sometime in 2017, Plaintiff learned that a crew chief said "the County is going to shit because they keep hiring all of these beaners and spics."  Plaintiff reported the statement to his superintendent, but did not receive a response.

Through most of time period of around 2018, supervisors began to overly-scrutinized Plaintiffs' work, especially when they worked as the interim crew chief.  Crew chiefs repeatedly encouraged and selected non-Latino employees to fill in as interim crew chief whenever Plaintiffs volunteered for the position.

Crew chiefs directed additional racist remarks to and around Plaintiffs.  Around the summer of 2018, Plaintiff heard a crew chief say "it's a good day at the County boys.  Trump is kicking out the Mexicans and the cops are killing ni**ers."

Beginning in around 2019, crew chiefs referred to the primarily Latino crew that included Plaintiffs:  the "Manuel labor crew" (replace the English word "manual" with the

Spanish name "Manuel"); the "Brown crew"; the "Landscaping crew"; and, that they "work for their White master."  Around May 2019, Plaintiff heard a crew chief, in a threatening manner, that Latinos were "cancers" who made the County worse, in reference to the increase of Latinos who moved to Clark County.  The crew chief implied violence against Latinos when he said that he was "working on getting rid of cancer in the County" and that he would "cut it out because some of 'them' think they are untouchable."  Plaintiff Hutson immediately reported the statement to Defendant human resources employee.  On information and belief, Defendant did not investigate and/or discipline the crew chief for his remarks.

Defendant subjected Plaintiff to a pattern of additional procedures to obtain additional pay and benefits to which they are entitled that their non-Latino colleagues are not subjected to. Plaintiff experienced differential treatment in pay, which was ultimately resolved in the grievance process.  Non-Latino employees appeared to receive the additional pay as a matter of course, however Plaintiff had to file union grievances to obtain the same extra earned pay.

In the December 2019 and January 2020 meetings with HR Representatives, Plaintiff complained that he felt humiliated by supervisors' mistreatment and the racist remarks.   Plaintiff shared all of the complaints about discrimination that he had shared during meetings with Defendant's human resources employees around March and April 2020.

On or around June 18, 2020, Defendant human resources letter to Plaintiffs stated that Defendant's human resources department concluded that "no County policies were violated." Plaintiffs then filed a combined appeal of Defendant's human resources department's decision to dismiss their complaints.

In around late August 2020, Plaintiff met the County manager.  Plaintiff reiterated his complaints in greater detail.  On or around December 10, 2020, the County informed Plaintiffs that it did not find a violation of any County policies.  Plaintiff exhausted his efforts to remedy the discrimination through the County.

On or around February 18, 2021, for multiple days Plaintiffs were subjected to seeing a sign-up sheet for extra work that was posted in a common area in which someone crossed out Latino employee's name and replaced it with "Donald J. Trump."  As a result of Defendant's

maintenance of a hostile work environment, Plaintiff suffered harm, including emotional

distress, in an amount to be determined at trial.

Without waiving these objections, while Plaintiffs are still discovering relevant

information, Plaintiff responds that the identities of the potential witnesses are in his Initial

Disclosures on pages 2 to 5 and described above in Answer to Interrogatory No. 12.    Plaintiff

further responds that these witnesses include:

- Union representative Larry Clark
- Union representative Darryl Young
- Jeff Tuttle
- Isidrio Flores
- Julio Morales
- Ed Day
- Pat Cosgrove
- Andrew Smith
- Kenny Hugo
- Kara Hill
- Mande Lawrence
- Carl Oman
- Ahmad Quayomi
- Micah Passmore
- Eddie Perez
- Gauge Bryant

Defendant is in the best position to ascertain the contact information for its current and

former employees.  Plaintiff reserves the right to supplement this answer.

**REQUEST FOR PRODUCTION NO. 11.:**  Please produce any documents or tangible

item that is related to or supports your response to the preceding Interrogatory.

**RESPONSE:**

Plaintiff asserts all the  General  Objections listed above.  In particular, Plaintiff objects

1   not relevant to any contentions and allegations in the Complaint, and irrelevant to any party's

2   claim or defense and proportional to the needs of the case.  Plaintiff further objects that this

3   question invades his right to privacy because it requests information from individuals who are

4   not persons referred to or reference a person in the Complaint.  Plaintiff further objects to this

5   question because it seeks information that is neither relevant to the subject matter of this action

6   nor reasonably calculated to lead to the discovery of admissible evidence.

7         Subject to, and without waiving the foregoing objections, Plaintiff responds as follows:

8   • Sabrina Hutson (360-909-6672)

9   • Ray Woodson, Jr. (360-518-3784)

10  • Pastor Ray Woodson, Sr. (360-798-3232)

11

12  Dated:  January 14, 2022                    MEXICAN AMERICAN LEGAL
                                                DEFENSE AND EDUCATONAL FUND
13
                                        By:     /s/Andrés R. Holguin-Flores
14                                              Leticia Saucedo
                                                Andrés R. Holguin-Flores
15                                              Luis L. Lozada
                                                634 S. Spring Street, 11th Floor
16                                              Los Angeles, California 90014
                                                lsaucedo@maldef.org
17                                              aholguin-flores@maldef.org
                                                llozada@maldef.org
18                                              scontreras@maldef.org
                                                *Attorneys for Plaintiffs*
19
20
                                                BRESKIN, JOHNSON, TOWNSEND PLLC
21
                                                Roger M. Townsend, WSBA No. 25525 1000
22                                              Second Avenue, Suite 3670
                                                Seattle, WA 98104
23                                              Telephone: (206) 652-8660 Facsimile: (206) 652-
                                                8290 rtownsend@bjtlegal.com
24
                                                *Attorneys for Plaintiffs*
25

26

27

28

**VERIFICATION**

I, _Isaiah Hutson_, certify and declare under penalty of perjury under 28 U.S.C. §1764 and the laws of the United States of America that the foregoing answers and responses to DEFENDANT CLARK COUNTY'S INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS, SET ONE TO PLAINTIFF _Isaiah Hutson_ are true and correct.

Dated: _1/13/22_   _Isaiah Hutson_

**DECLARATION OF SERVICE**

I declare under penalty of perjury under the laws of the State of California that on

January 14, 2022, a true and correct copy of the foregoing was served upon the parties listed

below *via email*:

| *Attorney for Plaintiffs* | *Attorneys for Defendant* |
|---|---|
| Roger M. Townsend | Jayne L. Freeman |
| BRESKIN JOHNSON & TOWNSEND PLLC | Audrey M. Airut Murphy |
| 1000 Second Ave., Suite 3670 | KEATING BUCKLIN & MCCORMACK, INC., P.S. |
| Seattle, WA  98104 | 801 2nd Avenue, Suite 1210 |
| Phone: 206-652-8660 | Seattle, Washington 98104 |
| Fax: 206-652-8290 | Phone: 206-623-8861 |
| Email:  rtownsend@bjtlegal.com | Fax: 206-223-9423 |
| | Email:  JFreeman@kbmlawyers.com |
| | amurphy@kbmlawyers.com |
| | LWalker@kbmlawyers.com |
| | LMartin@kbmlawyers.com |

DATED this 14th day of January 2022 in Sacramento, California.


*/s/* Susana Contreras

Susana Contreras

The Honorable David G. Estudillo

1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

10

11

12

13

14

15

16

| ELIAS PEÑA, ISAIAH HUTSON, and RAY ALANIS, | Case No.: 3:21-CV-05411-DGE |
|---|---|
| Plaintiffs, | PLAINTIFF ELIAS PEÑA'S RESPONSES TO DEFENDANT'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION |
| v. | |
| CLARK COUNTY, WASHINGTON, | |
| Defendant. | JUDGE: Hon. Judge David G. Estudillo |

17

18

19

20

TO:          Defendant Clark County, Washington

Jayne L. Freeman, Audrey M. Airut Murphy

KEATING BUCKLIN & MCCORMACK, INC., P.S.

Attorneys for Defendant

21

22

23

24

25

26

27

28

1   responds as follows:  Plaintiff does not possess any non-privileged documents.

2   **INTERROGATORY NO. 12.:**  Please state each and every fact, including names,

3   addresses and telephone numbers of witnesses with knowledge of such facts, upon which you

4   base your allegation in paragraph 1 of Plaintiff's Complaint that Defendant Clark County

5   discriminated against Plaintiff Peña on the basis of race and national origin. Please include in

6   your response the name, phone number, and address of each witness with knowledge of such

7   facts.

8   **ANSWER:**

9   Plaintiff incorporates his General Objections above as though fully set forth herein.

10  Plaintiff further objects to this request as premature, burdensome, oppressive, harassing, and

11  abusive of the discovery process to the extent the interrogatory, individually and cumulatively,

12  calls for the disclosure of information that supports the contentions and allegations in

13  the Complaint.  Contention interrogatories are premature and improper at this juncture of the

14  litigation before discovery has not been completed.  Also, Plaintiff objects that this request is

15  premature because the answer depends on information in Defendant's possession.  Plaintiff

16  further objects to the extent Defendant seeks information that is readily or more accessible to

17  Defendant from Defendant's own files, from documents or information in Defendant's

18  possession, or from documents or information that Defendant previously produced to Plaintiff,

19  and which Plaintiff is therefore not under the obligation to produce.  Plaintiff further objects to

20  this interrogatory on the grounds that it is overly broad, unduly burdensome, oppressive, and

21  irrelevant to any party's claim or defense and proportional to the needs of the case.  Plaintiff

22  further objects to this request on the basis that it calls for information protected by the attorney-

23  client privilege and attorney work-product doctrine. Plaintiff objects that this question seeks

24  disclosure of witnesses and information collected by interviews, and therefore violates the

25  attorney work product exemption and seeks information protected by attorney-client privilege.

26  Plaintiff also objects that this question is unduly burdensome, oppressive, and harassing in

27  nature, and/or would require Plaintiff to incur an undue expenditure of money and time to

28  respond to the request for "each and every" person who witnessed Defendant's discrimination.

1

2      Without waiving these objections, particularly because Plaintiffs are in the process of

3   discovering relevant information, Plaintiff responds that his allegations are in his Complaint,

4   paragraphs 1 to 82.  He further responds that, on or about June 2017, a crew chief, when

5   referring to Plaintiff Peña and Plaintiff Hutson moving to a different shed, told the crew "[the]

    new Trump wall is working because we only have one Mexican left to get rid of."

6      In the latter part of 2017, Plaintiff's supervisors began to treat Plaintiff Peña and Plaintiff

7   Hutson with hostility in contrast to their non-Latino colleagues.  On or about October 2017,

8   Plaintiff learned that a crew chief said "the County is going to shit because they keep hiring all

9   of these beaners and spics."  Plaintiff Hutson reported the statement to his superintendent, but

10  did not receive any additional response.

11     Through most of 2018, Plaintiffs' superintendent overly-scrutinized Plaintiffs' work,

12  especially when they worked as the interim crew chief.  Crew chiefs repeatedly encouraged and

13  selected non-Latino employees to fill in as interim crew chief whenever Plaintiffs volunteered

14  for the position.

15     Crew chiefs directed additional racist remarks to and around Plaintiffs.  Around the

16  summer of 2018, a former crew chief walked into a break room and said "it's a good day at the

17  County boys.  Trump is kicking out the Mexicans and the cops are killing ni**ers."

18     Beginning in or around 2019, crew chiefs referred to the primarily Latino crew that

19  included Plaintiffs:  the "Manuel labor crew" (replace the English word "manual" with the

20  Spanish name "Manuel"); the "Brown crew"; the "Landscaping crew"; and, that they "work for

21  their White master."

22     Defendant subjected Plaintiffs to a pattern of additional procedures to obtain additional

23  pay and benefits to which they are entitled that their non-Latino colleagues are not subjected to.

24  Plaintiff experienced differential treatment in pay, which they ultimately resolved in the

25  grievance process.  Non-Latino employees appeared to receive the additional pay as a matter of

26  course, however Plaintiffs had to file union grievances to obtain the same earned extra pay.

27     On or about July 2019, a superintendent insisted that Plaintiff Peña's employment was in

28  jeopardy if he did not obtain a specialized license from the Washington Department of Licensing

1    in an unreasonably short amount of time because Plaintiff Peña could not conceivably complete

2    the pre-requisite training for the license.  On information and belief, two non-Latino employees

3    were permitted months to obtain the same license.  Plaintiff Peña had to file a union grievance

4    for additional time, which resulted in him having more training time, however, Defendant did

5    not respond to Plaintiff Peña's complaints that the conduct was discriminatory.

6         In the December 2019 and January 2020 meetings with County HR representatives

7    Plaintiff Peña complained that he felt humiliated by supervisors' mistreatment and racist

8    remarks.  Plaintiffs shared all of the complaints about discrimination that they had shared during

9    meetings with Defendant's human resources representatives on or about March and April 2020.

10        On or around June 18, 2020, Defendant human resources sent Plaintiff a letter that stated

11   that Defendant's human resources department concluded that "no County policies were

12   violated."  Plaintiffs then filed a combined appeal of Defendant's human resources department's

13   decision to dismiss their complaints.

14        On or about July 1, 2020, Plaintiffs Peña and Alanis shared a work truck together.  On or

15   around July 3, 2020, Plaintiff Alanis tested positive for COVID-19.  On or about July 5, 2020, a

16   superintendent, upon learning that Plaintiff Alanis had tested positive, sent home two non-Latino

17   employees who had worked with Plaintiff Alanis and Plaintiff Peña a few days earlier.  Plaintiff

18   Peña informed his supervisor that he had also worked with Plaintiff Alanis so he requested time

19   off to take a COVID-19 test and quarantine, but the supervisor denied Plaintiff Peña's request

20        On or about August 2020, Plaintiff Peña met with Defendant regarding his appeal.  He

21   provided all of the complaints above in greater detail.  On or about December 10, 2020,

22   Defendant informed Plaintiffs that it did not find a violation of any County policies. Plaintiff

23   exhausted his efforts to remedy the discrimination through the County.

24        On or about February 18, 2021, for multiple days Plaintiffs were subjected to seeing a

25   sign-up sheet for extra work that was posted in a common area in which someone crossed out

26   Latino employee's name and replaced it with "Donald J. Trump."  As a result of Defendant's

27   maintenance of a hostile work environment, Plaintiff suffered harm, including emotional

28   distress, in an amount to be determined at trial.

1   Without waiving these objections, while Plaintiffs are still discovering relevant

2   information, Plaintiff responds that the identities of the potential witnesses are in his Initial

3   Disclosures on pages 2 to 5 and described above in Answer to Interrogatory No. 12.    Plaintiff

4   further responds that these witnesses include:

5   - Union representative Larry Clark

6   - Union representative Darryl Young

7   - Isidrio Flores

8   - Julio Morales

9   - Andrew Smith

10   - Kenny Hugo

11   - Kara Hill

12   - Mande Lawrence

13   - Carl Oman

14   - Ahmad Quayomi

15   - Micah Passmore

16   - Eddie Perez

17   - Gauge Bryant

18   - Marc Smith

19   Defendant is in the best position to ascertain the contact information for its current and

20   former employees.  Plaintiff reserves the right to supplement this answer.

21   **REQUEST FOR PRODUCTION NO. 11.:**  Please produce any documents or tangible

22   item that is related to or supports your response to the preceding Interrogatory.

23   **RESPONSE:**

24   Plaintiff asserts all the General Objections listed above.  In particular, Plaintiff objects to

25   the Request to the extent that it seeks information which is privileged under attorney-client

26   privilege and/or protected from disclosure under the work-product doctrine, including draft

27   reports.  Plaintiff also objects to the extent Defendant seeks documents or information that is

28   readily or more accessible to Defendant from Defendant's own files, from documents or

1   **ANSWER:**

2       Plaintiff incorporates his General Objections above.  Plaintiff further objects to this

3   request as burdensome, oppressive, harassing, and abusive of the discovery process to the extent

4   the interrogatory, individually and cumulatively, calls for the disclosure of information that is

5   not relevant to any contentions and allegations in the Complaint.  Plaintiff further objects that

6   this question invades his right to privacy because it requests information from individuals who

7   are not persons referred to or reference a person in the Complaint.  Plaintiff further objects to

8   this question because it seeks information that is neither relevant to the subject matter of this

9   action nor reasonably calculated to lead to the discovery of admissible evidence.  Subject to, and

10  without waiving the foregoing objections, Plaintiff responds as follows:

11      • Jeremy Fields (Clark County detective)

12           o Phone number: 360-721-1964

13      • Tey Draszt (VA contractor)

14           o Phone number: 360-771-7477

15  Dated:  January 14, 2022             MEXICAN AMERICAN LEGAL
                                   DEFENSE AND EDUCATONAL FUND

16

17                              By:    /s/Luis L. Lozada
                                        Leticia Saucedo

18                                      Andrés R. Holguin-Flores
                                        Luis L. Lozada

19                                      634 S. Spring Street, 11th Floor
                                        Los Angeles, California 90014

20                                      lsaucedo@maldef.org

21                                      aholguin-flores@maldef.org
                                        llozada@maldef.org

22                                      scontreras@maldef.org
                                        *Attorneys for Plaintiffs*

23

24                                      BRESKIN, JOHNSON, TOWNSEND PLLC

25                                      Roger M. Townsend, WSBA No. 25525 1000
                                        Second Avenue, Suite 3670

26                                      Seattle, WA 98104
                                        Telephone: (206) 652-8660 Facsimile: (206) 652-

27                                      8290 rtownsend@bjtlegal.com

28                                    *Attorneys for Plaintiffs*

1

2

### **<u>VERIFICATION</u>**

3      I, _____, certify and declare under penalty of perjury under 28 U.S.C. §1764

and the laws of the United States of America that the foregoing answers and responses to

4   DEFENDANT CLARK COUNTY'S INTERROGATORIES AND REQUEST FOR

5   PRODUCTION OF DOCUMENTS, SET ONE TO PLAINTIFF _____ are true

and correct.

6

7

Dated: _____      _____

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>VERIFICATION</u>

I, Elias Peña _____, certify and declare under penalty of perjury under 28 U.S.C. §1764 and the laws of the United States of America that the foregoing answers and responses to DEFENDANT CLARK COUNTY'S INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS, SET ONE TO PLAINTIFF _____ are true and correct.

Elias Peña

Dated:
1/13/22   _____

## DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the State of California that on January 14, 2022, a true and correct copy of the foregoing was served upon the parties listed below ***via email***:

**Attorney for Plaintiffs**

Roger M. Townsend
BRESKIN JOHNSON & TOWNSEND
PLLC
1000 Second Ave., Suite 3670
Seattle, WA  98104
Phone: 206-652-8660
Fax: 206-652-8290
Email:  rtownsend@bjtlegal.com

**Attorneys for Defendant**

Jayne L. Freeman
Audrey M. Airut Murphy
KEATING BUCKLIN & MCCORMACK, INC., P.S.
801 2nd Avenue, Suite 1210
Seattle, Washington 98104
Phone: 206-623-8861
Fax: 206-223-9423
Email:  JFreeman@kbmlawyers.com
amurphy@kbmlawyers.com
LWalker@kbmlawyers.com
LMartin@kbmlawyers.com

DATED this 14th day of January, 2022, in Sacramento, California.

*/s/* Susana Contreras

Susana Contreras